**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAPITOL JUSTICE LLC, *et al.,* | Civil Action No.: 1:07-cv-02095-RCL |
| Plaintiffs, | |
| v. | **AMENDED COMPLAINT** |
| WACHOVIA CORPORATION, *et al.,* | **JURY TRIAL DEMANDED** |
| Defendants. | |

For their Amended Complaint against Wachovia Corporation, Wachovia Bank, N.A., Wachovia Capital Markets, LLC, Wachovia Securities, LLC (collectively "Wachovia"), and Sandor Biderman (with Wachovia, collectively, "Defendants"), Plaintiffs Capitol Justice LLC and American Association for Justice, by their attorneys, Shulman, Rogers, Gandal, Pordy & Ecker, P.A., upon knowledge as to their own actions and dealings and upon information and belief as to Defendants and their actions, allege as follows:

**NATURE OF THE ACTION**

1.      By this action, American Association for Justice (along with its subsidiary, Capitol Justice LLC, "AAJ" or "Plaintiffs") seeks to hold Wachovia accountable for reneging on a written agreement to lend it $89.5 million for the purchase of a premier commercial office building in Washington, D.C. (the "Loan"), as well as for fraud, breach of fiduciary duty, negligent misrepresentation, and breach of the duty of good faith and fair dealing committed by Wachovia and Biderman throughout the course of the parties' relationship.

2.      Wachovia and Biderman induced AAJ to enter a loan commitment agreement and rate lock agreement by specific representations about the current and anticipated state of the market for commercial mortgage-backed securities ("CMBS"), Wachovia's unique qualifications

and ability to fund and sell the Loan to CMBS or other secondary buyers or investors, and the meaning of a provision in the commitment agreement, which at best (for Wachovia) is vague and ambiguous, that it now seeks to rely upon to avoid its obligation to make the Loan.

3.      These were critical representations, without which AAJ never would have proceeded to enter a loan commitment agreement and rate lock agreement with Wachovia.  This is because the loan commitment agreement contained a provision purporting to allow Wachovia to terminate the Loan, in very limited circumstances, based on "material adverse changes" in market conditions affecting Wachovia's ability to sell all or part of the Loan as contemplated by the parties.  At the time it committed to make the Loan to AAJ, Wachovia specifically sought to allay AAJ's concerns about the meaning of this provision as well as the risk of Wachovia's invoking it.  At the time, there were media reports of a downturn in the CMBS market.  During the parties' negotiations, AAJ expressed its concern to Wachovia because of the provision's possible ambiguity.  Wachovia assured AAJ that it was the "largest CMBS lender in the market" and that, because of its extensive market knowledge and expertise, it could and would make the Loan to AAJ and sell all or part of it in the secondary markets.  Thus, Wachovia told AAJ that it should have "no worries" that the "material adverse change" clause of the loan commitment agreement could be triggered because the factual predicate for doing so would not exist. Wachovia told AAJ to place its trust in Wachovia that it would be able to make and sell the Loan in all but the most extreme and unforeseeable of circumstances.

4.      Wachovia made these representations and commitments to AAJ knowing that existing and forecasted market conditions made it impossible or extremely difficult for Wachovia profitably to securitize or sell a loan with a profile similar to that being offered to AAJ and that, therefore, Wachovia had no intention of honoring the loan commitment, which included a fixed,

locked interest rate, unless, against long odds, market conditions dramatically improved. Wachovia thus concealed from AAJ its knowledge of the extraordinary risk that Wachovia would seek to invoke the "material adverse change" provision in the loan commitment agreement. Indeed, in sharp contrast to its assurances to AAJ, Wachovia secretly viewed this provision as its "ace in the hole" for extricating itself from a loan it knew it was likely later to abandon.

5.    Wachovia deliberately concealed from AAJ its knowledge that it most likely would not honor the loan commitment, which was based on Wachovia's specialized market knowledge and experience, so that AAJ would be induced to enter the loan commitment agreement and rate lock agreement. Wachovia gambled that if, contrary to its expectation, the CMBS market improved and Wachovia could find a palatable way of securitizing the Loan, it would reap large profits and expand its share of the lucrative, and fiercely competitive, market for CMBS loans. If, as it anticipated, however, Wachovia were not able to find investors for AAJ's Loan, it would simply abandon the Loan and leave AAJ to deal with the consequences.

6.    Wachovia's misleading sales tactics with respect to AAJ were part of a broader, highly aggressive strategy for Wachovia to become and maintain its position as the leader in the CMBS lending marketplace. As reported by the Wall Street Journal on August 26, 2006 (*The Tough Guy of Big Mortgages Boosts Wachovia—Mr. Verrone Bumps Off Rivals in $50 Million-Plus Loan Niche; Pistachio Shells on Park Avenue*), in less than three years, Wachovia moved from "hardly any presence" in $50-million-plus mortgages to the nation's top CMBS loan originator. Spearheading this effort was Wachovia's Robert "Big Loan" Verrone, who, according to an October 3, 2007 Reuters report (*"Big Loan" Problem at Wachovia*), was recently named co-head of Wachovia's Real Estate Americas group, and was instrumental in

helping Wachovia more than double the volume of loans it placed in CMBS structures during the first half of 2007 compared with the previous year.  According to Reuters, "Some rival bankers called Wachovia 'reckless' in building its CMBS market share and say it is now sitting on billions of property debt that investors find too risky."  None of these ulterior motives, or the risks that investors would balk at Wachovia's unmarketable loan portfolio, were ever disclosed to AAJ, which placed its complete trust and confidence in Wachovia based on Wachovia's representations and assurances.

7.    AAJ explained to Wachovia that it needed a firm loan commitment because it had signed a purchase agreement to acquire the office building and, upon expiration of the due diligence period under that agreement, AAJ would have its $5 million earnest money deposit at risk.  AAJ told Wachovia that without a firm loan commitment, AAJ stood to lose the $5 million deposit and the opportunity to acquire the building.  AAJ informed Wachovia that, given its financial circumstances and as a non-profit organization, it was unwilling to bear that risk.  Relying on Wachovia's representations, in late June 2007, AAJ entered the loan commitment agreement, allowed the due diligence period to expire, and ceased its pursuit of alternative financing options to acquire the building.  AAJ also signed a rate lock agreement, paid Wachovia $1.79 million to lock in an interest rate for the Loan of 6.02%, and paid Wachovia a further deposit of $20,000.

8.    On October 22, 2007, less than eight weeks before AAJ was to close on its acquisition of the building, Wachovia notified AAJ that, due to what it claimed was a "material and adverse change in the fixed income sector of the capital markets," Wachovia would not honor its commitment to loan AAJ the $89.5 million because it claimed "it would be unable to effect a Securitization of the Loan if the Loan were made upon the financial terms committed."

Contrary to Wachovia's assertion, however, there had not been a "material adverse change" in market conditions sufficient to permit termination under the loan commitment agreement, and thus there was (and there continues to be) no permissible basis for Wachovia to evade its commitment to loan AAJ the funds needed for its acquisition of the building.  On November 16, 2007, Wachovia notified AAJ that it had unilaterally terminated the rate lock agreement, resulting in further damage to AAJ.

9.     Wachovia's eleventh-hour repudiation of its obligation to fund the $89.5 million Loan in accordance with the terms of the loan commitment agreement stands to cause and has caused AAJ enormous harm because AAJ has been unable to procure comparable alternative financing and thus may lose the opportunity to purchase the building, which was to house its future offices, and may forfeit its $5 million deposit.  Even if alternative financing could be procured prior to the closing date, the cost of that financing would be tens of millions of dollars greater than the cost of the Wachovia Loan.  By this lawsuit, AAJ seeks to enforce Wachovia's commitment and to obtain direct, consequential, punitive, and ancillary damages arising from Wachovia's contractual breaches and fraudulent and otherwise bad faith tactics in connection with the Loan.

## **PARTIES**

10.     Plaintiff Capitol Justice LLC ("Capitol Justice") is a limited liability company organized and existing under the laws of the District of Columbia, with its principal place of business located at 1050 31st Street, N.W., Washington, D.C. 20007.

11.     Plaintiff American Association for Justice, formerly known as the Association of Trial Lawyers of America, is a non-profit corporation organized and existing under the laws of the District of Columbia, with its principal place of business located at 1050 31st Street, N.W.,

Washington, D.C. 20007.  American Association for Justice is the parent and managing member of Capitol Justice.  The mission of American Association for Justice is to promote a fair and effective justice system, and to support the work of attorneys in their efforts to ensure that any person who is injured by the misconduct of others can obtain justice in America's courtrooms, even when taking on the most powerful interests, such as large financial institutions.

12.     Defendant Wachovia Corporation is a corporation organized and existing under the laws of Delaware, with its principal place of business located at 1 Wachovia Center, Charlotte, North Carolina 28288 and offices in more than 21 states and the District of Columbia. Wachovia Corporation is the fourth largest bank holding company in the United States based on assets, with assets in excess of $754 billion.  In its most recent quarter, Wachovia Corporation recorded a net profit of $1.7 billion.

13.     Defendant Wachovia Bank, N.A. is a banking institution chartered by the U.S. Office of the Comptroller of the Currency, with its principal place of business located at 301 S. College Street, Charlotte, North Carolina 28288.

14.     Defendant Wachovia Capital Markets, LLC is a limited liability company organized and existing under the laws of Delaware, with its principal place of business located at 301 S. College Street, Charlotte, North Carolina 28288.  Wachovia Capital Markets, LLC is a wholly-owned subsidiary of Wachovia Corporation.

15.     Defendant Wachovia Securities, LLC is a limited liability company organized and existing under the laws of Delaware, with its principal place of business located at 901 East Byrd Street, Richmond, Virginia 23219.  Wachovia Securities, LLC is a wholly-owned subsidiary of Wachovia Corporation.

16.    Defendant Sandor Biderman is an individual who resides at 10731 Normandie Farm Drive, Potomac, Maryland 20854. Throughout the negotiations and execution of Wachovia's loan commitment, Biderman was a Director of Wachovia and in charge of Wachovia's commercial mortgage-backed securities business for the Washington, D.C. area.

## JURISDICTION AND VENUE

17.    This Court has subject-matter jurisdiction over all claims asserted in this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy in this action exceeds $75,000 and because there is complete diversity between the parties to this action, *i.e.*, Plaintiffs are citizens of different states than Defendants.

18.    This Court has personal jurisdiction over each of the Defendants pursuant to D.C. Code § 13-423.

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to this action took place in this judicial district.

## STATEMENT OF FACTS

### A.    AAJ's Execution of Agreements to Purchase the Property and Sell its Current Headquarters Building

20.    On or about March 30, 2007, AAJ entered into a Purchase and Sale Agreement ("Purchase Agreement") with 777 6th Street, LLC to purchase a commercial office building located at 777 6th Street, N.W. in Washington, D.C. (the "Property"). The purchase price for the Property was $105 million.

21.    The Property, which was built in 2007, is across the street from the Verizon Center and in the heart of the fastest developing section of the central business district of Washington, D.C. It is an eleven-story, Class A office building with approximately 187,937 square feet of net rentable area.

22.    At the time AAJ entered into the Purchase Agreement, the Property was entirely vacant, although approximately 54,000 square feet, or approximately 29% of the rentable area of the Property, is now occupied by the law firm Cooley Godward Kronish LLP ("Cooley Godward"), which entered into a ten-year lease that commenced in or about August 2007.

23.    As provided for in the Purchase Agreement, within three business days of executing the Purchase Agreement, AAJ made an initial earnest money deposit of $1 million.

24.    The Purchase Agreement provided for a 75-day due diligence period following signing, during which time AAJ could terminate its obligation to purchase the Property for any reason or for no reason, in its sole discretion.  By agreement between the parties to the Purchase Agreement, the due diligence period was extended through June 18, 2007.

25.    The Purchase Agreement provided that within three business days following expiration of the due diligence period, AAJ was required to make an additional earnest money deposit of $4 million, which AAJ timely made on or about June 21, 2007, bringing AAJ's total earnest money deposit on the Property to $5 million.

26.    Pursuant to the Purchase Agreement, closing on the purchase of the Property by AAJ is scheduled to occur on December 17, 2007.

27.    On or about March 30, 2007, AAJ entered into a Purchase and Sale Agreement ("Sale Agreement") with Castleton/31st Street LLC for the sale of AAJ's current headquarters building located at 1050 31st Street, N.W. in Washington, DC ("31st Street Property").

28.    Closing on the sale of the 31st Street Property pursuant to the Sale Agreement is scheduled to take place as early as December 28, 2007.

**B.     Pursuit of Financing From Wachovia**

29.     In February 2007, AAJ engaged The Staubach Company ("Staubach") to, among other things, assist it in obtaining financing for the purchase of the Property.  In March 2007, acting on behalf of AAJ, Staubach proceeded to contact prospective lenders to arrange the financing of approximately $89 million to meet AAJ's requirements for the purchase of the Property.

30.     Staubach focused its financing search on so-called "CMBS financing," which is obtained from lenders who extend large commercial purchase money loans and then, at some later point, attempt to pool all or portions of the loans in sets of securities offered to investors. More specifically, in a CMBS transaction, many single mortgage loans of varying size, property type and location are pooled and transferred to a trust, which issues a series of bonds that may vary in yield, duration and payment priority.  Nationally recognized rating agencies, such as Moody's, Standard & Poors, and Fitch Ratings, then assign credit ratings to the various bond classes ranging from investment grade to below investment grade and an unrated class which is subordinate to the lowest rated bond class.  Investors are then recruited to invest in one or more of the available bond classes.

31.     In addition to CMBS financing, Staubach also considered so-called "portfolio loans," which refers to loans that are originated by a lender and held on its balance sheet through maturity, as well as other financing options.

32.     Wachovia was among the lenders Staubach approached to discuss financing options for AAJ's acquisition of the Property.  Wachovia touts itself as a market leader in commercial mortgage transactions, including CMBS lending, portfolio loans, and various other financing structures.  Wachovia has more than 75 real estate professionals in 13 regional offices

handling commercial mortgage transactions, and has placed over $31.2 billion in commercial real estate transactions with institutional investors nationwide since 2001. Wachovia also holds itself out as a leading source of capital and strategic advice to organizations and trusts that cannot conduct commercial real estate transactions through traditional institutional or programmatic lending or investment. Wachovia regularly advises clients, and has advised AAJ, with respect to strategies to place loans with long-term lenders, such as insurance companies, for transactions that do not fit Wachovia's proprietary project finance programs.

33.     Staubach informed prospective lenders, including Wachovia, that AAJ's Board of Governors would be meeting to approve the purchase of the Property, and that such approval would be conditioned on entering into a binding commitment agreement with a lender to provide the requisite financing.

34.     Following its initial contact with Wachovia, Staubach was referred to Defendant Biderman, who, at the time, was a Director of Wachovia, and in charge of Wachovia's CMBS business for the Washington, D.C. area. Throughout the negotiations that ultimately led to Wachovia's making a written commitment to loan AAJ $89.5 million for the purchase of the Property, Biderman was the principal point of contact at Wachovia for AAJ, acting principally through Staubach. At all times relevant to this action, Biderman was acting as an agent for Wachovia.

35.     At Biderman's request, AAJ provided Wachovia with extensive information about the Property and the loan terms that it required. Among other things, AAJ informed Wachovia that:

        a.     AAJ needed approximately $89 million for the purchase of the Property on December 17, 2007;

b.      for its financing package, AAJ wished to eliminate the risk of a negative change in the market by locking in a fixed interest rate for its loan and obtaining a firm, binding loan commitment agreement from its lender;

c.      AAJ intended to sell the 31st Street Property, which housed its offices, on November 30, 2007;

d.      the Property was currently vacant and that the only portion of the approximately 187,000 square feet of space that had been leased was approximately 54,000 square feet (or about 29% of the total rentable space) to Cooley Godward, which would not begin paying rent until December 2007;

e.      following the purchase of the Property by AAJ, AAJ intended to lease approximately 61,000 square feet, which along with Cooley Godward would account for just under 62% of the building being leased, and that AAJ would not begin paying rent until April 2008;

f.      AAJ needed to finalize its financing for the purchase of the Property before the expiration of the due diligence period in mid-June under the Purchase Agreement;

g.      at the expiration of the due diligence period, AAJ would be making a non-refundable $4 million earnest money deposit for the purchase of the Property that would bring its total non-refundable, earnest money deposit to $5 million; and,

h.     AAJ's Board's approval of the purchase of the Property would be predicated upon whether AAJ had a binding loan commitment for the financing needed to purchase the Property.

36.     On or about April 26, 2007, Wachovia sent a term sheet setting forth terms and conditions that Wachovia proposed for a loan to AAJ to finance its acquisition of the Property ("Term Sheet").  A true and correct copy of the Term Sheet is attached as Exhibit A.

37.     Among other things, the Term Sheet contemplated a loan of approximately $89.5 million over ten years, with interest-only amortization.  It also contemplated maximum loan-to-cost and loan-to-value ratios of 80% at closing.

38.     The Term Sheet proposed a loan that would later be sold or securitized in whole or in part.  In this regard, page 6 of the Term Sheet states that "Lender intends to sell all or a portion of the Financing by certificates, participations, securities or pari passu notes evidencing whole or component interests therein, through one or more public or private offerings (each a 'Securitization')."

39.     Page 3 of the Term Sheet provides for an origination fee of $10,000.

40.     Page 7 of the Term Sheet provides that "Borrower shall pay to Lender a good faith deposit of $20,000.00 (the 'Good Faith Deposit') simultaneously with its return of a countersigned copy of this Term Sheet."  Biderman acknowledged receiving the Good Faith Deposit in an email dated April 30, 2007.

41.     To protect itself from market fluctuations that could occur during the extended period between the time of negotiations of the financing package with Wachovia and the closing on the Property scheduled for December 17, 2007, AAJ insisted on locking in a fixed interest rate for the term of the Loan.

12

42.    On April 26, 2007, Biderman informed John Gibb at Staubach that, although "Wachovia is trying to limit our forward rate lock exposure and [is] only going to be rate locking transactions beyond a 60-day closing time [] on a select basis going forward," Wachovia would be able to provide AAJ with the rate lock it was seeking, although at a slightly higher rate than previously discussed.

43.    Biderman further informed Gibb that once the rate lock was executed, the interest rate risk would be eliminated and there would be, in his words, "no worries" with respect to AAJ's ability to count on Wachovia's making a loan in accordance with the Term Sheet. Biderman indicated that AAJ did not have to worry about the risk that Wachovia would be unable to fund and securitize the Loan, as Wachovia had extensive resources, market knowledge and expertise in doing so.

44.    On or about April 30, 2007, Wachovia and AAJ executed a Forward Rate Lock Agreement ("Rate Lock Agreement"), a true and correct copy of which is attached as Exhibit B. Page 6 of the Rate Lock Agreement is titled Form of Confirmation ("Confirmation").  The Rate Lock Agreement and Confirmation were prepared by Wachovia.  The Confirmation, which is dated April 2, 2007, and was executed by both parties, provides for a Lock Date of April 2, 2007, at a fixed rate of 6.02% per annum on a specified principal amount of $89.5 million.  The fixed rate period runs to and includes December 17, 2007, the closing date for AAJ's purchase of the Property.

45.    The Confirmation required AAJ to pay Wachovia a mandatory lock fee of $1,790,000, which AAJ wired to Wachovia upon execution of the Confirmation.

46.    Paragraph 4 of the Rate Lock Agreement provides, "The Mandatory Lock Fee shall be refundable provided that the applicable Loan is actually closed and funded in accordance

13

with this Agreement prior to the expiration of the applicable Fixed Rate Period." The Confirmation defines the Fixed Rate Period as extending from the date of the Confirmation to and including December 17, 2007.

47.    Paragraph 4 of the Rate Lock Agreement further provides that "a portion of the Mandatory Lock Fee shall be non-refundable (such non-refundable portion being the 'Transaction Costs Fee') and may be retained by Wachovia on account, and as a reasonable estimate, of the costs and expenses associated with and incurred by Wachovia in entering into and maintaining the Hedging Arrangements (the 'Transaction Costs')." Paragraph 3 of the Confirmation, however, indicates that the Transaction Costs Fee for the rate lock transaction for "the initial 228 day period for which the loan is locked but not funded" is $0.00.

48.    Paragraph 2(a) of the Rate Lock Agreement provides that to effect the rate lock transaction, "Wachovia shall enter into certain hedging arrangements in its sole and absolute discretion through the purchase or sale of United States Treasury notes, bonds or futures contracts, options or swaps on such notes, bonds or futures contracts or other measures deemed necessary or appropriate by Wachovia."

49.    Paragraph 3 of the Rate Lock Agreement provides that in the event Wachovia "does not issue a [loan] commitment by May 30th 2007, and Borrower elects to terminate the rate lock agreement, [Wachovia] shall not profit from any gains that are realized from the hedge agreement and all profits less costs shall be released to the Borrower."

50.    Although Wachovia did not, in fact, issue a loan commitment by May 30, 2007, AAJ, in reliance on Wachovia and Biderman's representations and assurances described below, did not elect to terminate the Rate Lock Agreement, pursuant to paragraph 3 of that agreement.

51.    Following the execution of the Rate Lock Agreement, the parties proceeded to negotiate the language of a loan commitment agreement, which AAJ required from Wachovia prior to the expiration of the due diligence period on the Purchase Agreement, after which AAJ could no longer terminate the Purchase Agreement without forfeiting its $5 million earnest money deposit.

**C.    Wachovia Induces AAJ to Enter the Loan
        Commitment Agreement by Offering
        Assurances and Representations Concerning
        Its Ability to Securitize or Sell the Loan and
        Its Intention to Honor the Loan Commitment**

52.    On or about May 18, 2007, Biderman sent AAJ a proposed loan commitment agreement, which was drafted entirely by Wachovia, for AAJ's review.  After reviewing the proposed loan commitment agreement, AAJ, acting principally though John Gibb at Staubach, expressed concern to Biderman about certain language and provisions, including paragraph 1.15(d), which purported to permit Wachovia to terminate its agreement to make the loan "in the event of any material adverse change in the financial, banking or capital market conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet."

53.    On May 23, 2007, AAJ proposed to Biderman striking paragraph 1.15(d) from the loan commitment agreement altogether.  AAJ noted that, among other things, the phrase "material adverse change" was not defined in the loan commitment agreement, was subject to interpretation, and was ambiguous.

54.    At or about the time Biderman and Gibb discussed the "material adverse change provision," Biderman and Wachovia were aware that there was substantial instability in the CMBS market and that, in particular, loans with a profile similar to the proposed AAJ Loan could not be successfully sold in the secondary markets.  Among the sources of Biderman's and

15

Wachovia's knowledge of the troubled market conditions were numerous reports by credit rating agencies and respected media outlets.

55.    Most notable was a report by Moody's, one of the leading agencies involved in rating CMBS securities, that was widely distributed on April 10, 2007, and was entitled: "US CMBS: Conduit Loan Underwriting Continues to Slide—Credit Enhancement Increase Likely." Moody's indicated that it intended to adjust its manner of rating CMBS securities to better reflect the risk associated with then-prevailing underwriting standards for loan originations by major banks such as Wachovia.

56.    Similarly, an article in the May 2007 issue of Mortgage Banking headlined "Subprime Mortgage Decline Will Impact Commercial Real Estate" discussed a report by Boston-based Property & Portfolio Research, Inc. regarding the negative impact the deteriorating subprime mortgage market was expected to have on commercial real estate lending standards.

57.    Likewise, an article in The New York Times on May 2, 2007, headlined "A Warning on Risk in Commercial Mortgages," quotes a group managing director at Moody's as saying, "Underwriting has gotten so frothy that we have to take a stand." He predicted then that the industry "was heading to Niagara Falls" because of risky loan underwriting practices adopted by many lenders.

58.    Another market commentator observed on May 11, 2007 that "the CMBS market underwent an enormous adjustment seemingly overnight. Banks re-traded loan [applications] on . . . some of their most successful and profitable clients, several banks made it be known that they are out of the 10-year interest-only lending business for good, some borrowers unable to obtain financing walked away from hard deposits, and one of the go-to funding sources for large deal financings went POOF – literally – overnight."

59.     Moreover, the Wall Street Journal reported in its "Heard on the Street" column on June 15, 2007 that the CMBS market had experienced a "meltdown" that had caused a "sea change" in the amount that real-estate investors could borrow.  As the Wall Street Journal reported on June 15, "The whole market is in upheaval," and, as a result, "a lot of CMBS issuers are running for their lives."

60.     In response to AAJ's expressions of concern about the "material adverse change" clause in paragraph 1.15(d) of the draft loan commitment agreement, Biderman, on behalf of Wachovia, indicated that he understood AAJ's concerns and AAJ's need to be able to rely on a loan commitment agreement so that it could move forward with the December 2007 closing on the Property.  In attempting to reassure AAJ and explain the meaning of the ambiguous provision, Biderman informed AAJ that the "material adverse change" language was "standard" in all of Wachovia's loan commitments.  He further assured AAJ that there would be no need to invoke the provision, that it was meant to be invoked only in the case of an unforeseeable, "9/11-type meltdown" and that therefore AAJ had no need to worry.

61.     In addition, Biderman, on behalf of Wachovia, told Gibb and others at Staubach that AAJ should not worry about paragraph 1.15(d) because Wachovia was the biggest CMBS lender in the United States, that Wachovia would stand by AAJ, that Wachovia would not let AAJ down, and that Wachovia would not leave AAJ "alone at the altar" when the Purchase Agreement was scheduled to close.

62.     Biderman emphasized Wachovia's expertise, sophistication, and resources, as well as its leadership role in the CMBS marketplace, and, under the circumstances, sought to persuade AAJ that it should feel completely comfortable placing its trust in Wachovia to stand by its commitment and fund the Loan under the terms in the Term Sheet.  Biderman said that, as

17

the leading CMBS lender in the United States, Wachovia could be counted on to fund and sell AAJ's loan as contemplated, and therefore there could be no occasion to invoke paragraph 1.15(d).

63.     In making these representations, Biderman and Wachovia knew that they had far superior expertise and knowledge to that of AAJ regarding the Loan, the CMBS market, and whether market conditions would permit sale of the Loan as contemplated in the Term Sheet. Biderman and Wachovia knew that AAJ had placed its trust in them based on their representations, including their representations about their ability to sell the Loan under foreseeable market conditions, and that AAJ relied upon these representations in entering the loan commitment agreement and allowing the due diligence period under the Purchase Agreement to expire, thus putting at risk its $5 million earnest money deposit and, in fact, the entire opportunity to acquire the Property.

64.     Biderman and Wachovia knew at the time that they made the above representations that they were false and misleading, or made with a reckless disregard for the truth. Biderman made these assurances for the purpose of inducing AAJ to enter the loan commitment agreement, allow the due diligence period on the Property to expire, make its nonrefundable $5 million deposit, commit itself to purchase the Property, and forego alternative financing arrangements for the purchase of the Property. Biderman sought to induce this action because Wachovia considered the Property a "trophy property," the inclusion of which in its portfolio of loans would further its aggressive strategy to increase its standing in the fiercely competitive CMBS marketplace.

65.     At the time the representations were made and AAJ's Loan was approved, Wachovia knew that it would be impossible to securitize the loan in a profitable manner, or

alternatively, that there was a substantial probability it could not do so.  Blinded by its profit

motive and other factors, however, Wachovia deliberately concealed this risk from AAJ and

agreed to make the Loan with the secret knowledge and expectation that it would invoke

paragraph 1.15(d) unless, against the odds, the sale or securitization prospects for the Loan

improved as the closing date under the Purchase Agreement neared.

**D.    Execution of the Loan Commitment Agreement**

66.     As a result of and in reliance on Biderman and Wachovia's representations and

assurances, prior to the expiration of the due diligence period under the Purchase Agreement,

AAJ agreed with Wachovia to execute a loan commitment agreement with the language of the

draft paragraph 1.15(d) remaining in place.

67.     Although dated May 25, 2007, AAJ did not formally execute the agreement until

June 18, 2007 (the "Loan Commitment Agreement").  Wachovia executed the agreement on June

20, 2007.  A true and correct copy of the Loan Commitment Agreement is attached as Exhibit C.

68.     Prior to issuing its commitment to AAJ, Wachovia knew of the severe troubles in

the CMBS market and had already begun withdrawing from loan transactions on CMBS loans to

other borrowers.  Wachovia, however, failed to share any of this information with AAJ upon

making its commitment to loan AAJ $89.5 million.

69.     In specific reliance on the Loan Commitment Agreement, AAJ allowed the due

diligence period on the Property to expire, thus putting at risk its $5 million earnest money

deposit made in connection with the acquisition of the Property.  Wachovia and Biderman were

fully aware that AAJ relied upon the Loan Commitment Agreement and Biderman and

Wachovia's representations to go firm in its acquisition of the Property.

70.    In the Loan Commitment Agreement, Wachovia became obligated to lend AAJ $89.5 million at a fixed interest rate of 6.02% per annum, with AAJ required to make only interest payments during the ten-year term of the Loan.

71.    The first sentence of the Loan Commitment Agreement states that "Wachovia Bank, National Association ('Lender') hereby confirms its interest in and ***commits to making a loan*** (the 'Loan') to Capitol Justice LLC . . . upon and subject to the terms and conditions set forth herein and as more particularly set forth in the Term Sheet."  (Emphasis added.)

72.    Paragraph 1.14 of the Loan Commitment Agreement provides, "Upon the return by Borrower to Lender of a fully executed copy of this Commitment within five (5) days after the date hereof, this Commitment will constitute an agreement obligating Lender to make and Borrower to accept the Loan in accordance with the terms and conditions set forth in this Commitment."  AAJ returned to Wachovia an executed copy of the Loan Commitment Agreement in a timely fashion.

73.    Attached to the Loan Commitment Agreement are the Term Sheet and Forward Rate Lock Agreement, the terms of both of which are incorporated into the Loan Commitment Agreement.

74.    Section 1.13 of the Loan Commitment Agreement provides that the Loan closing would take place on or about December 17, 2007, but no later than December 21, 2007.

75.    Paragraph 1.15 of the Loan Commitment Agreement provides limited, objective contract-based criteria for terminating what is otherwise an enforceable obligation by Wachovia to fund the $89.5 million loan on the terms stated in the agreement.  In pertinent part, paragraph 1.15 states that "Lender may, at its option, terminate its agreement to make the Loan . . . (d) in the event of any material adverse change in the financial, banking or capital market conditions

20

that could impair the sale of the Loan by Lender as contemplated in the Term Sheet; provided, however, that upon the termination of this Commitment by Lender pursuant to the terms of this subsection (d), Lender shall use its best efforts to offer a loan to Borrower in accordance with its then-current pricing and underwriting requirements."

76.    Page 6 of the Term Sheet provides in a section labeled "Securitization/Cooperation" that "Lender intends to sell all or a portion of the Financing by certificates, participations, securities or pari passu notes evidencing whole or component interests therein, through one or more public or private offering (each a 'Securitization')."

77.    The Term Sheet further describes a variety of different ways that this could occur, including "separating the Financing into two or more separate notes and/or participation interests, including, but not limited to, separate senior and junior notes, participations or components."  It indicates that "[s]uch notes or components may be assigned different interests [sic] rates, so long as the initial weighted average of such interest rates equals the Interest Rate as of the closing of the Financing."

**E.    Without Justification, Wachovia Reneges**
**      on its Loan Commitment to AAJ**

78.    Less than two months from the closing date for AAJ's purchase of the Property, Wachovia, through its Managing Director, John Tinkey ("Tinkey"), sent a letter to AAJ dated October 22, 2007, purporting to terminate the Loan Commitment Agreement (the "Termination Letter").

79.    In the Termination Letter, Wachovia alleges that there has been a "material and adverse change in the fixed income sector of the capital markets" such that Wachovia "has determined that it would be unable to effect a Securitization of the Loan if the Loan were made

upon the financial terms committed."  Accordingly, Wachovia purports to invoke paragraph 1.15(d) of the Loan Commitment Agreement to terminate the loan commitment.

80.     Accompanying the Termination Letter was a new term sheet for floating rate financing for a proposed alternate loan of $80.6 million—significantly less than the loan that Wachovia committed to make in its Loan Commitment Agreement.

81.     In addition, the terms of the newly proposed loan were far more onerous than those committed to in the Loan Commitment Agreement.  Indeed, the new terms were prohibitively expensive for AAJ and thus could not be the basis for moving forward with AAJ's purchase of the Property.

82.     Moreover, Wachovia's decision to wait until October 22 to send the Termination Letter was done in disregard of paragraph 1.17 of the Loan Commitment Agreement, which states that "[t]ime is of the essence with respect to all dates and periods of time set forth in this Commitment."

83.     Contrary to the premise upon which the Termination Letter is based, in an article appearing in Financial Week only two weeks later, Wachovia's Senior Vice President for Lending, Mark Melchione, admitted that Wachovia "is still quoting fixed-rate CMBS deals, and on average they include a 75% to 80% loan-to-value ratio and are priced at 140 to 160 basis points over swaps"—terms quite similar to those that Wachovia in its Termination Letter claimed it could no longer offer to AAJ due to what it claimed was a "material and adverse change in the fixed income sector of the capital markets" since it issued its Loan Commitment Agreement to AAJ on June 20, 2007.

84.     Contrary to the contention in the Termination Letter, there had not been a "material adverse change" in market conditions, as that term is used and intended in the Loan

Commitment Agreement, between the time Wachovia executed the Loan Commitment Agreement and the date of the Termination Letter. In addition, the Termination Letter applies a markedly different standard for the ambiguously worded paragraph 1.15(d) than that which had been explained and represented to AAJ by Biderman (who had since left Wachovia) at the time that the parties entered into the Loan Commitment Agreement.

85.    The appetite in the CMBS market for the occupancy profile of the Property has not changed materially since the Loan Commitment Agreement was issued. At the time the Loan Commitment Agreement was issued, the Property was entirely vacant, and there were firm commitments for leasing just 29% of the 187,937 total square footage. It was contemplated that AAJ would lease an additional 61,803 square feet, which would bring the total expected occupancy by the middle of 2008 to just under 62%. None of these circumstances has changed. Whatever challenges Wachovia perceived to the sale or securitization of the Loan as of October 22, 2007 were in all material respects present in late June 2007 when the Loan Commitment Agreement was executed.

86.    Further, Section 1.15(d) of the Loan Commitment Agreement permits termination only if materially adverse changes in market conditions could impair Wachovia's ability to sell all or part of the Loan in the secondary markets. Contrary to Wachovia's suggestion, Wachovia would be able to sell the Loan in the current environment. Nowhere in the Loan Commitment Agreement does AAJ guarantee the terms of sale, or that Wachovia will make a profit on the sale. Indeed, the very purpose of the Loan Commitment Agreement was to protect AAJ from changes in market conditions that could make the Loan more expensive for AAJ or cost-prohibitive due to changes in the market from the June 20, 2007 issuance of the Loan Commitment Agreement to the December 17, 2007 closing date.

23

87.     In addition, the Loan Commitment Agreement and Term Sheet make no reference to the timing of Wachovia's intention to sell all or a portion of the AAJ Loan.  It is not at all uncommon for loans similar to the Loan to be placed on a lender's balance sheet for a period of time and later bundled with other loans for sale in the secondary markets.  This is especially true with respect to property that was not going to be substantially leased, occupied, have tenants paying rent, or stabilized for 12-18 months.  Thus, even if Wachovia were genuinely to believe that it could not attract CMBS buyers as of October 22, 2007, nothing in the Loan Commitment Agreement requires that buyers be immediately available.

88.     Wachovia has not made diligent efforts to exhaust its options to sell all or a portion of the AAJ loan, as it is required to do under the Loan Commitment Agreement and applicable law.

89.     On October 29, 2007, counsel to AAJ wrote to counsel for Wachovia, rejecting Wachovia's position in the Termination Letter, denying that Wachovia is entitled to re-negotiate the terms of the Loan, and demanding that Wachovia honor its commitment to fund the Loan in accordance with the terms of the Loan Commitment Agreement.

90.     Wachovia has refused to retract its asserted termination of the Loan Commitment Agreement, and most recently reiterated its position to that effect in a letter to AAJ's counsel dated November 7, 2007.

**E.      Wachovia Unilaterally Terminates
          The Rate Lock Agreement**

91.     By email dated November 16, 2007, Wachovia (through Tinkey) informed AAJ that it had terminated the Rate Lock Agreement.  Wachovia indicated that it would "refund to the Borrowers all deposits paid by AAJ or Capitol [Justice] in connection with the rate lock transaction, adjusted for any loss incurred in breaking the rate lock and any out-of-pocket

expenses incurred by the Lender in connection with the Loan to date." Wachovia stated that an "accounting of the net amount to be remitted to AAJ shall be provided under separate cover."

92.    Wachovia offered no explanation for the apparent delay between its purported termination of the Loan Commitment Agreement and Rate Lock Agreement, and what, if any, impact that delay may have had on the funds at issue. It also appeared to ignore that its decision to terminate the Rate Lock Agreement resulted from its decision to unilaterally terminate the Loan Commitment Agreement. Moreover, these decisions were not due to any action or omission by AAJ.

93.    At the time that Wachovia purported to terminate the Rate Lock Agreement, AAJ was in full compliance with all its obligations under the Rate Lock Agreement, and there had been no default by AAJ under the Rate Lock Agreement or Loan Commitment Agreement.

94.    In AAJ's emailed response on November 18, AAJ took issue with Wachovia's position, and reiterated its demand that Wachovia honor the Loan Commitment Agreement and Rate Lock Agreement to enable AAJ to close on its acquisition of the Property on December 17, and otherwise minimize harm to AAJ. It noted, "If Wachovia refuses to do so, however, then Wachovia may not benefit from its contractual breaches and other wrongdoing by retaining for its own use the $1.79 million rate lock deposit or any profits derived from the deposit." AAJ informed Wachovia that "[s]uch funds should be returned immediately, without deduction for expenses or 'loss incurred in breaking the rate lock.'" It noted that "[a]ny such deduction would be particularly inappropriate given that Wachovia is the one that has unilaterally and improperly terminated the agreements and is responsible for any losses." AAJ further advised that its "acceptance of any remittance from Wachovia is and will be with a full reservation of [AAJ's] rights and remedies."

95.     On December 3, 2007, Wachovia sent AAJ what it claimed to be an "accounting of the net amount to be remitted to AAJ." Wachovia's highly-opaque "accounting" appears to indicate that its hedging transactions in accordance with the Rate Lock Agreement produced a profit of $672,166 on AAJ's rate lock deposit of $1.79 million. However, Wachovia purports to offset that profit with undefined "carry" charges of $682,171, resulting in a net loss of $10,005 that it attempts to deduct from AAJ's deposits of $1.81 million ($1.79 rate lock deposit plus $20,000 good faith deposit). In addition, Wachovia purports to deduct $12,000 for appraisal fees, $1,400 for an appraisal review and $4,700 for legal fees. After unilaterally deducting these fees, Wachovia purports to arrive at a balance due to AAJ of $1,781,895, which would leave AAJ with not only less than what it deposited in entering into the Rate Lock Agreement, but also none of the $672,166 profit that Wachovia claims to have realized in its hedging transactions with AAJ's funds during the term of the Rate Lock Agreement.

96.     On December 3, 2007, AAJ responded to Wachovia by demanding immediate payment of AAJ's $1.81 million in deposits, plus the $672,166 in claimed hedging profits, without deductions for claimed expenses. AAJ also demanded that Wachovia provide a detailed accounting of the specific transactions resulting in the asserted $672,166 profit, including buy/sell dates and other customary trading data for each trade, so that AAJ can properly assess the asserted profit and alleged "carry" charges. Wachovia has refused to remit the full payment or to provide the true accounting of its hedging transactions demanded in AAJ's December 3, 2007 communication.

97.     The Rate Lock Agreement provides no basis, under the circumstances presented, for deducting "carry" charges before remitting AAJ's Mandatory Lock Fee and profits earned on that fee.

98.    Moreover, Wachovia's actions are in sharp contrast to the express provision of paragraph 4(a) of the Rate Lock Agreement, which provides that the Transaction Costs Fee would be considered "a reasonable estimate[] of the costs and expenses associated with and incurred by Wachovia in entering into and maintaining the Hedging Arrangements."  The parties agreed that, for purposes of the Rate Lock Agreement, the Transaction Costs Fee would be $0.00, as indicated in paragraph 3 of the Confirmation.

99.    On or about December 3, Wachovia wired $1,781,895 to AAJ's bank account.

100.    Were Wachovia to fund the Loan and permit it to close in accordance with the Loan Commitment Agreement, as AAJ is prepared to do, paragraph 4 of the Rate Lock Agreement provides that AAJ would receive a refund of the **_entire_** $1.79 million Mandatory Lock Fee.

101.    Under the circumstances, Wachovia must return to AAJ the entire $1.79 million Mandatory Lock Fee, all other deposits, plus all profits earned, without any deduction, and also provide a complete accounting of how AAJ's deposits were handled during the applicable time period along with what profits were realized at each point during that time period.

## COUNT I

**Breach of Contract – Money Damages**
**Loan Commitment Agreement**
**(Against Wachovia)**

102.    AAJ repeats and realleges each and every allegation contained in paragraphs 1 through 101 as if set forth herein.

103.    The Loan Commitment Agreement constitutes a lawful, binding, and enforceable contract between AAJ and Wachovia.  Moreover, the Agreement was drafted by Wachovia, and thus must be construed against Wachovia.

27

104.    The Loan Commitment Agreement requires Wachovia to lend AAJ $89.5 million at a fixed interest rate of 6.02% per annum, with AAJ required to make only interest payments during the ten-year term of the Loan.

105.    AAJ, in all respects and at all relevant times, has been in full compliance with its obligations under the Loan Commitment Agreement, and all conditions precedent to invoking AAJ's rights under the Loan Commitment Agreement have been fulfilled or waived.

106.    On October 22, 2007, less than two months from the closing date for AAJ's purchase of the Property, Wachovia sent the Termination Letter to AAJ, purporting to invoke Section 1.15(d) of the Loan Commitment Agreement to terminate the loan commitment by alleging that, because of a "material and adverse change in the fixed income sector of the capital markets," Wachovia "ha[d] determined that it would be unable to effect a Securitization of the Loan if the Loan were made upon the financial terms committed."

107.    There is no basis under the Loan Commitment Agreement for Wachovia to terminate its commitment to fund the Loan.

108.    There has been no "material adverse change in the financial, banking or capital market conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet."

109.    Wachovia's refusal to lend AAJ $89.5 million as contemplated in the Loan Commitment Agreement, and its late notice of such refusal, constitutes an actual and anticipatory breach of the Loan Commitment Agreement.

110.    Wachovia entered the Loan Commitment Agreement knowing that it had no intention of performing thereunder unless, against long odds, the CMBS market improved dramatically prior to AAJ's closing under the Purchase Agreement.  Rather, if, as Wachovia

28

expected, the CMBS market did not improve, Wachovia intended to invoke the "material adverse change" provision in the Loan Commitment Agreement. Wachovia deliberately and maliciously concealed from AAJ its knowledge of this extraordinary risk that it would not perform under the Loan Commitment Agreement so that AAJ would be induced to enter the Loan Commitment Agreement. Entry of the Loan Commitment Agreement under these circumstances, and Wachovia's subsequent attempted termination of the Loan Commitment Agreement, represents bad faith in the negotiation, execution, and performance of the agreement.

111.    Wachovia's breach of the Loan Commitment Agreement gives rise to AAJ's right to pursue all appropriate contractual remedies and relief.

112.    AAJ has incurred and will incur substantial losses as a direct and proximate result of Wachovia's breach of the Loan Commitment Agreement, including, but not limited to, damages for increased financing costs for its acquisition of the Property, loss of its current headquarters building, which was also to house its future offices, loss of the opportunity to acquire the Property, and/or forfeiture of its $5 million earnest money deposit. AAJ has suffered damages in an amount to be determined at trial, but that in no event is less than $120 million.

## COUNT II

### Breach of Contract – Rescission and/or Money Damages
### Rate Lock Agreement
### (Against Wachovia)

113.    AAJ repeats and realleges each and every allegation contained in paragraphs 1 through 101 as if set forth herein.

114.    The Rate Lock Agreement constitutes a lawful, binding, and enforceable contract between AAJ and Wachovia. Moreover, the Rate Lock Agreement was drafted by Wachovia, and thus must be construed against Wachovia.

29

115.    AAJ, in all respects and at all relevant times, has been in full compliance with its obligations under the Rate Lock Agreement, and all conditions precedent to invoking AAJ's rights under the Rate Lock Agreement have been fulfilled or waived.

116.    By email dated November 16, 2007, Wachovia (through Tinkey) informed AAJ that it had terminated the Rate Lock Agreement and indicated that Wachovia would "refund to Borrower all deposits paid by AAJ or Capitol [Justice] in connection with the rate lock transaction, adjusted for any loss incurred in breaking the rate lock and any out-of-pocket expenses incurred by the Lender in connection with the Loan to date."

117.    On December 3, 2007, Wachovia sent AAJ what it claimed to be an "accounting of the net amount to be remitted to AAJ."  Wachovia's "accounting" appears to indicate that its hedging transactions in accordance with the Rate Lock Agreement produced a profit of $672,166 on AAJ's rate lock deposit of $1.79 million.  However, Wachovia's accounting purports to offset that profit with an undefined "carry" charge of $682,171, resulting in a purported net loss of $10,005 that it attempts to deduct from AAJ's deposits of $1.81 million ($1.79 rate lock deposit plus $20,000 good faith deposit).  In addition, Wachovia purports to deduct $12,000 for appraisal fees, $1,400 for an appraisal review and $4,700 for legal fees.  After unilaterally deducting these fees, Wachovia purports to arrive at a balance due to AAJ of $1,781,895, which would leave AAJ with not only less than what it deposited in entering into the Rate Lock Agreement, but also none of the $672,166 profit that Wachovia claims to have realized in its hedging transactions with AAJ's funds during the term of the Rate Lock Agreement.

118.    The Rate Lock Agreement provides no basis, under the circumstances presented, for deducting "carry" charges before remitting AAJ's Mandatory Lock Fee, other deposits, and profits earned on the fee.

119.    Wachovia's actions constitute a breach of the express provision of paragraph 4(a) of the Rate Lock Agreement, which provides that the Transaction Costs Fee would be considered "a reasonable estimate[] of the costs and expenses associated with and incurred by Wachovia in entering into and maintaining the Hedging Arrangements."  The parties agreed that, for purposes of the Rate Lock Agreement, the Transaction Costs Fee would be $0.00, as indicated in paragraph 3 of the Confirmation.

120.    On or about December 3, Wachovia wired $1,781,895 to AAJ's bank account.

121.    Wachovia has refused to return to AAJ the entire $1.79 million Mandatory Lock Fee, plus other deposits and all profits earned, without deductions.  Wachovia's refusal to return to AAJ the entire $1.79 million Mandatory Lock Fee, without any deduction, constitutes a breach of the Rate Lock Agreement.

122.    Paragraph 3 of the Rate Lock Agreement provides that in the event Wachovia "does not issue a [loan] commitment by May 30th 2007, and Borrower elects to terminate the rate lock agreement, [Wachovia] shall not profit from any gains that are realized from the hedge agreement and all profits less costs shall be released to the Borrower."

123.    Although Wachovia did not, in fact, issue a loan commitment by May 30, 2007, AAJ, in reliance on Wachovia and Biderman's fraudulent representations and assurances described herein, did not elect to terminate the Rate Lock Agreement, pursuant to paragraph 3 of that agreement.

124.    Wachovia's breach of the Rate Lock Agreement gives rise to AAJ's right to pursue all appropriate contractual remedies and relief.

125.    AAJ has incurred and will incur substantial losses as a direct and proximate result of Wachovia's breach of the Rate Lock Agreement, including, but not limited to, the net loss of

$10,005 that Wachovia attempts to deduct from AAJ's deposits of $1.81 million as a result of the undefined and unauthorized "carry" charge, plus $18,100 in unauthorized appraisal and legal fees. AAJ is thus entitled to rescission of the Rate Lock Agreement and a full refund of its deposits of $1.81 million.

126.    Additionally, Wachovia's breach of the Rate Lock Agreement, coupled with its inducement of AAJ not to elect to terminate the Rate Lock Agreement even though the loan commitment was not issued by May 30, 2007, gives rise to AAJ's right to recover special damages (*i.e.,* at least the $672,166 Wachovia claims to have realized from the hedging transactions) as a result of Wachovia's fraud, which the rescission of the Rate Lock Agreement does not fully repair.

127.    As a result of Wachovia's breach of contract, AAJ has suffered damages in an amount to be determined at trial, but that in no event is less than $690,266.

## COUNT III

### Breach of Contract – Specific Performance
### (Against Wachovia)

128.    AAJ repeats and realleges each and every allegation contained in paragraphs 1 through 101 as if set forth herein.

129.    The Loan Commitment Agreement constitutes a lawful, binding, and enforceable contract between AAJ and Wachovia. Moreover, the Agreement was drafted by Wachovia, and thus must be construed against Wachovia.

130.    The Loan Commitment Agreement required Wachovia to lend AAJ $89.5 million at a fixed interest rate of 6.02% per annum, with AAJ required to make only interest payments during the ten-year term of the Loan.

131.    On October 22, 2007, less than two months from the closing date for AAJ's purchase of the Property, Wachovia sent the Termination letter to AAJ, purporting to invoke Section 1.15(d) of the Loan Commitment Agreement to terminate the loan commitment by alleging that, because of a "material and adverse change in the fixed income sector of the capital markets," Wachovia "ha[d] determined that it would be unable to effect a Securitization of the Loan if the Loan were made upon the financial terms committed."

132.    AAJ, in all respects and at all relevant times, has been in full compliance with its obligations under the Loan Commitment Agreement and is ready, willing and able to perform any remaining obligations.

133.    Wachovia is able to perform its obligations under the Loan Commitment Agreement.

134.    There is no basis under the Loan Commitment Agreement for Wachovia to terminate its commitment to fund the Loan.  There has been no "material adverse change in the financial, banking or capital market conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet."

135.    Wachovia's attempt to terminate its loan commitment, and doing so at the eleventh hour in contravention of the "time is of the essence" clause, constitutes bad faith and an actual and anticipatory breach of the Loan Commitment Agreement.

136.    Wachovia's breach of the Loan Commitment Agreement gives rise to AAJ's right to pursue all appropriate contractual remedies and relief.

137.    If Wachovia fails to perform its obligations under the Loan Commitment Agreement, AAJ may not be able to purchase the Property.

138.    As a result, no adequate remedy at law exists, obligating Wachovia to specifically perform its obligations pursuant to the terms of the Loan Commitment Agreement.

139.    By reason of the foregoing, the Court should order Wachovia to specifically perform its obligations pursuant to the terms of the Loan Commitment Agreement and, in particular, to fund the $89.5 million Loan in accordance with the terms thereof.

### COUNT IV

**Fraud**
**(Against Wachovia and Biderman)**

140.    AAJ repeats and realleges each and every allegation contained in paragraphs 1 through 101 as if set forth herein.

141.    To protect itself from market fluctuations that could occur during the extended period between the time of negotiations and the closing on the Property scheduled for December 17, 2007, AAJ insisted on locking in a fixed interest rate for the term of the Loan.

142.    On April 26, 2007, Biderman, acting on behalf of Wachovia, informed AAJ that Wachovia would be able to provide AAJ with the rate lock it was seeking.

143.    Biderman further informed Staubach that once the rate lock was executed, the interest rate risk would be eliminated and there would be "no worries" moving forward with the Loan.

144.    In reliance on Wachovia's representations, AAJ executed the Rate Lock Agreement on or about April 30, 2007 and paid Wachovia a $1,790,000 rate lock fee.

145.    Paragraph 3 of the Rate Lock Agreement provides that in the event Wachovia "does not issue a [loan] commitment by May 30th 2007, and Borrower elects to terminate the rate lock agreement, [Wachovia] shall not profit from any gains that are realized from the hedge agreement and all profits less costs shall be released to the Borrower."

34

146. Although Wachovia did not, in fact, issue a loan commitment by May 30, 2007, AAJ, in reliance on Wachovia and Biderman's fraudulent representations and assurances described herein, did not elect to terminate the Rate Lock Agreement, pursuant to paragraph 3 of that agreement.

147. Likewise, during negotiations over the terms of the loan commitment, Wachovia made the numerous misrepresentations of material fact and material omissions that are described above.

148. More specifically, AAJ expressed concern over certain language and provisions of the proposed Loan Commitment Agreement, particularly the termination provisions of paragraph 1.15(d) respecting any "material adverse change in the financial, banking or capital market conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet," especially given that the clause was subject to interpretation and was ambiguous.

149. In response, Biderman, on behalf of Wachovia, indicated that he understood AAJ's concerns about the possible ambiguity of the provision. In attempting to reassure AAJ, Biderman informed AAJ that the "material adverse change" language was "standard" in all of Wachovia's loan commitments. He further assured AAJ that there would be no need to invoke the provision, that the clause was meant to be invoked only in the case of a "9/11-type meltdown," and that therefore AAJ had no need to worry about this provision.

150. In addition, Biderman, on behalf of Wachovia, told AAJ that it should not worry about paragraph 1.15(d) because Wachovia was the biggest CMBS lender in the United States, that, based on its market expertise, resources and sophistication, it could be trusted to fund and sell the Loan as contemplated in the Term Sheet, and that Wachovia would stand by AAJ and see to it that AAJ would proceed to closing in December 2007.

151.    Biderman and Wachovia knew at the time that they made these material representations and omissions that they were false and misleading and/or made with reckless disregard for the truth.

152.    Biderman and Wachovia made these assurances and representations with the intention that AAJ rely upon them in proceeding with the Rate Lock Agreement and Loan Commitment Agreement, in not terminating the Rate Lock Agreement even though Wachovia did not issue the loan commitment by May 30, 2007, in allowing the due diligence period on the Property to expire, in putting its nonrefundable $5 million deposit at risk, in committing itself to the purchase of the Property, and in not pursuing alternative financing arrangements for the purchase of the Property.

153.    AAJ relied upon Biderman and Wachovia's representations in proceeding with the Rate Lock Agreement and Loan Commitment Agreement, in not terminating the Rate Lock Agreement even though Wachovia did not issue the loan commitment by May 30, 2007, in allowing the due diligence period on the Property to expire, in putting its nonrefundable $5 million deposit at risk, in committing itself to the purchase of the Property, and in not pursuing alternative financing arrangements for the purchase of the Property.  AAJ's reliance was justifiable and reasonably foreseeable due to, among other things, the relationship between the parties and Wachovia's expertise and superior knowledge with respect to the Loan and CMBS market transactions.

154.    Had Biderman and Wachovia truthfully and accurately represented the overwhelming risk that market conditions would not permit a sale of the Loan in the manner Wachovia would find acceptable, and not affirmatively misstated and misrepresented the facts and omitted material information, AAJ would not have entered the Rate Lock Agreement and

36

Loan Commitment Agreement or would have terminated the Rate Lock Agreement on or after May 30, 2007 and before Wachovia issued the Loan Commitment Agreement, would not have allowed the due diligence period on the Property to expire, would not have put its nonrefundable $5 million deposit at risk, would not have committed itself to the purchase of the Property, and would have pursued alternative financing arrangements for the purchase of the Property.

155.    As a direct and proximate result of Biderman and Wachovia's fraudulent conduct alleged above, AAJ has suffered damages in an amount to be determined at trial, but that in no event is less than $120 million.

156.    In addition, Biderman's and Wachovia's fraudulent conduct was perpetrated knowingly, intentionally, recklessly, in bad faith, with a conscious disregard to the rights of AAJ, and with actual and common-law malice.  As a result, the Court should award punitive damages against Defendants.

## COUNT V

### Breach of Fiduciary Duty
### (Against Wachovia)

157.    AAJ repeats and realleges each and every allegation contained in paragraphs 1 through 101 as if set forth herein.

158.    AAJ placed its complete trust and confidence in Wachovia because Wachovia offered financial advice to AAJ and possessed superior knowledge or access to material facts in connection with the CMBS market and other secondary lending markets.  Additionally, Wachovia held itself out as an expert in CMBS and other secondary market-based commercial loan transactions, and expressly sought to induce AAJ to place its trust in Wachovia's ability to fund and sell the Loan.

159.    The representations and promises of Wachovia's expertise in CMBS and other secondary market transactions, its superior market knowledge, the fact that Wachovia held itself out to AAJ as a trusted commercial mortgage advisor, and AAJ's foreseeable and reasonable reliance on Wachovia, gave rise to a fiduciary relationship between AAJ and Wachovia.

160.    As part of its fiduciary duties to AAJ, Wachovia owed AAJ common law duties of care, loyalty, candor, disclosure, and good faith and fair dealing.

161.    To protect itself from market fluctuations that could occur during the extended period between the time of negotiations and the closing on the Property scheduled for December 17, 2007, AAJ insisted on locking in a fixed interest rate for the term of the Loan.

162.    On April 26, 2007, Biderman informed AAJ that Wachovia would be able to provide AAJ with the rate lock it was seeking.  Wachovia knew the risks associated with pursuing this Loan aggressively and decided under the circumstances to assume those risks.

163.    Biderman further informed AAJ that once the rate lock was executed, the interest rate risk would be eliminated and there would be "no worries" with respect to Wachovia's ability to fund and sell the Loan as contemplated.

164.    In reliance on Wachovia's representations, AAJ entered into the Rate Lock Agreement with Wachovia that became effective on or about April 2, 2007.  Pursuant to the Rate Lock Agreement, Wachovia became the custodian of $1.81 million in AAJ's funds and became obligated to invest those funds with care and in good faith and fully to account for their disposition.

165.    During negotiations over the terms of the loan commitment, AAJ expressed concern over certain language and provisions of the Loan Commitment Agreement, particularly the termination provisions of paragraph 1.15(d) respecting any "material adverse change in the

38

financial, banking or capital market conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet," for the reasons described above.

166.    In response, Biderman on behalf of Wachovia indicated that he understood AAJ's concerns as described above.  He further assured AAJ that there would be no need to invoke the provision, that the clause was meant to be invoked only in the case of a "9/11-type meltdown," and that therefore AAJ had no need to worry about this provision.

167.    In addition, Biderman on behalf of Wachovia told AAJ that it should not worry about paragraph 1.15(d) because Wachovia was the biggest CMBS lender in the United States, that, based on its market expertise, resources and sophistication, as well as its knowledge of current and expected market conditions, it could be trusted to be able to fund and sell the Loan as contemplated in the Term Sheet, and that Wachovia would stand by AAJ and not let it down.

168.    Wachovia misrepresented its intention to follow through with its loan commitment and/or omitted material information with respect to the actual or foreseeable state of the CMBS market or other secondary markets at the time that it entered into the Rate Lock Agreement and Loan Commitment Agreement.  Wachovia had a duty to disclose such information to AAJ because Wachovia possessed superior knowledge or access to material facts in connection with the CMBS market and other secondary markets.  Additionally, Wachovia held itself out as an expert in CMBS and other secondary market transactions and expressly sought to induce AAJ to place its trust in Wachovia's ability to fund and sell the Loan.

169.    Biderman and Wachovia knew at the time that they made these material representations and omissions that they were false and misleading and/or made with reckless disregard for the truth.

170.    Biderman, on behalf of Wachovia, made these assurances and representations with the intention that AAJ rely upon them in proceeding with the Loan Commitment Agreement and Rate Lock Agreement, in not terminating the Rate Lock Agreement even though Wachovia did not issue the loan commitment by May 30, 2007, in allowing the due diligence period on the Property to expire, in putting its nonrefundable $5 million deposit at risk, in committing itself to the purchase of the Property, and in not pursuing alternative financing arrangements for the purchase of the Property.

171.    AAJ justifiably relied upon Biderman and Wachovia's representations and assurances in proceeding with the Loan Commitment Agreement and Rate Lock Agreement, in not terminating the Rate Lock Agreement even though Wachovia did not issue the loan commitment by May 30, 2007, in allowing the due diligence period on the Property to expire, in putting its nonrefundable $5 million deposit at risk, in committing itself to the purchase of the Property, and in not pursuing alternative financing arrangements for the purchase of the Property.

172.    Wachovia breached its fiduciary duty to AAJ by overstating its intention and ability to follow through with its loan commitment and to sell the Loan in the secondary markets, and/or omitting material information with respect to the actual or foreseeable state of the CMBS market and other secondary markets as it would affect the Loan Commitment Agreement. Wachovia also breached its fiduciary duty by improperly retaining profits realized on hedging transactions placed with AAJ's deposits of $1.81 million and refusing properly to account for the use and disposition of these deposits.

173.     As a direct and proximate result of Biderman and Wachovia's conduct alleged above, AAJ has suffered damages in an amount to be determined at trial, but that in no event is less than $120 million.

174.     In addition, Biderman's and Wachovia's conduct was perpetrated knowingly, intentionally, recklessly, in bad faith, with a conscious disregard to the rights of AAJ, and with actual and common-law malice.  As a result, the Court should award punitive damages against Defendants.

## COUNT VI

### Negligent Misrepresentation
### (Against Wachovia)

175.     AAJ repeats and realleges each and every allegation contained in paragraphs 1 through 101 as if set forth herein.

176.     To protect itself from market fluctuations that could occur during the extended period between the time of negotiations and the closing on the Property scheduled for December 17, 2007, AAJ insisted on locking in a fixed interest rate for the term of the loan.

177.     On April 26, 2007, Biderman informed AAJ that Wachovia would be able to provide AAJ with the rate lock it was seeking.  Wachovia knew the risks associated with pursuing the Loan aggressively and decided under the circumstances to assume those risks.

178.     Biderman further informed AAJ that once the rate lock was executed, the interest rate risk would be eliminated and there would be "no worries" that Wachovia would fund and sell the Loan.

179.     In reliance on Wachovia's representations, AAJ executed the Rate Lock Agreement on or about April 30, 2007 and paid Wachovia a $1,790,000 rate lock fee.

41

180.    During negotiations over the terms of the Loan Commitment Agreement, AAJ expressed concern over certain language and provisions of the Loan Commitment Agreement, particularly the termination provisions of paragraph 1.15(d) respecting any "material adverse change in the financial, banking or capital market conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet," for the reasons described above.

181.    In response, Biderman on behalf of Wachovia indicated that he understood AAJ concerns, as described above.  He further assured AAJ that there would be no need to invoke the provision, that the clause was meant to be invoked only in the case of a "9/11 type meltdown," and that therefore AAJ had no need to worry about this provision.

182.    In addition, Biderman on behalf of Wachovia told AAJ that it should not worry about paragraph 1.15(d) because Wachovia was the biggest CMBS lender in the United States, that, based on its market expertise, resources and sophistication, it could be trusted to fund and sell the Loan as contemplated in the Term Sheet, and that it would stand by AAJ and see to it that AAJ would proceed to closing in December 2007.

183.    As detailed above, Wachovia misrepresented its intention to follow through with its loan commitment and/or omitted material information with respect to the actual or foreseeable state of the CMBS market at the time that entered into the Rate Lock Agreement and Loan Commitment Agreement.  Wachovia had a duty to disclose such information to AAJ because Wachovia possessed superior knowledge or access to material facts in connection with the CMBS market.  Additionally, Wachovia held itself out as an expert in CMBS transactions and expressly sought to induce and did induce AAJ to place its trust in Wachovia's ability to securitize or sell the Loan.

184.    AAJ justifiably relied upon Wachovia's misrepresentations and omissions, the falsity of which were neither known to nor readily discoverable by AAJ. These misrepresentations were false when made and were made with negligent, grossly negligent, or reckless disregard for the truth and AAJ's detrimental reliance thereon.

185.    As a direct and proximate result of Biderman and Wachovia's negligent, grossly negligent and/or reckless conduct alleged above, AAJ has suffered damages in an amount to be determined at trial but that in no event is less than $120 million.

186.    In addition, Biderman's and Wachovia's fraudulent conduct was perpetrated knowingly, intentionally, recklessly, in bad faith, with a conscious disregard to the rights of AAJ, and with actual and common-law malice. As a result, the Court should award punitive damages against Defendants.

## COUNT VII

### Breach of the Duty of Good Faith and Fair Dealing
### (Against Wachovia)

187.    AAJ repeats and realleges each and every allegation contained in paragraphs 1 through 101 as if set forth herein.

188.    Wachovia was under an implied duty of good faith and fair dealing by virtue of the Rate Lock Agreement, Loan Commitment Agreement and its fiduciary relationship with AAJ.

189.    At the time that it issued its Loan Commitment Agreement, Wachovia misrepresented its intention and ability to follow through with its loan commitment and/or omitted material information with respect to the actual or foreseeable state of the CMBS market as it would affect the Loan Commitment Agreement.

190.    Wachovia had a duty to disclose such information to AAJ because Wachovia possessed superior knowledge or access to material facts in connection with the CMBS market. Additionally, Wachovia held itself out as an expert in CMBS transactions and expressly sought to induce AAJ to place its trust in Wachovia's ability to sell all or part of the Loan.

191.    Wachovia breached the implied duty of good faith and fair dealing by issuing the Loan Commitment Agreement knowing that it did not intend to perform or recklessly disregarding its prospective inability, intention or desire to perform.

192.    Wachovia breached the implied duty of good faith and fair dealing by failing to disclose all material facts in connection with the Loan transaction, its intention or ability to follow through with its loan commitment, and the actual or foreseeable state of the CMBS market as it would affect the Loan Commitment Agreement.

193.    Wachovia breached the implied duty of good faith and fair dealing by failing to provide reasonable notice of its decision not to fund the Loan (less than two months from the closing date for AAJ's purchase of the Property), particularly given paragraph 1.17 of the Loan Commitment Agreement, which specified that time was of the essence, such that AAJ did not have adequate time to locate suitable alternative financing.

194.    Wachovia breached the implied duty of good faith and fair dealing by inducing AAJ not to elect to terminate the Rate Lock Agreement pursuant to paragraph 3 of that agreement, even though Wachovia did not issue the loan commitment by May 30, 2007.

195.    Wachovia breached the implied duty of good faith and fair dealing by failing to provide reasonable notice of its decision not to fund the Loan, and further for refusing to return the full Rate Lock Fee and associated hedging profits, particularly given paragraph 3 of the Rate Lock Agreement, which provides that in the event Wachovia "does not issue a [loan]

commitment by May 30, 2007, and Borrower elects to terminate the rate lock agreement, [Wachovia] shall not profit from any gains that are realized from the hedge agreement and all profits less costs shall be released to the Borrower." Significantly, as stated in the Confirmation, Wachovia agreed to waive all transaction costs associated with the Rate Lock Agreement.

196.    Wachovia's invocation of paragraph 1.15(d) of the Loan Commitment Agreement was simply a pretext for Wachovia's business decision not to honor its commitment to AAJ to make the Loan, as Wachovia expected at the time it entered the Loan Commitment Agreement.

197.    As a direct and proximate result of Wachovia's conduct alleged herein, AAJ has suffered damages in an amount to be determined at trial, but that in no event is less than $120 million.

## COUNT VIII

### Equitable Estoppel
### (Against Wachovia)

198.    AAJ repeats and realleges each and every allegation contained in paragraphs 1 through 101 as if set forth herein.

199.    Biderman and Wachovia made the false representations or omitted the material facts as set forth above.

200.    Biderman and Wachovia knew at the time they made these material representations and omissions that they were false and misleading and/or made with reckless disregard for the truth.

201.    Biderman, on behalf of Wachovia, made these representations and omissions with the intention that AAJ rely upon them in proceeding with the Loan Commitment Agreement, in allowing the due diligence period on the Property to expire, in putting its nonrefundable $5

million deposit at risk, in committing itself to the purchase of the Property, and in not pursuing alternative financing arrangements for the purchase of the Property.

202.    AAJ lacked the knowledge or the means of knowledge concerning the truth of the representations and omissions made by Biderman and Wachovia.

203.    AAJ justifiably relied upon Biderman's and Wachovia's representations, assurances, and material omissions in proceeding with the Loan Commitment Agreement, in allowing the due diligence period on the Property to expire, in putting its nonrefundable $5 million deposit at risk, in committing itself to the purchase of the Property, and in not pursuing alternative financing arrangements for the purchase of the Property.

204.    As a direct and proximate result of Wachovia's conduct alleged herein, AAJ has suffered damages in an amount to be determined at trial, but that in no event is less than $120 million.

**COUNT IX**

**Unjust Enrichment**
**(Against Wachovia)**

205.    AAJ repeats and realleges each and every allegation contained in paragraphs 1 through 101 as if set forth herein.

206.    Paragraph 2(a) of the Rate Lock Agreement provides that to effect the rate lock transaction, "Wachovia shall enter into certain hedging arrangements in its sole and absolute discretion through the purchase or sale of United States Treasury notes, bonds or futures contracts, options or swaps on such notes, bonds or futures contracts or other measures deemed necessary or appropriate by Wachovia."

207.    Paragraph 3 of the Rate Lock Agreement provides that in the event Wachovia "does not issue a [loan] commitment by May 30th 2007, and Borrower elects to terminate the rate

lock agreement, [Wachovia] shall not profit from any gains that are realized from the hedge agreement and all profits less costs shall be released to the Borrower."

208.    Although Wachovia did not, in fact, issue a loan commitment by May 30, 2007, AAJ, in reliance on Wachovia and Biderman's representations and assurances described herein, did not elect to terminate the Rate Lock Agreement, pursuant to paragraph 3 of that agreement.

209.    By email dated November 16, 2007, Wachovia (through Tinkey) informed AAJ that it had terminated the Rate Lock Agreement.

210.    On December 3, 2007, Wachovia sent AAJ what it claimed to be an "accounting of the net amount to be remitted to AAJ."  Wachovia's "accounting" appears to indicate that its hedging transactions in accordance with the Rate Lock Agreement produced a profit of $672,166 on AAJ's rate lock deposit of $1.79 million.  However, Wachovia's accounting purports to offset that profit with undefined "carry" charge of $682,171, resulting in a net loss of $10,005 that it attempts to deduct from AAJ's deposits of $1.81 million ($1.79 rate lock deposit plus $20,000 good faith deposit).

211.    The Rate Lock Agreement provides no basis, under the circumstances presented, for deducting "carrying" charges before remitting AAJ's Mandatory Lock Fee, other deposits, and profits earned on the fee.

212.    AAJ has thus conferred a benefit on Wachovia, in that Wachovia claims to have realized a $672,166 profit in its hedging transactions with AAJ's funds during the term of the Rate Lock Agreement.

213.    AAJ did not officiously or gratuitously confer the benefit of a profit on the hedging transactions on Wachovia.

214.    The benefit of the profit on the hedging transactions is measurable, the true amount of which can be ascertained by requiring Wachovia to fully and completely account for the profit as requested herein.

215.    Wachovia has consciously accepted the benefit of the profit on the hedging transactions.

216.    Because it would be unjust for Wachovia to keep the profit on the hedging transactions, Wachovia is required to disgorge such profits.

## COUNT X

### Accounting
### (Against Wachovia)

217.    AAJ repeats and realleges each and every allegation contained in paragraphs 1 through 101 as if set forth herein.

218.    AAJ deposited $1.81 million with Wachovia in connection with the Rate Lock Agreement.

219.    Paragraph 2(a) of the Rate Lock Agreement provides that to effect the rate lock transaction, "Wachovia shall enter into certain hedging arrangements in its sole and absolute discretion through the purchase or sale of United States Treasury notes, bonds or futures contracts, options or swaps on such notes, bonds or futures contracts or other measures deemed necessary or appropriate by Wachovia."

220.    By email dated November 16, 2007, Wachovia (through Tinkey) informed AAJ that it had terminated the Rate Lock Agreement.  Wachovia indicated that it would "refund to the Borrowers all deposits paid by AAJ or Capitol [Justice] in connection with the rate lock transaction, adjusted for any loss incurred in breaking the rate lock and any out-of-pocket

expenses incurred by the Lender in connection with the Loan to date." Wachovia stated that an "accounting of the net amount to be remitted to AAJ shall be provided under separate cover."

221. On December 3, 2007, Wachovia sent AAJ what it claimed to be an "accounting of the net amount to be remitted to AAJ." Wachovia's "accounting" appears to indicate that its hedging transactions in accordance with the Rate Lock Agreement produced a profit of $672,166 on AAJ's rate lock deposit of $1.79 million. However, Wachovia's "accounting" purports to offset that profit with an undefined "carry" charge of $682,171, resulting in a net loss of $10,005 that it attempts to deduct from AAJ's deposits of $1.81 million ($1.79 rate lock deposit plus $20,000 good faith deposit). In addition, Wachovia purports to deduct $12,000 for appraisal fees, $1,400 for an appraisal review and $4,700 for legal fees. After unilaterally deducting these fees, Wachovia purports to arrive at a balance due to AAJ of $1,781,895, which would leave AAJ with not only less than what it deposited in entering into the Rate Lock Agreement, but also none of the $672,166 profit that Wachovia claims to have realized in its hedging transactions with AAJ's funds during the term of the Rate Lock Agreement.

222. The Rate Lock Agreement provides no basis, under the circumstances presented, for deducting "carry" charges before remitting AAJ's Mandatory Lock Fee and profits earned on that fee.

223. Moreover, Wachovia's actions are in sharp contrast to the express provision of paragraph 4(a) of the Rate Lock Agreement, which provides that the Transaction Costs Fee would be considered "a reasonable estimate[] of the costs and expenses associated with and incurred by Wachovia in entering into and maintaining the Hedging Arrangements." The parties agreed that, for purposes of the Rate Lock Agreement, the Transaction Costs Fee would be $0.00, as indicated in paragraph 3 of the Confirmation.

224.     Wachovia is under a legal duty to account for how AAJ's deposits were handled during the applicable time period along with what profits were realized at each point during that time period.

225.     Wachovia's purported accounting, provided to AAJ on December 3, 2007, is incomplete and does not fully account for how AAJ's deposits were handled during the applicable time period along with what profits were realized at each point during that time period.

226.     By reason of the foregoing, AAJ is entitled to a detailed and complete accounting of how AAJ's deposits were handled during the applicable time period along with what profits were realized at each point during that time period.

## COUNT XI

### Declaratory Judgment
### (Against Wachovia)

227.     AAJ repeats and realleges each and every allegation contained in paragraphs 1 through 101 as if set forth herein.

228.     Less than two months from the closing date for Capitol Justice's purchase of the Property, on October 22, 2007, Wachovia sent the Termination Letter to AAJ, purporting to invoke paragraph 1.15(d) of the Loan Commitment Agreement to terminate the loan commitment by alleging that, because of a "material and adverse change in the fixed income sector of the capital markets," Wachovia "ha[d] determined that it would be unable to effect a Securitization of the Loan if the Loan were made upon the financial terms committed."

229.     Contrary to Wachovia's contention, there was no "material adverse change" in capital market conditions such that Wachovia would be permitted to invoke paragraph 1.15(d) as a basis for termination of the Loan Commitment Agreement.

50

230.    On October 29, 2007, counsel for AAJ wrote to counsel for Wachovia, rejecting Wachovia's position in the Termination Letter, denying that Wachovia is entitled to re-negotiate the terms of the Loan, and demanding that Wachovia honor its commitment to fund the Loan in accordance with the terms of the Loan Commitment Agreement.

231.    Wachovia responded in a November 7, 2007 letter, refusing to retract its termination of the loan commitment.

232.    Therefore, there exists a substantial genuine dispute and actual justiciable controversy between AAJ and Wachovia concerning whether Wachovia must honor its loan commitment.  This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment pursuant to 28 U.S.C. § 2201.

233.    By reason of the foregoing, the Court should make the following declaration: That there has been no "material adverse change," as that phrase is used in the Loan Commitment Agreement, in the financial, banking or capital market conditions that could impair the sale of the Loan by Wachovia as contemplated in the Term Sheet; that all conditions precedent to funding of the Loan as contemplated in the Loan Commitment Agreement have been fulfilled or waived; and that Wachovia is obligated to fund the Loan according to the terms set forth in the Loan Commitment Agreement.

WHEREFORE, AAJ demands judgment as follows:

1.    on Count I, against Wachovia, awarding AAJ compensatory damages in an amount to be determined at trial, but in no event less than $120 million, together with interest, costs, reasonable attorneys' fees and other expenses;

2.      on Count II, against Wachovia, awarding AAJ rescission of the Rate Lock

        Agreement and special damages in an amount to be determined at trial, but

        in no event less than $690,266, together with interest, costs, reasonable

        attorneys' fees and other expenses;

3.      on Count III, against Wachovia, ordering Wachovia to specifically

        perform its obligations under the Loan Commitment Agreement, including

        providing a loan of $89.5 million to Capitol Justice for the purchase of the

        Property under the terms set forth in the Loan Commitment Agreement;

4.      on Count IV, against Wachovia and Biderman, awarding AAJ

        compensatory and consequential damages in an amount to be determined

        at trial, but in no event less than $120 million, as well as punitive

        damages, together with interest, costs, reasonable attorneys' fees and other

        expenses;

5.      on Counts V-VI, against Wachovia, awarding AAJ compensatory and

        consequential damages in an amount to be determined at trial, but in no

        event less than $120 million, as well as punitive damages, together with

        interest, costs, reasonable attorneys' fees and other expenses;

6.      on Counts VII-VIII, against Wachovia, awarding AAJ compensatory

        damages in an amount to be determined at trial, but in no event less than

        $120 million, together with interest, costs, reasonable attorneys' fees and

        other expenses;

7.      on Count IX, against Wachovia, ordering the disgorgement of all profits

        earned by Wachovia from the Rate Lock Agreement;

8.   on Count X, against Wachovia, ordering Wachovia to fully and completely account for how AAJ's deposits were handled during the applicable time period along with what profits were realized at each point during that time period;

9.   on Count XI, against Wachovia, declaring that there has been no "material adverse change," as that phrase is used in the Loan Commitment Agreement, in the financial, banking or capital market conditions that could impair the sale of the Loan by Wachovia as contemplated in the Term Sheet; that all conditions precedent to funding of the Loan as contemplated in the Loan Commitment Agreement have been fulfilled or waived; and that Wachovia is obligated to fund the Loan according to the terms set forth in the Loan Commitment Agreement; and

10.  against Wachovia and Biderman, awarding AAJ its costs, reasonable attorneys' fees and other expenses incurred in this action, and such other and further relief as the Court deems just and proper.

## JURY DEMAND

AAJ hereby demands a trial by jury on all claims so triable.

Dated: December 14, 2007

SHULMAN, ROGERS, GANDAL,
 PORDY & ECKER, P.A.


_____/s/ Jeremy W. Schulman_____
Jeremy W. Schulman (DC Bar No. 481755)
David S. Wachen (DC Bar No. 441836)
11921 Rockville Pike
Rockville, Maryland 20852
(301) 230-5200

*Attorneys for Plaintiffs Capitol Justice LLC and American Association for Justice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of December, 2007, I caused to be sent the

foregoing Amended Complaint by first-class U.S. mail, postage prepaid, to:

>Mark William Ryan, Esq.
>Reginald R. Goeke, Esq.
>Joseph Raymond Baker, Esq.
>Mayer Brown LLP
>1909 K Street, NW
>Washington, DC  20006-1101
>*Counsel for Defendants Wachovia Corp., Wachovia Bank N.A., Wachovia Capital Markets, LLC, Wachovia Securities, LLC*
>[and courtesy copy by e-mail]
>
>Sandor Biderman
>10731 Normandie Farm Drive
>Potomac, Maryland 20854
>*Defendant Pro Se*

>*s/ Jeremy W. Schulman*
>Jeremy W. Schulman

Exhibit A

Wachovia Bank
7255 Woodmont Avenue, Suite 200
Bethesda, MD 20814

**WACHOVIA SECURITIES**



April 26, 2007

Mr. Robert Michaels
Chief Financial Officer
American Association for Justice
1050 31st Street, NW
Washington, DC 20007

Mr. John Gibb
Senior Vice President
The Staubach Company – Northeast
575 7th Street, NW  Suite 400
Washington, DC  20004

Re:     Fixed Rate Financing for 777 6th Street, NW, Washington, DC (the "**Property**")

Dear Gentlemen:

The purpose of this letter  (the "**Term Sheet**") is to set forth the proposed terms and conditions to be considered by Wachovia Bank, National Association ("**Lender**") in connection with your request for financing secured by the Property and other collateral (the "**Financing**").

This Term Sheet is not a commitment to lend, either express or implied, and does not impose any obligation on Lender to issue a commitment or to provide the Financing.

**Financing Amount:**              Approximately $89,500,000.

**Interest Rate:**                  The Interest Rate shall be (a) the ten-year US Treasury, plus (b) the greater of (i) 83 basis points plus the ten-year Mid-Market Swap spread, or (ii) 135 basis points, but in no event shall the Interest Rate be less than 5.65%. The rate will be set at closing and calculated based upon the actual number of calendar days in a year divided by 360.

**Borrower:**                      The borrower ("**Borrower**") will be a new single purpose, bankruptcy remote entity formed exclusively for the purpose of owning and operating the Property. Borrower shall be prohibited from engaging in any other business activities and shall otherwise meet applicable Rating Agency criteria with respect to qualifying as bankruptcy remote entity, including but not limited to the existence of two independent directors and the delivery of a non-consolidation opinion at closing.

**Financing Collateral:**          The Financing will be secured by, among other things, (i) a first mortgage lien encumbering the  fee-simple  interest  in  the

Property (the "**Mortgage**"), (ii) an assignment of all related leases, rents, deposits, letters of credit, income and profits, (iii) an assignment of the Financing lockbox described below and (iv) an assignment of all other contracts, agreements and personal property relating to the Property.

**Loan-to-Cost:**

At closing Lender will require a maximum loan-to-cost ratio, based upon the actual purchase price and tenant improvement costs of the Property as determined by Lender, of 80.0%.

**Loan-to-Value:**

At closing Lender will require a maximum loan-to-value ratio, based on an acceptable MAI appraisal, of 80.0%.

**Debt Service Coverage:**

At closing Lender will require a minimum DSCR of 1.20x based on the actual constant.

**Interest Reserve:**

At closing Lender will require borrower to place into escrow an amount equal to one years of interest payments currently estimated at $5,370,000. Monthly payments for interest will be drawn from this account in order to make interest payments in accordance with the loan documents.

**Net Cash Flow:**

At closing Lender will require a pro forma underwritten net cash flow of no less than $6,600,000.

**Maturity Date:**

120 months.

**Amortization:**

Interest only

**Prepayment:**

Prepayment of the Financing shall be prohibited until the earlier of (i) two years after securitization or (ii) three years from the closing date. Thereafter, Borrower shall be permitted to pay to Lender a defeasance deposit (in an amount sufficient to defease the Financing as determined by Lender in accordance with the terms of the Financing documents) in lieu of a prepayment thereof. The defeasance deposit must be an amount sufficient to purchase direct, non-callable U.S. obligations that provide for payments at least equal to the amount of each monthly installment under the note to an including the Maturity Date. In the event of a Borrower default or other event that shall result in an acceleration of the Financing under the Financing documents or Borrower is otherwise required to involuntarily prepay in full the outstanding Financing amount, Borrower shall pay the greater of (x) "yield maintenance" (using Lender's standard yield maintenance formula as set forth in the Financing documents) or (y) 2% of the principal amount being repaid. Prepayment in full will be permitted at par on the last three (3) payment dates preceding the Maturity Date or on any other date subsequent to the second to last payment date preceding the Maturity Date

Wachovia Bank
7255 Woodmont Avenue, Suite 200
Bethesda, MD 20814
Page 3 of 8

provided that interest is paid through the month in which such prepayment occurs. No prepayment premium will be payable in connection with prepayments made as a result of casualty or condemnation.

**Cash Management:**

On or prior to the closing, Borrower will be required to establish a clearing account and lockbox at a bank acceptable to the Lender. Borrower will be required to notify each tenant to remit all amounts due with respect to the Property directly to the lockbox maintained by the lockbox bank or to wire such amounts directly into the clearing account. Amounts on deposit in the clearing account will be transferred daily to an account (the "**Cash Collateral Account**") controlled by Lender. After payment of all scheduled monthly amounts required under the Financing documents (including debt service, reserves, escrows, etc.), any funds remaining ("**Excess Cash Flow**") will be distributed to Borrower,

**Origination Fee:**

$10,000.00

**Guarantor:**

American Association of Justice

**Limited Recourse:**

Borrower and Guarantor shall have no personal liability for the repayment of the Financing or performance under the Financing documents, except for (a) misapplication or misappropriation of insurance proceeds, condemnation proceeds, tenant security deposits, rents and any other funds due Lender under the Financing documents, (b) intentional damage to or waste of the Property and damage or loss in value to the Property resulting from gross negligence; (c) fraud or intentional misrepresentation of Borrower, Guarantor or any of their affiliates; (d) failure to obtain Lender's prior written consent to a transfer of or other encumbrance on the Property or a majority interest in Borrower; (e) damages arising from the existence of hazardous or toxic substances or the failure of Borrower to comply with environmental laws; and (f) certain other matters which are contained in Lender's standard Financing documents and which are normally contained in transactions similar in type and size to the Financing.

The liability for Limited Recourse condition (e) regarding hazardous or toxic substances shall be limited to the Borrowing Entity.

Additionally, the Financing documents will provide that the Financing will be fully recourse to Borrower and Guarantor in the event of a bankruptcy which is filed by, consented to or acquiesced in by Borrower, Guarantor or any of their affiliates or if Borrower or Guarantor or any of their affiliates interfere with

Wachovia Bank
7255 Woodmont Avenue, Suite 200
Bethesda, MD 20814
Page 4 of 8

Lender's pursuit of any of its remedies under any of the Financing documents.

**Tax & Insurance Escrow:**          The Financing will require a monthly escrow in an amount equal to 1/12 of annual taxes and insurance premiums.

**Replacement Reserves:**          The Financing will require an estimated replacement reserve, to be funded monthly, in the amount of $0.15 per square foot per year to be determined by Lender based on Lender's final underwriting. Funds in this reserve will be released to Borrower for reimbursement of the cost of certain capital expenditures. This reserve may be adjusted after evaluation of the engineering report.

In addition, the Financing will require a reserve at closing in an amount equal to 125% of the estimated costs of any immediately needed maintenance and repairs, as determined by the engineering report. Funds in this reserve will be released to Borrower for reimbursement of the cost of such immediately needed maintenance and repairs.

**Tenant Improvement & Leasing Commission Reserves:**          The Financing will require a reserve at closing in an amount of $5,900,000.00 for future tenant improvements and Leasing Commissions. Funds in this reserve will be released to reimburse Borrower for the payment of such obligations as they become due for any space excluding the 61,278 square feet leased to AAJ and the 54,277 square feet leased to Cooley Godward Kronish LLP.

In addition, the Financing will require a reserve, to be funded monthly, for tenant improvements and leasing commissions in the amount of $0.50 per square foot per year starting in the fifth calendar year. Funds in this reserve will be released to Borrower for reimbursement of tenant improvements and leasing commissions incurred in connection with tenant turnover or lease renewals. This reserve may be adjusted after completion of Lender's due diligence and underwriting. Such account shall be interest bearing.

**Mortgage Assumability:**          The Financing may be assumed in full, but not in part, subject to (i) approval by Lender, in its reasonable discretion, (ii) payment of a 0.375% assumption fee, plus any costs and expenses incurred by Lender, (iii) receipt of "no-downgrade" letters from applicable rating agencies and (iv) execution of assumption documentation required by Lender.

Wachovia Bank
7255 Woodmont Avenue, Suite 200
Bethesda, MD 20814
Page 5 of 8

**Default Interest:**

Following the occurrence of an Event of Default, as defined in the Financing Documents, the interest rate shall be increased by 5%.

**Management:**

Management of the Property shall be pursuant to a Management Agreement, which shall be subordinate to the Financing and satisfactory to Lender. Lender reserves the right to remove management of the Property: (i) upon a continuing event of default under the Financing documents; (ii) upon a change in control of the management company; (iii) if after stabilization the DSCR under the Financing falls to 1.03x; or (iv) for cause including but not limited to fraud, gross negligence, willful misconduct or misappropriation of funds.

**Insurance:**

The Property will be covered by fire and casualty, machine and boiler, business interruption and liability insurance, all in form and substance satisfactory to Lender. Insurance against terrorist acts will also be required in an amount equal to the full amount of the Financing. Additional insurance, such as flood, mold, windstorm and earthquake, may be required. All insurance (except for earthquake or flood insurance) must be written by carriers with an S&P rating of at least AA. Business interruption insurance shall cover a period of not less than 24 months.

**Reporting Requirements:**

Borrower will provide to Lender during the term of the Financing (i) annual financial statements (including operating and capital expense budget for the upcoming year) within 120 days following year end and certified by an accounting firm acceptable to Lender, (ii) quarterly and monthly unaudited financial statements within 20 days of the applicable period, certified as accurate by the Vice President of Finance.

**Due Diligence:**

Prior to closing, Lender will conduct customary due diligence with respect to the Property, tenants, Borrower and Guarantor, all of which must be satisfactory to Lender. Such due diligence will include, but is not limited to:

(a) The engagement by Lender of a due diligence firm to verify historical income and expenses numbers and to perform other due diligence;

(b) Receipt of tenant estoppels and SNDA's from all tenants of the Property;

(c) Receipt of title insurance, survey and third party reports including a MAI appraisal (in accordance with FIRREA standards), environmental and engineering reports (all commissioned by Lender in the name of Lender its successors and assigns); and

(d) Review of applicable ground leases, if any, to confirm same meet rating agency criteria for securitization.

The Title Policy shall be issued by a title company chosen by Lender.

**Patriot Act Disclosure:**

To help fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person or corporation that enters into a business relationship. Accordingly, Wachovia's due diligence will include customary public record searches on the direct and indirect owners of Borrower.

**Exclusivity:**

Lender requires that Borrower not make, accept, negotiate, entertain or otherwise pursue any offers to engage in any debt financing regarding the Property other than the Financing contemplated hereby unless Lender elects not to provide the proposed Financing.

**Securitization/Cooperation:**

Lender intends to sell all or a portion of the Financing by certificates, participations, securities or pari passu notes evidencing whole or component interests therein, through one or more public or private offerings (each a "**Securitization**"). Borrower and Guarantor shall enter into a cooperation agreement with Lender pursuant to which such parties shall cooperate with Lender and its affiliates in connection with any such transaction, including, without limitation:

(a) separating the Financing into two or more separate notes and/or participation interests including, but not limited to, separate senior and junior notes, participations or components. Such notes or components may be assigned different interests rates, so long as the initial weighted average of such interest rates equals the Interest Rate as of the closing of the Financing. Partial prepayments of principal may cause the Interest Rate to change over time due to the non pro-rata allocation of such prepayments between any such separate notes, participations or components;

(b) obtaining ratings from two or more rating agencies;

(c) making or causing to be made non-material changes or modifications to the Financing documentation, organizational documentation, opinion letters and other documentation;

Wachovia Bank
7255 Woodmont Avenue, Suite 200
Bethesda, MD 20814
Page 7 of 8

    (d)  reviewing prepared offering materials relating to the Property, Borrower, Guarantor and Financing, and making certain indemnifications, representations and warranties with regard to such offering materials; and

    (e)  delivering updated information on Borrower, Guarantor and the Property.

**Brokers:**
Other than The Staubach Company, Lender and Borrower represent and confirm that neither party has engaged or worked with any broker or agent in arranging the financing for this transaction. Further, it is hereby agreed that all costs, finders' fees, commissions, concessions remuneration or similar fees or compensation relating to the financing are the sole and absolute responsibility of Borrower. Borrower agrees to indemnify and hold Lender and its respective affiliates harmless from and against any and all compensation sought by such parties, or any other party who makes claim for such commission or compensation relating to the financing if the foregoing representation by Borrower is untrue.

**Good Faith Deposit:**
Borrower shall be responsible for all costs and expenses incurred by Lender relating to the Financing. Borrower shall pay to Lender a good faith deposit of $20,000.00 (the "**Good Faith Deposit**") simultaneously with its return of a countersigned copy of this Term Sheet. After payment of all costs and expenses incurred by Lender (and any break-up fee), the balance of the Good Faith Deposit shall be refunded to Borrower. If Lender's costs and expenses exceed the Good Faith Deposit, Borrower shall promptly pay such difference to Lender upon demand.

This Term Sheet is provided for discussion purposes only and does not constitute a commitment to lend or an agreement to issue a commitment, but merely indicates Lender's willingness to proceed with its evaluation of this potential transaction. Its terms are not all-inclusive. No agreement (oral or otherwise) that may be reached during negotiations shall be binding upon the parties until a final commitment letter has been issued by the Lender and accepted by Borrower. Lender is under no obligation to fund the Financing outlined in this Term Sheet. Any commitment that may be issued by Lender will contain a "material adverse change" clause allowing Lender to terminate the Commitment (and any obligation thereunder to fund the Financing) as a result of material adverse changes in (a) the Property or the financial conditions of major tenants, Borrower or Guarantor, (b) financial, banking or capital market conditions that could impair the sale of the Financing by Lender.

This Term Sheet shall be kept confidential, shall not be reproduced or disclosed, and shall not be used by you other than in connection with evaluating the transaction described herein.

To commence processing of your requested financing, please sign and return an original counterpart of this Term Sheet together with the Good Faith Deposit. This letter shall be null and void if not countersigned by Borrower and returned to Lender by Tuesday, May 1, 2007.

Wachovia Bank
7255 Woodmont Avenue, Suite 200
Bethesda, MD 20814
Page 8 of 8

Please do not hesitate to call me at (301) 321-1283 if you have any questions.

Please sign below in the space provided for your signature and please complete the borrower history section. We look forward to working with you on this transaction.

Sincerely,


Sandor Biderman
Director


**Agreed to and accepted on behalf of Borrower:**

_____

By:_____

Name:_____

Title:_____


**<u>Borrower History</u>**

Please check the appropriate space regarding the statements below. If "Yes" is checked for any statement, please attach an explanatory statement which is subject to Lender's approval.

In the last twenty years from the date of this term sheet, has any Guarantor, Borrower, sponsor and/or affiliate of any of the foregoing:

(i)  ever defaulted and/or been delinquent on a commercial mortgage loan? Yes (__) No (__)

(ii) ever had any outstanding tax liens against them? Yes (__) No (__)

(iii) ever had any outstanding judgments against them? Yes (__) No (__)

(iv) ever been a debtor in a bankruptcy action? Yes (__) No (__)

(v)  ever had any extraordinary course of business litigation pending? Yes (__) No (__)

(vi) ever had any criminal convictions? Yes (__) No (__)

Exhibit B

# FORWARD RATE LOCK AGREEMENT

**AGREEMENT** dated as of April 30, 2007 between **WACHOVIA BANK, N.A.** ("Wachovia"), One Wachovia Center, DC-6, Charlotte, North Carolina 28288-0166 and The American Association for Justice, Capitol Justice LLC, a District of Columbia limited liability corporation and Affiliates ("Borrowers") having an address at 1050 31st Street, NW Washington, DC 20007.

## Preliminary Statement

    **WHEREAS,** Borrowers have submitted to Wachovia a loan application (the "**Application**") for a mortgage loan in the approximate principal amount of $89,500,000 (a "**Loan**") with regard to the property(s) located at 777 6th Street, NW Washington, DC 20001 (the "**Property**").

    **WHEREAS,** Wachovia has not issued a commitment letter for the Loan (the "**Commitment**") and, therefore, no commitment fee (the "**Commitment Fee**") has been paid by Borrower.

    **WHEREAS,** Borrowers have requested that Wachovia lock in advance the fixed per annum interest rate to be payable for the Loan (the "**Rate Lock**") notwithstanding that a Commitment has not been issued and all of Wachovia's conditions to Rate Lock have not yet been fulfilled and satisfied by Borrower.

    **WHEREAS,** Wachovia is unwilling to Rate Lock unless Borrowers and Guarantors enter into this Agreement.

    **NOW, THEREFORE,** in consideration of $10.00 and the mutual covenants contained herein, and other good and valuable consideration, the parties hereby agree as follows:

    1.    **Rate Lock Transaction.**

        (a)    Borrowers shall be permitted to enter into a Rate Lock transaction with regard to the Loan subject to the terms of this Agreement. Such transaction (a "**Transaction**") shall be evidenced by a confirmation in the form attached hereto and made a part hereof as **Exhibit A** (a "**Confirmation**") setting forth, among other things, the "**Fixed Rate**", the "**Specified Principal Amount**" and the "**Fixed Rate Period**" of each Transaction.

        (b)    Borrowers acknowledge and agree that the actual principal amount of the Loan shall be determined by Wachovia in accordance with the terms of the Commitment and nothing contained in this Agreement shall be deemed to limit or impair any such terms. The Specified Principal Amount with regard to a Transaction is merely an approximation of the actual Loan amount and is not binding upon Wachovia.

        (c)    BORROWERS ACKNOWLEDGE AND AGREE THAT WACHOVIA HAS NOT ISSUED, AND IS UNDER NO OBLIGATION TO ISSUE, A COMMITMENT AND IS ALLOWING BORROWER TO RATE LOCK IN RESPONSE TO BORROWERS' REQUEST. NEITHER THIS AGREEMENT NOR THE RATE LOCK CONSTITUTES, OR SHOULD BE DEEMED OR CONSTRUED TO CONSTITUTE, A COMMITMENT OR AGREEMENT BY WACHOVIA TO PROVIDE THE REQUESTED FINANCING.

    2.    **Hedging Arrangements.**

        (a)    In order to effect a Transaction, Wachovia shall enter into certain hedging arrangements in its sole and absolute discretion through the purchase or sale of United States Treasury notes, bonds or futures contracts, options or swaps on such notes, bonds or futures contracts or other measures deemed necessary or appropriate by Wachovia (collectively, "**Hedging Arrangements**").

(b)      If at any time during the Fixed Rate Period, Wachovia determines, in its sole discretion that the Hedging Arrangements will or have incurred losses equal to or greater than 75% of the Mandatory Lock Fee (as hereinafter defined) Borrowers or Guarantor shall be required, no later than 10:00 am (Charlotte, North Carolina time) on the fifth business day following notice of any such losses (the "Losses Payment Date") to deposit with Wachovia by wire transfer of immediately available funds the amount of such losses which amount shall be known as the "Additional Mandatory Lock Fee". Lender will also allow borrower to substitute an Irrevocable Letter of Credit in the same amount in place of cash for any potential increased deposit. Borrowers or Guarantors fail to pay Wachovia the Additional Mandatory Lock Fee by the Losses Payment Date, Wachovia may, at its sole discretion, declare a default hereunder, in which event (i) the interest rate for the Loan will no longer be fixed at the Fixed Rate, (ii) Wachovia shall unwind the Hedging Arrangements, and (iii) Wachovia's only obligation to Borrowers and Guarantors shall be to return the Mandatory Lock Fee less any (X) Transaction Cost (as hereinafter defined), (Y) Breakage Costs (as hereinafter defined), and (Z) fees and expenses (including attorney's fees) incurred by Wachovia in connection with the Loan (collectively, "Wachovia's Expenses"). If Wachovia's Expenses exceed the Mandatory Lock Fee, Borrowers or Guarantors shall pay Wachovia the difference within two (2) business days following the written notice thereof from Wachovia to either Borrowers or Guarantors.

3.      **Breakage Costs.**  In the event that a Transaction shall be entered into as evidenced by a Confirmation and either (a) the Loan relating thereto shall not be closed and funded by Wachovia for any reason prior to the expiration of the Fixed Rate Period, (b) the actual maturity date of the Loan relating thereto shall differ from the "Loan Maturity Date" set forth in the applicable Confirmation  and/or (c) the final principal amount of the Loan relating thereto shall differ from the Specified Principal Amount set forth in the applicable Confirmation, Borrowers acknowledge and agree that Wachovia may suffer or incur damages, losses, liabilities, costs, fees and expenses (including breakage, unwind and similar costs, fees and expenses) (collectively, the "Breakage Costs").  Borrowers shall be fully responsible for all Breakage Costs and the same shall be paid by Borrower upon demand to Wachovia.  Wachovia shall determine the amount of Breakage Costs in good faith using such methodology as Wachovia deems appropriate under the circumstances, and such determination shall be conclusive and binding.  Wachovia shall provide Borrowers with a statement setting forth its determination of Breakage Costs.  In the event Lender does not issue a commitment by May 30th 2007, and Borrower elects to terminate the rate lock agreement, Lender shall not profit from any gains that are realized from the hedge agreement and all profits less costs shall be released to the Borrower.  In no event, shall Borrower be able to hold Lender liable in the event there are any loses and Borrower agrees to pay all costs related to breaking the hedge agreement.

4.      **Hedging Fees.**

(a)      In order to be eligible to enter into a Transaction and as a condition precedent thereto, Borrowers shall be required to pay to Wachovia a fee equal to the amount set forth in the applicable Confirmation (the "Mandatory Lock Fee"), which Mandatory Lock Fee may, at Wachovia's option, be applied to the payment of all Breakage Costs.  In the event that Wachovia shall require an Additional Mandatory Lock Fees, as provided above, the term Mandatory Lock Fee shall mean the Mandatory Lock Fee and any Additional Mandatory Lock Fee.  The Mandatory Lock Fee shall be refundable provided that the applicable Loan is actually closed and funded in accordance with this Agreement prior to the expiration of the applicable Fixed Rate Period; provided, however, that a portion of the Mandatory Lock Fee shall be non-refundable  (such non-refundable portion being the "Transaction Costs Fee") and may be retained by Wachovia on account, and as a reasonable estimate, of the costs and expenses associated with and incurred by Wachovia in entering into and maintaining the Hedging Arrangements (the "Transaction Costs").  The non-refundable Transaction Costs Fee shall be the amount set forth in the applicable Confirmation. Notwithstanding anything to the contrary contained in this Agreement and without limiting any of  Wachovia's rights, if Borrowers either (i) willfully fail or refuse to close the Loan or (ii) otherwise default under the Commitment (if issued), the entire Mandatory Lock Fee shall be non-refundable, be deemed  immediately earned and may be retained by Wachovia.

(b)      Borrowers acknowledge and agree that if a Commitment shall be issued, the Commitment Fee may, at Wachovia's option, be applied to the payment of Breakage Costs. If any portion of the Commitment Fee shall be applied by Wachovia to pay any Breakage Costs, Borrowers shall be and remain fully liable to reimburse Wachovia upon

demand for such applied amounts so that the Commitment Fee due under the Commitment shall have been paid in full as required under the Commitment whether or not the Loan is closed or funded. Notwithstanding anything to the contrary contained in the Commitment, in no event shall the Commitment Fee be returned or refunded to Borrowers if a Transaction shall be outstanding unless and until all Breakage Costs and Transaction Costs have been paid in full.

        (c)     In no event may Borrowers Rate Lock beyond December 28, 2007. If Lender elects to extend the agreement beyond the 21st

     5.     **Rate Lock Guaranty.** Guarantors hereby jointly and severally, absolutely and unconditionally guaranty to Wachovia the prompt payment when due of all amounts required to be paid by Borrowers to Wachovia under, relating to or in respect of this Agreement.

     6.     **Representations and Warranties.** Each Borrower and each Guarantor, as applicable, hereby represents and warrants on behalf of itself as of the date hereof and as of the date of a Transaction that (a) Borrower and such Guarantors are (i) duly organized and formed, validly existing and in good standing in its state of formation and (ii) duly authorized to enter into and perform its obligations under this Agreement (and Borrowers and each non-individual Guarantor shall, upon request, deliver simultaneously herewith an authorizing resolution and incumbency certificate acceptable to Wachovia), (b) this Agreement does not violate or conflict with any applicable law or regulation, organizational document or other document, instrument or agreement binding upon or affecting Borrowers or Guarantors and all consents and approvals have been obtained, (c) its obligations hereunder are legally binding and enforceable, (d) Wachovia has been and will be acting on an arm's length basis with Borrowers and not as Borrowers' agent, fiduciary, broker, advisor or consultant with respect to a Transaction and Borrowers are relying solely upon the advice of their own advisors in connection with a Transaction and not upon the advice of Wachovia or any of its representatives and (e) Borrowers are aware of the risks associated with a Rate Lock and a Transaction and is willing to assume those risks.

     7.     **Indemnity.** Borrowers and Guarantors hereby agree to jointly and severally indemnify, defend and hold Wachovia harmless from and against all costs, fees and expenses (including attorneys' fees and disbursements) incurred by Wachovia under or by reason of this Agreement and/or the Rate Lock.

     8.     **Defaults.**     In the event that a default shall occur under the Commitment (if issued) or this Agreement or otherwise under the Loan (including, without limitation, the commencement of a case under the U.S. Bankruptcy Code or other creditor protection action or proceeding by or with respect to Borrowers or any Guarantor), Wachovia may, at its option, terminate the Transactions upon written notice to Borrowers. In such event, Borrowers shall be and remain liable for all Breakage Costs and Transaction Costs as otherwise provided in this Agreement.

     9.     **Miscellaneous.**

        (a)     The interest of Borrowers hereunder may not be transferred or assigned without Wachovia's prior written consent.

        (b)     No amendment, modification or waiver under this Agreement shall be effective unless in writing signed by the parties hereto.

        (c)     This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina.

        (d)     ~~Each party hereto hereby waives the right to a trial by jury in any legal proceeding in connection with this Agreement or a Transaction.~~ In addition, Borrowers and Guarantors hereby submit to the non-exclusive jurisdiction of North Carolina with respect to any actions or proceedings arising out of this Agreement or the subject matter hereof.

        (e)     The obligations of Borrowers and Guarantors hereunder are absolute, unconditional and irrevocable and are not subject to any offset, defense, claim or counterclaim.

        (f)     Nothing contained herein shall be deemed a waiver or limitation of any term or condition

contained in the Application or the Commitment.

(g)     This Agreement represents the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communications and prior writings.

(h)     This Agreement may be executed in one or more counterparts, each of which, when so executed, shall be deemed to be an original and all of which shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

WACHOVIA BANK. N.A.

By: _____
Name:   Sandor Biderman
Title:    Director


By: _____
Name: Robert T. Michaels
Title: Vice President of Finance

American Association for Justice
, as Guarantor

**EXHIBIT A**

**Form of Confirmation**

**CONFIRMATION** dated 4|2| 07 between **WACHOVIA BANK, N.A.** ("Wachovia") and Association of Trial Lawyers of America and Affiliates ("**Borrower**").

This Confirmation is entered into between Wachovia and Borrower pursuant to that certain Forward Rate Lock Agreement dated as of April 30, 2007 (the "**Forward Agreement**") and is the "**Confirmation**" referred to in the Forward Agreement and is intended to confirm the terms of a Rate Lock. Capitalized terms used herein shall have the meanings set forth in the Forward Agreement.

The terms of the Transaction are hereby confirmed as follows:

| | | |
|---|---|---|
| 1. | **Transaction Type:** | Forward Interest Rate Lock. |
| 2. | **Mandatory Lock Fee:** | $1,790,000 payable by Borrower to Wachovia (which amount includes the non-refundable Transaction Costs Fee). Borrower may reduce the cash deposit by $895,000 within 30-days of rate locked by substituting an Irrevocable Letter of credit in the amount of $1,790,000 from an acceptable banking institution. |
| 3. | **Transaction Costs Fee:** | For the initial 22$ day period for which the loan is locked but not funded, Borrower shall pay to Wachovia a Transaction Costs Fee in the amount of $0.00. For each subsequent 15 day interval, or portion thereof, for which the loan is rate locked but not funded Borrower shall elect for either: |

(i)    5 basis points to be added to the spread of the Loan.

(ii)   Actual costs to extend the hedge as long as it is not beyond the calendar year 2007.

| | | |
|---|---|---|
| 4. | **Lock Date:** | 04|02|2007 |
| 5. | **Fixed Rate:** | 6.02 % per annum. |
| 6. | **Specified Principal Amount:** | $89,500,000 |
| 7. | **Fixed Rate Period:** | From the date hereof to and including Dec 17, 2007 |
| 8. | **Loan Maturity Date:** | Approximately 120 months. |

This Confirmation shall be void and of no effect unless the Mandatory Lock Fee is paid in immediately available funds simultaneously herewith.

**WACHOVIA BANK, N.A.**

By: _Sandor B_
Name: Sandor Biderman
Title: Director

By: _RT Michaels_
Name: Robert T. Michaels
Title: Vice President of Finance, American Association for Justice

o:\shared\sp\coml_re\wp\bpr\misc\lockform.wpd                    6

Exhibit C

**LOAN COMMITMENT**

**Check One:**     [X]  **Commercial**
                   [  ] **Multi-Family**

Date:  May 25, 2007

Mr. Robert Michaels
Vice President of Finance
American Association for Justice
1050 31 st Street, NW
Washington, DC 20007

Mr. John Gibb
Senior Vice President
The Staubach Company – Northeast
575 7th Street, NW Suite 400
Washington, DC 20004

        Re:     Fixed Rate Financing for 777 6th Street, NW, Washington, DC (the "*Property*")

Gentlemen:

        We are pleased to advise you that Wachovia Bank, National Association ("*Lender*") hereby confirms its interest in and commits to making a loan (the "*Loan*") to Capitol Justice LLC, a District of Columbia limited liability company, upon and subject to the terms and conditions set forth herein and as more particularly set forth in the Term Sheet dated April 26, 2007 attached hereto as Annex 1 and incorporated herein by this reference (the "*Term Sheet*"). Capitalized terms used but not defined herein shall have the meaning set forth for such terms in the Term Sheet.

        1.1     Financing Amount. $89,500,000.00. The exact amount of the Loan will be determined by Lender based upon the coverage conditions contained in the Term Sheet.

        1.2     Interest Rate. A fixed interest rate (the "*Interest Rate*") per annum of 6.02% (subject to the terms of the Rate Lock Agreement (as defined herein)).

        1.3     Repayment Terms. Interest shall be payable monthly, in arrears, during the term of the Loan. All outstanding principal and unpaid interest shall be due and payable in full on the tenth (10th) anniversary of the date of the funding of the Loan (the "*Closing Date*") or on the tenth (10th) anniversary of the eleventh (11th) day of the calendar month immediately following the Closing Date if the Closing (as hereinafter defined) does not occur on the eleventh (11th) day of a calendar month, as applicable.

        1.4     Prepayment. Prepayment of the Loan shall be permitted as set forth in the Term Sheet.

4890856

May 25, 2007
Page 2 of 5

    1.5    <u>Liability</u>.  Borrower shall have no personal liability for the repayment of the Loan or performance under the Loan Documents (as hereinafter defined) except for Lender's standard recourse exceptions substantially as described in the Term Sheet.  Additionally, only Borrower shall indemnify Lender with respect to any recourse exception items and environmental matters pursuant to an Indemnity and Guaranty Agreement and an Environmental Indemnity Agreement executed by Borrower.

    1.6    <u>Assumption Rights</u>.  The Loan Documents shall provide that all amounts due under the Loan shall be due and payable upon the sale or other transfer of the Property or ownership interests in Borrower (directly or indirectly) or upon all or any portion of the Property being further encumbered; provided, however, that Lender shall consent to a transfer of ownership of the Property (or a portion thereof in connection with, a permitted partial release or an individual Property substitution) or ownership interests in Borrower upon the satisfaction of certain conditions susbtantially as described in the Term Sheet.

    1.7    <u>Tenant Improvement and Leasing Commission Reserve</u>.  At Closing, Borrower shall deposit with Lender in an interest bearing account the amount of $5,900,000 for the payment of future tenant improvements and leasing commissions at the Property (the "***TI/LC Reserve***").  In addition, commencing in the fifth (5th) year of the term of the Loan, Borrower shall make a deposit into the TI/LC Reserve concurrently with each monthly installment of principal and interest in an amount equal to $0.50 per square foot.  Amounts on deposit in the TI/LC Reserve shall be released to reimburse Borrower for the payment of tenant improvements and leasing commissions for space at the Property (provided, however, that in no event shall funds in the TI/LC Reserve be available for the space leased to American Association for Justice and Cooley Godward Kronish LLP) as follows: (i) in connection with the leasing of retail space at the Property, provided that the base rent pursuant to such lease is equal to or greater than $60.00 per square foot or the average base rent for the total retail and office space (excluding the American Association for Justice and Cooley Godward Kronish LLP spaces) is equal to or exceeds $53.56 per square foot, funds shall be released to Borrower (a) for the payment of tenant improvements, in an amount not to exceed $40.00 per square foot and (b) for the payment of leasing commissions in an amount not to exceed $27.00 per square foot; (ii) in connection with the leasing of office space at the Property, provided that the base rent pursuant to such lease is equal to or greater than $52.50 per square foot or the average base rent for the total retail and office space (excluding the American Association for Justice and Cooley Godward Kronish LLP spaces) is equal to or exceeds $53.56 per square foot, funds shall be released to Borrower (a) for the payment of tenant improvements in an amount not to exceed $60.00 per square foot and (b) for the payment of leasing commissions in an amount not to exceed $26.63 per square foot.  In the event that the base rent payable under any such lease is less than the amounts set forth in (i) and (ii) in the preceding sentence, funds available from the TI/LC Reserve for tenant improvements and leasing commissions shall be reduced pro-rata by Lender in its sole discretion.  All funds paid to Lender pursuant to this Section 1.7 shall constitute additional security for the Loan and may be commingled with Lender's or Lender's loan servicer's other funds and any interest earned thereon shall be accumulated for the benefit of Borrower.

    1.8    <u>Loan Documents and Back-up Documents</u>.  All such loan documents as Lender may, in its judgment, deem necessary or expedient for its protection, including a promissory note, mortgages, deeds of trust or security deeds, assignments of leases and rents, security agreements, environmental indemnity, indemnity and guaranty (relating to the matters set forth in Section 1.5 hereof), and appropriate collateral assignments (collectively, the "***Loan Documents***"), shall be prepared by counsel for Lender based on Lender's standard form loan documents, as modified to reflect the Term Sheet, and shall contain representations, covenants and agreements reasonably satisfactory to Lender.  Upon its review and approval of the Loan Documents, Borrower shall execute the Loan Documents and shall furnish back-up documentation as may be required by Lender or Lender's counsel including such items as

US2000.9906753.2

4890856

May 25, 2007
Page 3 of 5

financial statements, pro forma operating statements, corporate, partnership or other organizational documents, subordination agreements, legal opinions, mortgagee title insurance, property and liability insurance, surveys and other documents relating to the Property, all of which must be approved by Lender and Lender's counsel in their reasonable discretion as a condition to the Closing.

1.9   Appraisals, Engineering Reports and Environmental Reports. Lender acknowledges receipt of the appraisals, engineering reports and environmental reports, and that the appraisals, engineering reports and environmental reports are approved; provided, however, that notwithstanding such approval, Lender reserves the right to require Borrower to comply with any remediation or repair requirements based upon such reports as Lender may require.

1.10   Costs and Expenses. Borrower shall pay all reasonable costs and expenses incurred in connection with the preparation for and the closing of the Loan, whether the Loan is closed or not, including appraisal fees, engineering examination fees, environmental audit fees, inspection fees, credit report fees, accountant review fees, insurance policy review fees, surveyors' fees, zoning/survey consultant's fees, legal fees (including fees and disbursements of counsel and local counsel for Lender), which legal fees shall be limited to $65,000 (and notice shall be provided to Borrower when such legal fees equal $50,000), intangibles taxes, note taxes, mortgage taxes, stamp taxes, transfer taxes, all recording costs and filing fees, all license and permit fees, all title/UCC/litigation/tax lien search fees, and all title and other insurance premiums. The Good Faith Deposit shall be applied against such costs and expenses. Lender shall not bear any out-of-pocket costs or expenses whatsoever in connection with this Commitment or the Loan. This Section shall survive the Closing and the expiration or termination of this Commitment.

1.11   Commitment Fee; Rate Lock Fee. (a) No Commitment Fee shall be required.

(b)   Rate Lock Fee. If Borrower elects to lock the Interest Rate prior to the Closing Date, Borrower shall be required to pay Lender a Rate Lock Fee in the amount of one percent (1%) of the Financing Amount (the "*Rate Lock Fee*") in accordance with the Lender's required procedure, whereupon, Lender shall "lock" the Interest Rate. The Rate Lock Fee shall be fully earned upon Lender's receipt thereof and shall be refunded to Borrower only upon the closing of the Loan and payment in full of all fees and expenses due from Borrower on or before the Closing.

(c)   Borrower and Lender have executed that certain Forward Rate Lock Agreement (the "*Rate Lock Agreement*"), a copy of which is attached hereto as Annex 2 and incorporated herein. Provided that the conditions set forth in the confirmation attached to the Rate Lock Agreement are met, the Interest Rate shall be 6.02% and the terms of (b) above shall be inapplicable.

1.12   Correspondent and Other Fees. Lender shall not be obligated to pay any loan commission and/or brokerage fee in connection with this Commitment, Lender's acceptance thereof or the consummation of the Loan. Borrower shall pay any and all commissions and fees due to any person or party including, without limitation, any correspondent and/or broker, and hereby agrees to indemnify, defend and hold Lender harmless from any and all claims for commissions or fees, including any legal fees and expenses, from any person or party including, without limitation, any correspondent and/or broker. The foregoing representation and such indemnity shall survive the expiration or termination of this Commitment or the Closing, as applicable.

1.13   Closing and Funding of Loan. The execution and delivery of all documents and satisfaction of all requirements for Closing as determined by Lender (the "*Pre-Closing*") shall occur at the offices of Lender's counsel or in escrow, or at such other location as agreed to by Lender and

US2000 9900753.2

4890856

May 25, 2007
Page 4 of 5

Borrower, on or about December 17, 2007, but no later than December 21, 2007. In addition to satisfaction of all of the terms and conditions of this Commitment, funding of the Loan proceeds by Lender (collectively, the "*Closing*") shall be contingent on delivery of the executed Loan Documents, title policy, survey and other original documents to Lender's counsel or, at Lender's option, to a custodian designated by Lender.

    1.14.   Acceptance. Upon the return by Borrower to Lender of a fully executed copy of this Commitment within five (5) days after the date hereof, this Commitment will constitute an agreement obligating Lender to make and Borrower to accept the Loan in accordance with the terms and conditions set forth in this Commitment. If said executed copy of this Commitment are not received by Lender within five (5) days from the date hereof, this Commitment shall be null and void.

    1.15.   Expiration and Termination. Unless all applicable conditions contained herein and all of Lender's other terms and conditions have been met to the satisfaction of Lender and the Loan has been Pre-closed on or before December 21, 2007, this Commitment shall automatically expire unless Lender elects otherwise. Lender may, at its option, terminate its agreement to make the Loan (a) in the event that there is any material adverse inaccuracy or any material adverse change in any information, representations or materials submitted with or in support of this Commitment or the Term Sheet by or on behalf of Borrower, (b) in the event of any material adverse change in the financial condition of the Property, Borrower, Borrower's managers or any direct or indirect owner of Borrower (Borrower and any such manager or owner being herein referred to as a "*Credit Party*") or the default by Borrower under any material obligation to American Association for Justice or Cooley Godward Kronish LLP, (c) in the event of any material adverse change in the condition of the Property, physical or otherwise, including any changes, whether existing or potential, caused by pending or threatened condemnation or by casualty, or (d) in the event of any material adverse change in the financial, banking or capital market conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet; provided, however, that upon the termination of this Commitment by Lender pursuant to the terms of this subsection (d), Lender shall use its best efforts to offer a loan to Borrower in accordance with its then-current pricing and underwriting requirements.

    1.16.   Role of Correspondent. Any correspondent acting on behalf of Lender in connection with this Commitment is acting as an independent contractor and not as an agent, employee, partner, joint venturer or affiliate of Lender. Borrower understands that any such correspondent does not have the authority to, and cannot, bind Lender in any respect, including, without limitation, the waiver of any condition contained herein, or the funding of the Loan.

    1.17.   Miscellaneous. Lender shall be under no obligation to make the Loan unless and until all of the requirements hereunder and any and all other reasonable requirements and conditions of Lender have been fully satisfied. The Loan and Lender's obligations hereunder are subject to the completion by Lender of its underwriting process and its due diligence review of the Borrower and the Property, including, without limitation, conducting an on-site inspection of the Property, the results of which must be satisfactory to Lender and its counsel in their reasonable discretion. Except as otherwise specifically provided herein, all documents, certificates, permits and other items contemplated hereby, all inspections, appraisals, evaluations and approvals contemplated hereby, all payments required hereby, and all other conditions, matters or things of any nature contemplated hereby to exist, be performed or be provided, shall all be satisfactory to Lender in its sole discretion, acting in good faith, and, except as otherwise permitted by Lender, shall exist, be performed and be provided to Lender prior to the Pre-closing. Neither this Commitment, nor any of the proceeds of the Loan shall be assignable by Borrower without the prior written consent of Lender, and any attempt to make such assignment without such consent shall be void. Execution of this Commitment by Lender shall not imply the approval by Lender of any

US2000 9906753.2

4890856

May 25, 2007
Page 5 of 5.

document or information previously furnished to Lender, it being acknowledged by all parties hereto that, except as expressly provided herein, no approvals have been given by Lender with respect to the Loan. This Commitment contains the entire agreement of Borrower and Lender with respect to the matters referred to herein and supersedes entirely any and all prior written or oral agreements relating to the Loan, excluding the Term Sheet (the terms and conditions of which are incorporated herein). No change in the provisions of this Commitment and no approval or consent of Lender shall be binding unless in writing and executed in the name of, and by an officer of, Lender. Time is of the essence with respect to all dates and periods of time set forth in this Commitment.

　　　1.18　　Intentionally deleted.

US2000.9906753.3

4890856

May 25, 2007
Page 6 of 5


IN WITNESS WHEREOF, Lender hereby executes this Commitment as of the date first above written.

WACHOVIA BANK, NATIONAL ASSOCIATION

By: _____

Name: _Sandor Biderman_    _R. Zachary David_

Title: _Director_

The foregoing Commitment is hereby agreed to and accepted on behalf of Borrower by the undersigned this _____ day of _____, 2007, and the undersigned hereby guarantees to Lender the payment of the fees, costs and expenses owed to Lender under the terms of this Commitment.

CAPITOL JUSTICE LLC

By:    AMERICAN ASSOCIATION FOR JUSTICE, its MANAGING MEMBER

By: _____

Name: _Jon Haber_

Title: _CEO_

US2000.8906753.2

4890856

ANNEX 1

[ATTACH FORWARD RATE LOCK AGREEMENT]

US2000 9918257.2

4890856