**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CAPITOL JUSTICE LLC and AMERICAN
ASSOCIATION FOR JUSTICE,

              Plaintiffs,

      v.

WACHOVIA CORPORATION, WACHOVIA
BANK, N.A., WACHOVIA CAPITAL
MARKETS, LLC, WACHOVIA SECURITIES,
LLC, and SANDOR BIDERMAN,

              Defendants.

Civil Action No. 1:07-cv-02095-RCL

**DEFENDANTS' MOTION TO DISMISS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), and for the reasons set forth in the

attached Memorandum of Points and Authorities, defendants Wachovia Corporation, Wachovia

Bank, N.A., Wachovia Capital Markets, LLC, Wachovia Securities, LLC, and Sandor Biderman

("Defendants"), by and through their undersigned counsel of record, hereby respectfully move

this Court (a) to dismiss with prejudice, as to all Defendants, Counts II (Breach of Contract –

Rate Lock Agreement), IV (Fraud), V (Breach of Fiduciary Duty), VI (Negligent

Misrepresentation), VII (Breach of the Duty of Good Faith and Fair Dealing), VIII (Equitable

Estoppel), IX (Unjust Enrichment), and X (Accounting) of the Amended Complaint in the

above-captioned action for failure to state a claim upon which relief can be granted, and (b) to

dismiss with prejudice as to all Defendants other than Wachovia Bank, N.A., the remaining

Counts I (Breach of Contract – Money Damages), IV (Breach of Contract – Specific Performance), and XI (Declaratory Judgment) of the Amended Complaint.

Pursuant to LCvR 7(f), Defendants request oral argument on this Motion.

Respectfully submitted,

By:   /s/ Mark W. Ryan
    Mark W. Ryan (D.C. Bar No. 359098)
    Reginald R. Goeke (D.C. Bar No. 453613)
    Joseph R. Baker (D.C. Bar No. 490802)
    MAYER BROWN LLP
    1909 K Street, N.W.
    Washington, DC  20006-1101
    Telephone:   (202) 263-3000

*Attorneys for Defendants Wachovia
Corporation; Wachovia Bank, N.A.;
Wachovia Capital Markets, LLC; Wachovia
Securities, LLC; and Sandor Biderman*

Dated:  January 3, 2008

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAPITOL JUSTICE LLC and AMERICAN
ASSOCIATION FOR JUSTICE,

        Plaintiffs,

    v.

WACHOVIA CORPORATION, WACHOVIA
BANK, N.A., WACHOVIA CAPITAL
MARKETS, LLC, WACHOVIA SECURITIES,
LLC, and SANDOR BIDERMAN,

        Defendants.

Civil Action No. 1:07-cv-02095-RCL

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Mark W. Ryan (D.C. Bar No. 359098)
Reginald R. Goeke (D.C. Bar No. 453613)
Joseph R. Baker (D.C. Bar No. 490802)
MAYER BROWN LLP
1909 K Street, N.W.
Washington, DC  20006-1101
Telephone:  (202) 263-3000

*Attorneys for Defendants Wachovia
Corporation; Wachovia Bank, N.A.; Wachovia
Capital Markets, LLC; Wachovia Securities,
LLC; and Sandor Biderman*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... i

INTRODUCTION ................................................................................... 1

ALLEGATIONS OF THE COMPLAINT ............................................................... 2

  I.    AAJ Purchases a Commercial Office Building ............................................ 2

  II.   The Rate Lock Agreement ........................................................... 3

  III.  AAJ and Staubach Seek To Re-Negotiate the Terms of the Loan.............................. 4

  IV.  AAJ Executes the Loan Commitment Agreement.......................................... 6

  V.   Collapse of the Capital Markets and Termination of the Loan
      Commitment ..................................................................... 7

ARGUMENT ....................................................................................... 8

  I.    The Complaint Fails To State a Claim for Fraud or Negligent
     Misrepresentation................................................................ 9

      A.   Because the Loan Agreements Include Integration Clauses,
         Plaintiffs Cannot Base Their Fraud or Misrepresentation Claims on
         Representations Not Included in the Agreements................................. 10

      B.   Plaintiffs' Fraud and Negligent Misrepresentation Claims Should
         Be Dismissed Because Plaintiffs Have Failed To Allege a False
         Statement or Omission of Fact................................................ 13

      C.   Plaintiffs' Fraud Claim Should Be Dismissed Because the
         Complaint Insufficiently Alleges Knowledge and Intent. .......................... 17

  II.   The Complaint Fails To State a Claim for Breach of Fiduciary Duty ......................... 19

  III.  The Complaint Fails To State a Claim for Equitable Estoppel................................ 21

  IV.  The Complaint Fails To State a Claim for Breach of the Duty of Good
      Faith and Fair Dealing .......................................................... 23

  V.   The Complaint Fails To State a Claim for an Equitable Accounting ........................ 24

  VI.  The Complaint Fails To State Any Claim with Respect to the Rate Lock
      Agreement or the Withheld Deposit Amounts....................................... 25

  VII. All Claims Against Wachovia Defendants Other than Wachovia Bank,
      N.A. Should Be Dismissed ........................................................ 29

CONCLUSION..................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104 (D.C. Cir.1988) .................................................21

*Bates v. Northwestern Human Servs.*, 466 F. Supp. 2d 69 (D.D.C. 2006) ...................................24

*Bayvue Apts. Joint Venture v. Ocwen Fed. Bank FSB*,
    971 F. Supp. 129 (D.D.C. 1997) ...................................................................................................24

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ...............................................................10, 18

*Bennett Enterprises, Inc. v. Domino's Pizza, Inc.*,
    794 F. Supp. 434 (D.D.C. 1992) ..............................................................................................14, 16

*Bennett v. Kiggins*, 377 A.2d 57 (D.C. 1977) ...............................................................................14

*Bynum v. Equitable Mortg. Group*, No. 99-cv-2266-SBC-JMF,
    2005 U.S. Dist. LEXIS 6363 (D.D.C. April 7, 2005)........................................................19

*Cadet v. Draper & Goldberg, PLLC*, No. 05-2105,
    2007 WL 2893418 (D.D.C. 2007) ............................................................................................15, 16

*Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962)........................................................................24

*Daisley v. Riggs Bank, N.A.*, 372 F.Supp.2d 61 (D.D.C. 2005)....................................................22

*Donovan v. U.S. Postal Service*, 530 F. Supp 872 (D.D.C. 1981)................................................22

*Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99 (D.D.C. 2006) .............................................................9

*Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*,
    412 F.3d 745 (7th Cir. 2005) .......................................................................................................9

*Hercules & Co., Ltd. v. Shama Rest. Corp.*, 613 A.2d 916 (D.C. 1992) ......................................11

*Howard v. Riggs Nat'l Bank*, 432 A.2d 701 (D.C. 1981) .........................................................14, 16

*International Bus. Mach. Corp. v. Medlantic Healthcare Group*,
    708 F. Supp. 417 (D.D.C. 1989)................................................................................................22

*Jacobsen v. Oliver*, 201 F. Supp. 2d 93 (D.D.C. 1996) ...............................................................23

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Klayman v. Judicial Watch, Inc.*, Civ. A. No. 06-670, 2007
U.S. Dist. LEXIS 24706 (D.D.C. Apr. 3, 2007) ...............................................11

*Kowal v. MCI Communications Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) .................................16, 17

*Minebea Co., Ltd. v. Papst*, 444 F.Supp.2d 68 (D.D.C. 2006) ......................................28

*Miranda v. Contreras*, 754 A.2d 277 (D.C. 2000) .......................................28

*Nolan v. Nolan*, 568 A.2d 479 (D.C. 1990) ......................................................22

*One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1988) ..............................11, 12, 13

*Overseas Private Inv. Corp. v. Industria de Pesca, N.A.*,
920 F. Supp. 207 (D.D.C. 1996) ..........................................19, 20, 23

*Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141 (Cal. Ct. App. 2005) .........................20

*Rapaport v. U.S. Dept. of Treasury, Office of Thrift Supervision*,
59 F.3d 212 (D.C. Cir. 1995) ...............................................28

*Shekoyan v. Sibley Int'l. Corp.*, 217 F. Supp. 2d 59 (D.D.C. 2002) ................................9

*Schiff v. AARP*, 697 A.2d 1193 (D.C. 1997)..........................................28

*Somerville v. Major Exploration, Inc.*, 576 F. Supp. 902 (S.D.N.Y. 1983) ...................................9

*Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000)............................................18

*Tonn v. Philco Corp.*, 241 A.2d 442 (D.C. 1968)...........................................12

*United States ex rel. Debra Hockett v. Columbia/HCA Healthcare Corp.*,
498 F. Supp. 2d 25 (D.D.C. 2007) ......................................29

*Securities Industry Ass'n v. Federal Home Loan Bank Board*,
588 F. Supp. 749 (D.D.C. 1984) ......................................29

*United States Office Prods. Co. Secs. Litig.*,
251 F. Supp. 2d 77 (D.D.C. 2003) ....................................... *passim*

*Urban Invest., Inc. v. Branham*, 464 A.2d 93 (D.C. 1983)......................................20, 21

*Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999).........................................8

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Wash. Metro. Area Transit Auth. v. Quik Serve Foods, Inc.*,
    2006 U.S. Dist. LEXIS 24510 (D.D.C. 2006) .................................................................23

*Williams v. Federal Land Bank*, 293 U.S. App. D.C. 343 (D.C. Cir. 1992)...............................19

## STATUTES AND RULES

Fed. R. Civ. P. 8(a)(2).................................................................................................................10

Fed. R. Civ. P. 9(b) ......................................................................................................................9

## MISCELLANEOUS

HARPER, JAMES, & GRAY ON TORTS (3d ed. 2006) ......................................................................15

Dan B. Dobbs, THE LAW OF TORTS (2000).................................................................................15

RESTATEMENT (SECOND) OF TRUSTS ...........................................................................................20

Samuel Williston, A TREATISE ON THE LAW OF CONTRACTS.........................................................11

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants Wachovia Bank, N.A. ("Wachovia"), Wachovia Corporation, Wachovia Capital Markets, LLC, Wachovia Securities, LLC, and Sandor Biderman ("Defendants") respectfully submit this Memorandum of Points and Authorities in support of their motion to dismiss Count II and Counts IV through X of the Amended Complaint (the "Complaint") of plaintiffs Capitol Justice LLC and American Association for Justice ("AAJ") (together, "Plaintiffs"), and to dismiss all Defendants other than Wachovia.

## INTRODUCTION

Plaintiff AAJ, until recently known as the American Trial Lawyers Association, sought to purchase a new office building. Wachovia undertook to provide a specialized type of financing for the acquisition, financing that turned on Wachovia's ability to package the AAJ loan with similar loans and sell the package to investors. For reasons set forth below – and pursuant to the contract between Wachovia and AAJ – Wachovia withdrew the financing when capital markets imploded. AAJ rejected different financing terms offered by Wachovia, made other arrangements, and purchased the office building.

In withdrawing the original financing terms, Wachovia exercised a clear contractual right. That right was explicitly bargained for and AAJ agreed to it with the advice of its own counsel and commercial real estate advisors. Whatever rights AAJ may have are defined solely by its contracts with Wachovia Bank, N.A. But what AAJ does ***not*** have is a basis for fraud claims against Wachovia and its former employee (Mr. Biderman) or for the host of other non-contract claims with which it has larded its Complaint. Those claims should be dismissed, as should all defendants other than Wachovia Bank, N.A.

## ALLEGATIONS OF THE COMPLAINT[1]

### I.    AAJ Purchases a Commercial Office Building

Plaintiff AAJ was once known as the Association of Trial Lawyers of America.  Compl. ¶ 11.  In early 2007, AAJ and its wholly-owned entity Capitol Justice LLC, sought to acquire a commercial office building.   They selected a newly constructed building opposite the Verizon center at 777 6th Street N.W., which would provide space for AAJ, and space for lease to other tenants.  Compl. ¶¶ 21, 35.  Before entering any agreements with Wachovia, AAJ contracted for the purchase of the property (on March 30, 2007), and paid a $1 million deposit.  Compl. ¶ 23.

AAJ engaged the Staubach Company ("Staubach"), which is a nationally known commercial real estate advisory firm, for assistance in obtaining financing.   Compl. ¶ 29.  Staubach approached several prospective lenders about both "portfolio" and "CMBS" alternatives.  "Portfolio" financing refers generally to loans held by the lender through maturity.  Compl. ¶¶ 31, 32.  "CMBS" financing (commercial mortgage-backed securities) refers to loans that are pooled with other loans, securitized and sold to investors.  Compl. ¶¶ 30.  CMBS financing often permits borrowers to obtain loans on highly favorable terms, and Staubach eventually focused on obtaining CMBS financing for AAJ.  Compl. ¶ 30.

Wachovia provided Staubach with a term sheet dated April 26, 2007 (the "Term Sheet").  Compl. Ex. A.  The Term Sheet specifically advised AAJ that Wachovia "intends to sell all or a portion of the Financing . . . through one or more public or private offerings (each a 'Securitization')."  Compl. Ex. A at 6.  Highlighting the importance of Wachovia's ability to

---

[1]  Except as otherwise indicated, the following factual recitation reflects the allegations of the Complaint and the contents of the documents attached thereto and referenced therein.   The allegations of the Complaint are not admitted by Defendants for any purpose, but are assumed to be true solely for purposes of Defendants' Motion to Dismiss.

resell any loan, the Term Sheet expressly advised AAJ that any loan commitment would include

a "material adverse change" clause, such as the one that is the subject of AAJ's claims:

> Any commitment that may be issued by Lender will contain a "material adverse change" clause allowing Lender to terminate the Commitment (and any obligation thereunder to fund the Financing) as a result of material adverse changes in . . . (b) financial, banking or capital market conditions that could impair the sale of the Financing by lender.

*Id.* at 7.   After receiving this Term Sheet, Staubach and AAJ decided to obtain financing through

Wachovia.

## II.     The Rate Lock Agreement

AAJ and Staubach "insisted" that Wachovia enter into a forward rate lock agreement

("Rate Lock Agreement").  The parties entered that Agreement on April 30.  Compl. ¶¶ 41-44.

Plaintiffs allege that prior to entering the Rate Lock Agreement, Biderman made several

assurances to AAJ, including that "once the rate lock was executed, the interest rate risk would

be eliminated and there would be . . . 'no worries' with respect to AAJ's ability to count on

Wachovia's making a loan in accordance with the Term Sheet."  Compl. ¶ 43.  Nonetheless, the

Rate Lock Agreement itself states (in all capitalized terms):

> BORROWERS ACKNOWLEDGE AND AGREE THAT WACHOVIA HAS NOT ISSUED, AND IS UNDER NO OBLIGATION TO ISSUE, A COMMITMENT AND IS ALLOWING BORROWER TO RATE LOCK IN RESPONSE TO BORROWER'S REQUEST.  NEITHER THIS AGREEMENT NOR THE RATE LOCK CONSTITUTES, OR SHOULD BE DEEMED TO CONSTITUTE, A COMMITMENT OR AGREEMENT BY WACHOVIA TO PROVIDE THE REQUESTED FINANCING.

Compl. Ex. B § 1(c), at 1.  The Rate Lock Agreement also includes an integration clause stating

that "[t]his Agreement represents the entire agreement and understanding of the parties with

respect to its subject matter and supersedes all oral communications and prior writings." *Id.* § 9(g), at 4.

Plaintiffs allege that "AAJ placed its complete trust and confidence in Wachovia because Wachovia offered financial advice to AAJ," Compl. ¶158, and that AAJ's reliance on Wachovia "gave rise to a fiduciary relationship between AAJ and Wachovia." Compl. ¶ 159. But that allegation is flatly inconsistent with the agreement AAJ signed, which provides, "Wachovia has been and will be acting on an arm's length basis with Borrowers and ***not as Borrowers' agent, fiduciary,*** broker, advisor or consultant with respect to a Transaction and Borrowers are relying solely upon the advice of their own advisors in connection with a Transaction and not upon the advice of Wachovia or any of its representatives." Compl. Ex. B § 6, at 3 (emphasis added).

The Rate Lock Agreement expressly anticipates that Wachovia would "enter into certain hedging arrangements in its sole and absolute discretion." *Id.* § 2(a), at 1. The agreement also anticipates that if the loan were not closed ***for any reason***, certain "Breakage Costs" related to those hedging arrangements would be incurred, including "damages, losses, liabilities, costs, fees and expenses." *Id.* § 3. The Rate Lock Agreement expressly makes AAJ liable for those costs, which are to be calculated by Wachovia using such methodology as it deems appropriate. Wachovia's determination of those costs shall be "conclusive and binding." *Id.*

## III.    AAJ and Staubach Seek To Re-Negotiate the Terms of the Loan.

AAJ "required" Wachovia to provide it with a Loan Commitment Agreement, which AAJ and Staubach began negotiating with Wachovia following the execution of the Rate Lock Agreement. Compl. ¶ 51. On or about May 18, 2007, Biderman sent AAJ a draft loan

commitment agreement ("Loan Commitment Agreement").    Compl. ¶ 52.[2]    That draft agreement contained a material adverse change clause nearly identical to the language used in the initial Term Sheet.    *Compare* Compl. ¶ 52 *with* Compl. Ex. A at 6 (Lender permitted to terminate in the event of "any material adverse change in the financial, banking or capital market conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet.").

Notwithstanding the nearly identical language in the Term Sheet, Staubach, after reviewing the May 18 draft Commitment Agreement "expressed concern" about the material adverse change provision in Section 1.15(d).  Compl. ¶ 52.  AAJ asked Wachovia to remove that provision entirely from the Loan Commitment Agreement.  Compl. ¶ 53.  In the context of discussing AAJ's repeated "expressions of concern about the 'material adverse change' clause" – a clause upon which Wachovia's offer was conditioned from inception – AAJ alleges Biderman "reassure[d]" AAJ by telling AAJ that it should "not worry" about that provision. Compl. ¶ 60-62.

Collecting purported snippets from unspecified conversations at unspecified times and places, AAJ alleges that Biderman made several statements to reassure AAJ, including:

1.   that he understood AAJ's concerns and AAJ's need to be able to rely on a loan commitment agreement  (Compl. ¶ 60);

2.   that the "material adverse change" language was "standard" in all of Wachovia's loan commitments (Compl. ¶ 60);

3.   that there would be no need to invoke the provision, that it was meant to be invoked only in the case of an unforeseeable,

---

[2] Notwithstanding Plaintiffs' assertion at Paragraph 50 that "Wachovia did not, in fact, issue a loan commitment by May 30, 2007," Plaintiffs subsequently concede that "Biderman sent AAJ a proposed loan commitment agreement" on or about May 18. 2007.  Plaintiffs ultimately signed the Loan Commitment Agreement, which was dated as of May 25, 2007.  Compl. Ex. C § 1.14, at 4.

"9/11-type meltdown" and that therefore AAJ had no need to worry (Compl. ¶ 60);

4. that AAJ should not worry because Wachovia was the biggest CMBS lender in the United States (Compl. ¶ 61);

5. that Wachovia would stand by AAJ, that Wachovia would not let AAJ down, and that Wachovia would not leave AAJ "alone at the altar" when AAJ's purchase agreement was scheduled to close (Compl. ¶ 61);

6. that AAJ should feel completely comfortable placing its trust in Wachovia to stand by its commitment and fund the loan under the terms in the Term Sheet (Compl. ¶ 62); and

7. that, as the leading CMBS lender in the United States, Wachovia could be counted on to fund and sell AAJ's loan as contemplated, and therefore there could be no occasion to invoke paragraph 1.15(d) (Compl. ¶ 62).

AAJ asserts that at the time he made these statements, Biderman and Wachovia "considered the Property a 'trophy property,' the inclusion of which in its portfolio of loans would further its aggressive strategy to increase its standing in the fiercely competitive CMBS marketplace." Compl. ¶ 64.

## IV. AAJ Executes the Loan Commitment Agreement

Having failed in its attempt to remove the material adverse change clause, AAJ signed the Loan Commitment Agreement on June 18, 2007. Compl. ¶ 67. The material adverse change clause in that Agreement is nearly identical to the provision stated in the Term Sheet. It provides:

> Lender may, at its option, terminate its agreement to make the Loan . . . (d) in the event of any material adverse change in the financial, banking or capital market conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet; provided however, that upon the termination of this Commitment by Lender pursuant to the terms of this subsection (d), Lender shall use its best efforts to offer a loan to Borrower in accordance with its then current pricing and underwriting requirements.

Compl. Ex. C § 1.15(d), at 4.

In addition to that provision, the Loan Commitment Agreement also requires AAJ to pay all reasonable costs and expenses associated with the loan, whether the loan is closed or not. *Id.* § 1.10, at 3. Those expenses expressly include appraisal fees and legal fees. *Id.*

The Loan Commitment Agreement expressly incorporates both the Term Sheet and the Rate Lock Agreement. Together, those three documents are the integrated and entire agreement of the parties. The Loan Commitment Agreement provides that it "contains the entire agreement of Borrower and Lender with respect to the matters referred to herein and supersedes entirely any and all prior written or oral agreements relating to the Loan." *Id.* § 1.17, at 5.

## V.     Collapse of the Capital Markets and Termination of the Loan Commitment

Shortly after the parties entered the Loan Commitment Agreement, the capital markets collapsed. In fact, the very article quoted in the Complaint (at ¶ 83) states that "[i]nvestors hoping to fund highly leveraged commercial real estate deals using mortgage-backed securities can forget about it this year and probably next." Frank Byrt, "Highly Leveraged Commercial Real Estate Deals are Dead, but Capital is Ready to Jump at Low-Debt Deals," FINANCIAL WEEK (Oct. 26, 2007). It notes that financial markets have gone through a reevaluation following a "CMBS-fed run-up in commercial real estate values [similar] to the dotcom bubble of 2001," and that "[l]enders have shifted from participating in highly leveraged CMBS-backed deals to doing old-fashioned 'balance sheet lending.'" *Id.*

After numerous discussions with Staubach, Wachovia informed AAJ in a letter dated October 22, 2007 that there had been a "material and adverse change in the fixed income sector of the capital markets" such that Wachovia had "determined that it would be unable to effect a

Securitization of the Loan if the Loan were made upon the financial terms committed." Compl. ¶ 106. The letter, a true and correct copy of which is attached hereto as Exhibit 1,[3] noted that "[u]nder present market conditions, we are not aware of any buyers or potential buyers in the CMBS market for the Loan under the terms proposed in the Letter Agreement." Ex. 1 at 2. The letter concluded, stating "[a]s we are terminating the Letter Agreement, please call me as soon as possible . . . to process the termination of the Rate Lock Agreement." *Id.*

After receiving no response concerning the rate lock, Wachovia informed AAJ on November 16, 2007 that it had terminated the Rate Lock Agreement. Compl. ¶ 91. On December 3, 2007, Wachovia wired $1,781,895 to AAJ's bank account, and sent AAJ an accounting of the fees assessed. Compl. ¶¶ 95, 99. As anticipated under the Loan Commitment Agreement and Rate Lock Agreement, Wachovia deducted appraisal and legal fees. Compl. ¶ 95. Also as expressly provided in the Rate Lock Agreement, Wachovia deducted its Breakage Costs ($10,005), which equaled the profit associated with the various hedging contracts less the "carrying" costs to Wachovia. Compl. ¶ 95.

## ARGUMENT

AAJ, assisted by an experienced commercial real estate firm, sought a highly specialized form of real estate financing. The financing conferred benefits (in the form of favorable terms) on AAJ and was accompanied by certain risks (e.g., the continued health of securitization markets). In negotiating the financing, the parties reduced their understanding to a series of written contracts, which AAJ agreed contained the parties' "entire agreement." Now, rather than rely on the language of those agreements, AAJ resorts to extra-contractual claims sounding in

---

[3] The court may consider this document, which is referred to in the Complaint and is central to Plaintiffs' claims, without converting the motion to dismiss into one for summary judgment. *See Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999).

tort and equity in an effort to raise the litigation stakes.  The parties' contractual agreements flatly preclude those claims (as well as certain of the contract claims), and this Court should dismiss all but the Loan Commitment Agreement breach of contract claims in order to focus the scope of the litigation and limit any further reputational harm to the defendants, including Mr. Biderman.

## I.    The Complaint Fails To State a Claim for Fraud or Negligent Misrepresentation

"The irreparable damage to reputations and goodwill, which inevitably results from charges of fraud, and the threat of baseless strike suits are ample reasons for careful judicial review of claims alleging fraud." *Somerville v. Major Exploration, Inc.*, 576 F. Supp. 902, 909 (S.D.N.Y. 1983). Thus, Rule 9(b) requires that in "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," FED. R. CIV. P. 9(b), which "'usually requires the claimant to allege at a minimum the identity of the person who made the fraudulent statement, the time, place and content of the misrepresentation, the resulting injury, and the method by which the misrepresentation was communicated,'" *Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 105-106 (D.D.C. 2006) (Lamberth, J.) (quoting 2-9 MOORE'S FEDERAL PRACTICE – CIVIL § 9.03(1)(b)).  Indeed, the heightened pleading standard of Rule 9(b) "was designed to discourage meritless fraud accusations, to prevent serious damage to the reputation of the defending party from baseless claims, and to deter claimants from adding broad fraud allegations to induce advantageous settlements." *Shekoyan v. Sibley Int'l. Corp.,* 217 F. Supp. 2d 59, 73 (D.D.C. 2002).[4]

---

[4] *See also Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 748-49 (7th Cir. 2005) (Posner, J.) ("The purpose [of the heightened pleading standard] is to minimize the extortionate impact that a baseless claim of fraud can have on a firm or an individual.  In the typical commercial case there is a substantial interval between the filing of the complaint and the completion of enough pretrial discovery to enable the preparation and
(cont'd)

Those goals are particularly relevant here, where the reputations of Mr. Biderman and Wachovia are critical to their business success, and where Plaintiffs seek to induce an advantageous settlement (indeed they claim damages greater than the loan amount itself) by adding broad and unsubstantiated fraud claims to what, at best, is a claim for breach of contract. Also relevant is the more fundamental pleading standard of Fed. R. Civ. P. 8(a)(2), which requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face," before proceeding to discovery. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). A complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1965.

This Court should dismiss the fraud and misrepresentation claims for three independent reasons: (1) the integration clauses in the parties' agreements preclude any fraud claim; (2) Plaintiffs fail to identify any statement of *facts*, nor do they allege that any such statements are in fact false; and (3) Plaintiffs fail adequately to allege the elements of knowledge and intent to deceive.

    A.    *Because the Loan Agreements Include Integration Clauses, Plaintiffs Cannot Base Their Fraud or Misrepresentation Claims on Representations Not Included in the Agreements*

Plaintiffs' fraud and misrepresentation claims are precluded by the integration clauses in the parties' agreements. After "insisting" on a Rate Lock Agreement, and "requiring" a Loan Commitment Agreement, and after agreeing that those contracts represented the entire agreement

---

disposition of a motion by the defendant for summary judgment. Throughout that period a claim of fraud will stand unrefuted, placing what may be undue pressure on the defendant to settle the case in order to lift the cloud on its reputation. The requirement that fraud be pleaded with particularity compels the plaintiff to provide enough detail to enable the defendant to riposte swiftly and effectively if the claim is groundless.").

between the parties, AAJ cannot now assert fraud and misrepresentation claims relying on some other statements allegedly made during the negotiation of those agreements.

Under District of Columbia law, an integration clause bars fraud or misrepresentation claims based on prior representations not contained in the contract "even when the plaintiffs allege fraudulent inducement to enter the contract." *In re: United States Office Prods. Co. Secs. Litig.,* 251 F. Supp. 2d 77, 102 (D.D.C. 2003) (hereinafter "*USOP*"); *see also One-O-One Enters., Inc. v. Caruso,* 848 F.2d 1283, 1286-87 (D.C. Cir. 1988); *Hercules & Co., Ltd. v. Shama Rest. Corp.*, 613 A.2d 916, 928-33 (D.C. 1992). "[W]here an agreement provides that it supersedes all previous agreements and understandings, any prior representations are superseded, such that there are no representations on which a plaintiff could reasonably base a fraud claim." *Klayman v. Judicial Watch, Inc.*, Civ. A. No. 06-670, 2007 U.S. Dist. LEXIS 24706, at *26 (D.D.C. Apr. 3, 2007) (citing *One-O-One Enters., Inc.*, 848 F.2d at 1286-87).

To state a claim for fraud or negligent misrepresentation, Plaintiffs must allege that they ***reasonably relied*** on a misrepresentation as to a ***material fact***. *USOP*, 251 F. Supp. 2d at 99-100. Courts have reasoned that "if a statement is material or if a party relies on the statement, then the party will include it in the contract." *Id.* at 102 (citing *Hercules*, 613 A.2d at 929, 933). Statements not included in the contract are immaterial because "by definition, a completely integrated contract contains all the terms which the parties consider material and essential to the agreement." *Hercules*, 613 A.2d at 929. Reliance, in turn, "'is only justifiable if the fact misrepresented is material.'" *Id.* at 934 (quoting Samuel Williston, A TREATISE ON THE LAW OF CONTRACTS § 1515C at 493 (Walter Jaeger ed. 1970)). Thus, a party fails "adequately to allege the reasonableness of its continued reliance on . . . parol representations after those representations were not included in the terms of the completely integrated contract." *Hercules*,

613 A.2d at 934; s*ee also id.* at 932-33 ("If [plaintiff] considered these assurances important enough to induce it to agree to the contract . . . it could have conditioned its agreement on the explicit inclusion of those representations in the contract . . . [or] walked away . . . ."); *One-O-One Enters., Inc.*, 848 F.2d at 1286 (integration clause in a written agreement renders "any reliance . . . on prior representations . . . unreasonable").

Put another way, "reliance on any facts not in the [contract] is not reasonable because such reliance contravenes the written instrument." *USOP*, 251 F. Supp. 2d at 102. If courts "permit plaintiffs' use of defendants' prior representations . . . to defeat the clear words and purpose of the Final Agreement's integration clause, 'contracts would not be worth the paper on which they are written.'" *One-O-One Enters., Inc.*, 848 F.2d at 1286-87 (quoting *Tonn v. Philco Corp.*, 241 A.2d 442, 445 (D.C. 1968)).[5] "On a matter of such large significance to the parties' bargain, silence in a final agreement containing an integration clause – in the face of prior explicit representations – must be deemed an abandonment or excision of those earlier representations." *Id.*

After arms-length commercial negotiations with Wachovia, AAJ executed a Rate Lock Agreement and a Loan Commitment Agreement containing integration clauses that explicitly stated, in each case, that the writing was intended to be the entire expression of the parties' agreement up to that time, superseding prior communications. Because AAJ's fraud and negligent misrepresentation claims are based entirely on representations that predated and were

---

[5] Plaintiffs also allege vaguely that Wachovia made "material omissions" concerning the state of the market. Compl. ¶¶ 147, 183. The bar applies with equal force to these obscure allegations. *See One-O-One Enters., Inc.*, 848 F.2d at 1287 (barring use of defendants' alleged nondisclosure to defeat integration clause).

not included in the final, integrated agreements, they have failed to state a claim on either of these Counts.[6]

       **B.**    *Plaintiffs' Fraud and Negligent Misrepresentation Claims Should Be Dismissed Because Plaintiffs Have Failed To Allege a False Statement or Omission of Fact*

To state a claim for either fraud or negligent misrepresentation, Plaintiffs must allege a ***misrepresentation*** as to a material ***fact*** upon which Plaintiffs reasonably relied. *USOP*, 251 F. Supp. 2d at 99-100 (fraud claims must plead facts capable of establishing each of the requisite elements of fraud). Plaintiffs have failed, however, to identify a single false representation of fact upon which to base their fraud and misrepresentation claims. For this independent reason, those claims should be dismissed. Though Plaintiffs recite a multitude of representations by Biderman and Wachovia to support their claims, none are actionable. We address each in turn.

    i.   Plaintiffs allege that Biderman "indicated that he understood AAJ's concerns about the ambiguity of the provision." Compl. ¶ 149, 181. This is not an alleged statement of fact by Biderman, but a description of his state of mind. Nor do Plaintiffs provide any basis to establish that Biderman's "understanding" is somehow false. To the contrary, the Complaint itself establishes that Biderman "understood AAJ's concerns" by detailing his subsequent attempts to address those concerns. Compl. ¶¶ 60-62.

    ii.   Plaintiffs allege that Biderman "informed AAJ that the 'material adverse change' language was 'standard' in all of Wachovia's loan commitments." Compl. ¶ 149. Plaintiffs make no specific allegation that this statement is false, or that the "material adverse change"

---

[6] The Complaint establishes that Plaintiffs were not only aware of the "material adverse change" clause, they expressly negotiated over its inclusion in the contract. Compl. ¶¶ 52-53, 148-149, 180-182. This is the case of "a party with the capacity and opportunity to read a written contract, who has executed it, not under any emergency, and whose signature was not obtained by trick or artifice; such a party . . . cannot later claim fraud in the inducement." *One-O-One Enters., Inc.*, 848 F.2d at 1287 (internal quotation marks omitted).

13

language is not standard.  In fact, the Term Sheet itself stated that the Loan Commitment Agreement would contain such language.

iii.  Plaintiffs allege that Biderman "assured AAJ that there would be no need to invoke the provision, that the clause was meant to be invoked only in the case of a '9/11-type meltdown' and that therefore AAJ had no need to worry about this provision."  Compl. ¶¶ 149, 181.  This is not a statement of fact. Assuming the statement was made, Biderman's '9/11-type meltdown' characterization is at best his opinion concerning the contractual agreement.  "Such representations are legal conclusions and opinions not actionable in fraud." *Bennett Enterprises, Inc. v. Domino's Pizza, Inc.*, 794 F. Supp. 434, 437 (D.D.C. 1992) (dismissing fraud claim based on franchisor's statements to franchisee concerning the meaning and effect of terms in the franchising agreement).  In any event, Plaintiffs do not assert that this statement is false.  In fact, they rely upon this statement in support of their contract claims.

Further, Biderman's representation that there would be "no need to invoke the provision" and that "AAJ had no need to worry" is a prediction regarding future events, and provides no basis for a claim of fraud.  *See Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 706 (D.C. 1981) ("Opinions or predictions of future events do not constitute representations of material fact upon which a plaintiff successfully may place dispositive reliance."); *Bennett v. Kiggins*, 377 A.2d 57, 61 (D.C. 1977) ("[A] prophecy or prediction of something which it is merely hoped or expected will occur in the future is not actionable upon its nonoccurrence.").

iv.  Plaintiffs allege that "Biderman . . . told AAJ that it should not worry about [the "material adverse change" provision] because Wachovia was the biggest CMBS lender in the United States, that, based on its market expertise, resources and sophistication, it could be trusted to fund and sell the Loan as contemplated in the Term Sheet, and that Wachovia would stand by

AAJ and see to it that AAJ would proceed to closing in December 2007." This statement, again, is not a false representation of fact. Plaintiffs do not specifically allege that the representation as to Wachovia's market position was false. The part of the statement that Wachovia "could be trusted to fund and sell the loan . . . [and] see to it that AAJ would proceed to closing" simply evinces Biderman's present intent to fund the loan, which Plaintiffs have conceded was sincere, and thus is not actionable. *See* Compl. ¶ 64 (alleging that Defendants *wanted* to finance the property because it was a "trophy property, the inclusion of which in its portfolio of loans would further its aggressive strategy to increase its [market] standing").

v. Finally, in their negligent misrepresentation claim, Plaintiffs allege that Wachovia "omitted material information with respect to the actual or foreseeable state of the CMBS market at the time that [it] entered into the Rate Lock Agreement and Loan Commitment Agreement." When a fraud or misrepresentation claim "revolves around nondisclosure rather than affirmative misrepresentation . . . plaintiffs must necessarily allege when and what they believe should have been disclosed by the defendants." *Cadet v. Draper & Goldberg, PLLC*, No. 05-2105, 2007 WL 2893418, at *5 (D.D.C. 2007).[7] The only discernable information that Plaintiffs contend was available to Defendants at the time the parties entered the Loan Commitment Agreement appears to be reports and articles published in such sources as the New York Times and the Wall Street

---

[7] Plaintiffs' negligent misrepresentation claim fails for the additional reason that Wachovia is under no duty of care. "The ordinary commercial adversary bargainer ordinarily has no duty to use care in supplying information to those with whom he bargains." Dan B. Dobbs, THE LAW OF TORTS § 472 at 1350 (2000). In general, the law imposes a duty of care in conveying information only on persons in a special relationship such as agent-principal or client-professional, and on those in the business of supplying information, such as accountants and notaries. *See id.* at 1350-51; 2 HARPER, JAMES, & GRAY ON TORTS § 7.6, at 489 (3d ed. 2006) ("On the whole . . . courts have provided a remedy for negligent misrepresentation principally against those who advise in an essentially non-adversarial capacity."). Because the District of Columbia has not extended the duty of care beyond this traditional scope, Plaintiffs cannot state a claim for negligent representation.

Journal. Compl. ¶¶ 55-59. Such information was equally available to AAJ and its advisors, and Plaintiffs have failed to allege that Defendants had any duty to specifically draw AAJ's attention to such publicly available information. *Id.*; *See Cadet,* 2007 WL 2893418, at *6 (absent a fiduciary duty, silence does not constitute fraud unless the information is undiscoverable by a prudent person upon reasonable inspection); *cf. Howard v. Riggs Nat'l Bank*, 432 A.2d at 707 (plaintiff not entitled to rely on representations by defendant bank where the bank "certainly did not have exclusive access to such information"). Moreover, Plaintiffs fail even to allege that either Biderman or Wachovia had any actual knowledge or awareness of those published articles.[8]

Aside from the empty allegation that Defendants failed to disclose *public* information (of which they may have had no knowledge), Plaintiffs' omission claim is based solely on an allegation that Wachovia "omitted material information with respect to the actual or foreseeable state of the CMBS market at the time that [it] entered into the Forward Rate Lock and Loan Commitment Agreement." Compl. ¶ 183. This conclusory allegation is a patently insufficient basis for the misrepresentation claim. *See Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) ("[T]he court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the compliant. Nor must the court accept legal conclusions cast in the form of factual allegations."); *Bennett v. Kiggins*, 377 A.2d 57, 60 (D.C.

---

[8]  In their Amended Complaint, Plaintiffs note an October 3, 2007 Reuters "report" in which "some rival[s]" characterize Wachovia's efforts to build CMBS market share as "reckless," and allege that Wachovia "now" held debt that investors considered too "risky." This report does not advance Plaintiffs' attempt to state a claim based on omission. The belief of "rival bankers" that Wachovia was "reckless" is mere opinion, not fact. And, of course, the status of Wachovia's holdings on October 3, 2007 is irrelevant to Plaintiffs' omission claim, which depends on nondisclosure of facts existing at the time Plaintiffs were "induced" to sign the Loan Agreement.

1977) ("[A]llegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient.").

Because Plaintiffs have failed to identify any false statement of material fact upon which to base their fraud claim, that claim should be dismissed.

C.     *Plaintiffs' Fraud Claim Should Be Dismissed Because the Complaint Insufficiently Alleges Knowledge and Intent.*

Plaintiffs' fraud claims must be dismissed for the additional and independent reason that Plaintiffs have failed to allege any facts to support their otherwise conclusory and implausible assertions that Defendants' alleged false statements were made either with ***knowledge*** of their falsity or with the ***intent*** to mislead.

Plaintiffs make the boilerplate allegation that, at the time Biderman assured Plaintiffs to "not worry" and that Wachovia would "stand by AAJ," he and Wachovia knew that those statements "were false and misleading and/or made with reckless disregard for the truth." Compl. ¶ 151. Such bald assertions, "unsupported by facts set out in the complaint," *Kowal*, 16 F.3d at 1278, need not be credited by the Court. *Id.  See also USOP,* 251 F. Supp. 2d at 100 ("Plaintiffs alleging false and misleading projections or statements of optimism must plead facts that, if true, would prove that the defendant lacked a reasonable basis for its projections or issued them in less than good faith." (citing *Kowal*, 16 F.3d at 1278)).

The inadequacy is particularly apparent with respect to Plaintiffs' implausible suggestion that Wachovia may have entered the Loan Commitment Agreement with "no intention of honoring the loan commitment" because of its "secret knowledge and expectation" that it would exercise its termination rights under the material adverse change clause.  Compl. ¶¶ 4, 5, 65.

First, there are no facts alleged to support these conclusory statements about Wachovia's intent.[9] Second, as noted above, Plaintiffs have actually alleged facts that contradict such a conclusion. Plaintiffs allege (notably with more specificity than any other allegations regarding Defendants' intent) that Wachovia considered the property a "trophy property", and intended to complete a CMBS financing so as to include the property in its portfolio of loans. Taken as true, this allegation demonstrates that, at the time Defendants negotiated the Loan Commitment Agreement, Defendants intended to fund the loan. Because it is entirely implausible that Wachovia, in aggressive pursuit of this "trophy property," entered the Loan Commitment Agreement with an intention not to perform, Plaintiffs have failed to sufficiently allege intent. *See Twombly*, 127 S. Ct. at 1974 (requiring that plaintiff must plead "enough facts to state a claim for relief that is plausible on its face."); *USOP*, 251 F. Supp. 2d at 99 ("A court can dismiss claims for failure to state a claim on which relief can be granted when the complaint includes facts demonstrating that success on the merits is impossible – in other words, when the plaintiffs 'plead [themselves] out of court.'") (citing *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir. 2000)).

The above three defects warrant dismissal of Plaintiffs' fraud and misrepresentation claims. In addition to being precluded by the integration clauses, those claims fail to identify any false statement of fact, and fail to allege any facts to support the implausible allegations of intent. To the contrary, it is apparent that Plaintiffs are simply seeking to raise the stakes – both

---

[9]  To the extent that plaintiffs assert that Wachovia entered the Loan Commitment expecting  that it would likely rely upon the MAC clause to terminate its obligations, this assertion cannot support any claim, either in contract or fraud.  This claim simply asserts that Wachovia intended to take action in the future that was expressly permitted under the contract that it entered with AAJ.  Even Plaintiffs cannot suggest that an intention to abide by the terms of a contract could form the basis for a fraud claim.

monetary and reputational – for Wachovia and Biderman by tacking on unfounded tort claims to what is at best a simple breach of contract claim.

## II.     The Complaint Fails To State a Claim for Breach of Fiduciary Duty

Count V of the Complaint alleges that Wachovia owed a fiduciary duty to AAJ and breached that duty. This count should be dismissed because Wachovia owed no such duty to AAJ under its contracts with AAJ or at law. The relationship between Wachovia and AAJ is not a fiduciary one, but is instead an arm's length contractual relationship between two sophisticated, corporate parties.

AAJ has expressly disclaimed, and thereby waived, the existence of a fiduciary duty owed to it by Wachovia. In Section 6(d) of the Rate Lock Agreement (incorporated in the Loan Commitment Agreement), AAJ represents that "Wachovia has been and will be acting on an arm's length basis with Borrowers and not as Borrowers' agent, fiduciary, broker, advisor or consultant." This express representation, executed by a sophisticated party represented by counsel, forecloses any possibility that Wachovia owed a fiduciary duty to Plaintiffs. *See Bynum v. Equitable Mortg. Group*, No. 99-cv-2266-SBC-JMF, 2005 U.S. Dist. LEXIS 6363, at *59-*61 (D.D.C. April 7, 2005) (holding that even if there arguably existed a fiduciary relationship, a contractual acknowledgement that no fiduciary relationship existed served as an effective waiver of such a claim).

Even absent AAJ's disclaimer of a fiduciary relationship, the Complaint fails to allege facts sufficient to create a fiduciary relationship. "The relationship between a debtor and a creditor in a loan transaction is ordinarily a contractual relationship . . . and is not fiduciary in nature." *Overseas Private Inv. Corp. v. Industria de Pesca, N.A.*, 920 F. Supp. 207, 210 (D.D.C. 1996) (internal quotation marks omitted); *see also Williams v. Federal Land Bank*, 293 U.S.

App. D.C. 343 (D.C. Cir. 1992) (citing cases for the proposition that a bank does not owe a fiduciary duty to its debtors under the UCC, and noting that "the costs of lending would rise sharply if lenders were obliged to give their borrowers' interests the sort of priority inherent in a fiduciary duty").

This principle extends to arms-length business transactions generally, unless "special circumstances" exist that alter the character of the relationship beyond an "ordinary business transaction." *Urban Invest., Inc. v. Branham*, 464 A.2d 93, 96 (D.C. 1983). Such special circumstances generally involve a relationship of unusual trust or confidence arising as a result of a preexisting vulnerability of one party to the other – ***not*** a business relationship between two sophisticated, well-advised corporate parties on equal footing, as is the case here. *See, e.g., Overseas Private Inv. Corp.*, 920 F. Supp. at 210 (finding no "special relationship of trust or confidence" between borrower and lender beyond what would ordinarily exist in a normal financing transaction, and thus finding no fiduciary duty).[10]

Plaintiffs do not – and cannot – allege facts sufficient to establish the sort of "special circumstances" necessary to support a fiduciary relationship. AAJ alleges that it chose to place its "complete trust" in Wachovia in light of Wachovia's promise of "expertise in CMBS and other secondary market transactions" and "superior market knowledge" (Compl. ¶¶ 158, 159). Even if proven, those allegations are insufficient to establish the vulnerability and "special circumstances" necessary to create a fiduciary relationship. Indeed, in *Urban Invest., Inc.*, the

---

[10] *See also Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1162 (Cal. Ct. App. 2005) (noting that special confidential relationships leading to fiduciary duties require pre-existing vulnerability of one party to the other, usually arising from "advanced age, youth, lack of education, weakness of mind, grief, sickness, or some other incapacity."); RESTATEMENT (SECOND) OF TRUSTS § 2 (noting that such a relationship is "particularly likely to exist where there is a family relationship or one of friendship or such a relation of confidence as that which arises between physician and patient or priest and penitent").

D.C. Court of Appeals found no fiduciary relationship between a real estate seller's broker and a buyer even though the buyer, an elderly widow with only a high school education, had no advisor of her own, no business experience, and "little, if any, comprehension of the provisions of the various documents she signed." 464 A.2d at 95. AAJ, by contrast, is a sophisticated organization of lawyers, which was advised by Staubach, an experienced commercial real estate advisory firm. AAJ and Staubach were far from passive participants in the transaction, "insisting" on a Rate Lock Agreement, and "requiring" a Loan Commitment Agreement. Compl. ¶¶ 41, 51-53. AAJ could not only comprehend the provisions of the agreements, they specifically negotiated over the very provision about which they now complain. Such facts preclude any claim that a "special relationship of trust and confidence" existed among the parties.[11]

### III.    The Complaint Fails To State a Claim for Equitable Estoppel

In Count VIII, Plaintiffs have necessarily failed to state a claim for equitable estoppel, because equitable estoppel is not a freestanding claim. Rather, it is a means of *precluding* a litigant from asserting a claim or defense against a party who has detrimentally relied on that litigant's conduct. *See ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988) ("[A] plaintiff seeking the benefit of equitable estoppel must have some claim, sounding in equity or in law, that otherwise entitles it to prevail against the defendant.").

Plaintiffs here allege no more than that Wachovia assured (i.e., promised) AAJ that it would fund the loan, and that AAJ relied on that promise to its detriment. Properly construed, this claim is one for promissory estoppel. However, as Plaintiffs are surely aware, a promissory

---

[11] Even if a fiduciary duty existed, and was not waived, Plaintiffs' allegations that Wachovia breached such a fiduciary duty must fail for the same reasons that plaintiffs' fraud and misrepresentation claims fail: Plaintiffs have alleged no material misstatements or omissions by Wachovia upon which it would have been reasonable for Plaintiffs to rely. *See supra* Part I

estoppel claim in this instance would be barred by the presence of an express written contract governing the relationship out of which the promise emerged, and thus providing a remedy at law.[12]   *See Daisley v. Riggs Bank, N.A.*, 372 F.Supp.2d 61, 71 (D.D.C. 2005) (dismissing promissory estoppel claim based on this "near-universal" principle barring a "second bite at the apple" when breach of contract claim fails).   Plaintiffs cannot avoid this established case law by conjuring a new, offensive claim of equitable estoppel.

Even assuming equitable estoppel could be advanced as a freestanding claim, Plaintiffs have failed to state it.  To raise equitable estoppel, a party must show reasonable reliance on a false representation or concealment of material fact.  *See Nolan v. Nolan*, 568 A.2d 479 (D.C. 1990).  As with Plaintiffs' fraud and misrepresentation claims, the integration clause in the Loan Agreement renders any statement not contained in the writing immaterial, and any reliance on that statement unreasonable.  *See supra* Part I.A; *see also USOP,* 251 F. Supp. 2d at 96 (dismissing promissory estoppel claim because reliance upon oral statements was unreasonable where the parties were aware that the final written agreement could bar oral modifications, and defendants did not commit to the alleged oral agreement in writing); *International Bus. Mach. Corp. v. Medlantic Healthcare Group*, 708 F. Supp. 417, 424-25 (D.D.C. 1989) (barring the use of representations outside the contract to support a claim for promissory estoppel).  Further, as established in Part I.B above, Plaintiffs have failed to advance any false representation or omission (much less "concealment") of fact upon which to base a breach of fiduciary duty claim. For all the foregoing reasons, this claim should be dismissed.

---

[12] Equitable relief is not available if an adequate remedy at law exists.  *See Donovan v. U.S. Postal Service*, 530 F. Supp 872 (D.D.C. 1981).

**IV.    The Complaint Fails To State a Claim for Breach of the Duty of Good Faith and Fair Dealing**

AAJ invokes an "implied duty of good faith and fair dealing" in an effort to supplement and alter the terms of the contracts it entered into. However, this duty cannot be used to "supplant the terms actually contained in a contract," *Overseas Private Inv. Corp. v. Industria de Pesca, N.A.*, 920 F. Supp. 207, 211 (D.D.C. 1996). *See also Wash. Metro. Area Transit Auth. v. Quik Serve Foods, Inc.*, 2006 U.S. Dist. LEXIS 24510, at *14 (D.D.C. 2006) (Lamberth, J.) ("[T]he implied covenant may not override the express provisions of the contract.").

Nor can the implied covenant give rise to an independent cause of action where, as here, the allegations of bad faith are identical to those made in connection with "other claims for relief under established causes of action." *Wash. Metro. Area Transit Auth.*, 2006 U.S. Dist. LEXIS at *14 (Lamberth, J.) (citing *Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 98 n. 2 (D.D.C. 1996)). Even if such other claims are subject to dismissal for failure to state a claim, this rule applies so as to prevent plaintiffs from getting "two bites at the same apple" by bringing a second claim for the same conduct under the implied duty of good faith and fair dealing. *See id.* (dismissing a claim for breach of the duty of good faith and fair dealing on the ground that the claims of bad faith were identical to other claims in the complaint, which were also dismissed). Because Plaintiffs' allegations of bad faith are identical to other "established" causes of action for fraud and breach of contract within the Complaint,[13] Count VII should be dismissed.

---

[13] *Compare* Compl. ¶¶ 191-92 (breach of implied duty of good faith and fair dealing by issuing the Loan Commitment Agreement knowing that it did not intend to perform and by failing to disclose all material facts) *with* Compl. ¶¶ 147-154 (fraud by omitting to inform AAJ of intent not to perform and of other material facts); *Compare* Compl. ¶¶ 193, 195 (breach of implied duty of good faith and fair dealing by not informing AAJ of intent to terminate until two months prior to anticipated closing date) *with* Compl. ¶ 135 (breach of contract by terminating "at eleventh hour"); *Compare* Compl. ¶ 194 (breach of implied duty of good faith and fair dealing by inducing AAJ not to elect to terminate the rate lock agreement) *with* Compl. ¶ 146 (fraud by

(cont'd)

## V.    The Complaint Fails To State a Claim for an Equitable Accounting

Plaintiffs' accounting claim should be dismissed because it is an equitable remedy available only when plaintiffs lack an adequate remedy at law.  To the extent Plaintiffs have a valid claim for breach of contract – which Defendants dispute – they would have adequate remedies at law available to them.  Moreover, because Plaintiffs' tort and fiduciary duty claims must be dismissed, their claim for an equitable accounting must also be dismissed.

Plaintiffs seek an accounting as to "how AAJ's deposits were handled during the applicable time period along with what profits were realized at each point during that time period."  Compl. ¶ 226.  An equitable accounting is "a detailed statement of the debits and credits between parties arising out of a contract or a fiduciary relation," and may be obtained "in actions arising out of a tort where there is an allegation of fraud, especially when there is . . . the existence of a fiduciary relationship," and available only where the plaintiff is able to show "that the remedy at law is inadequate."  *Bates v. Northwestern Human Servs.*, 466 F. Supp. 2d 69, 103-104 (D.D.C. 2006); *see also Bayvue Apts. Joint Venture v. Ocwen Fed. Bank FSB*, 971 F. Supp. 129, 133 (D.D.C. 1997) ("The necessary prerequisite to the right to maintain an equitable accounting is the absence of an adequate remedy at law.") (citing *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962)).

Because the Complaint's tort and fiduciary duty claims must be dismissed as established in Parts I and II above, Plaintiffs' action lacks the "tort" or "fiduciary duty" elements required for an accounting claim to be appropriate.  Moreover, the remaining remedy available to Plaintiffs, an action for breach under the Loan Commitment Agreement, together with the

inducing AAJ not to elect to terminate the rate lock agreement); *Compare* Compl. ¶ 195 (breach of implied duty of good faith and fair dealing by not returning the full Mandatory Lock Fee and hedging profits) *with* Compl. ¶¶ 121-126 (breach of contract by not returning the full Mandatory Lock Fee and hedging profits).

opportunity for discovery and determination of damages that such an action entails, is a more than adequate remedy at law that remains available to Plaintiffs.

**VI.    The Complaint Fails To State Any Claim with Respect to the Rate Lock Agreement or the Withheld Deposit Amounts**

In connection with the contemplated loan transaction, AAJ paid to Wachovia deposits totaling $1.81 million, consisting of a $20,000 "Good Faith Deposit" under the Term Sheet and a "Mandatory Lock Fee" of $1.79 million under the Rate Lock Agreement.  Compl. ¶¶ 40, 117. On or about December 3, 2007, Wachovia returned to AAJ $1,781,895, which represented the full amount of AAJ's payments less $28,105 in Breakage Costs and other out-of-pocket expenses incurred in connection with the loan.  Compl. ¶ 117.  Plaintiffs now seek, in Counts II, IX, and X, and in parts of Counts V and VII, a return of these deducted amounts, as well as payment of over $670,000 in purported "profit" made by Wachovia on the rate lock hedge.  These claims are foreclosed by the plain language of the contracts between the parties.  Moreover, the very existence of the Rate Lock Agreement precludes Plaintiffs' unjust enrichment claim, and Counts V (Good Faith and Fair Dealing) and VII (Fiduciary Duty) fail for the reasons discussed in Parts IV and II, *supra*.

AAJ alleges that Wachovia breached the Rate Lock Agreement by deducting $10,005 in "Breakage Costs" from its refund of the Lock Fee, as well as $18,100 in appraisal and legal fees. Plaintiffs, however, are unable to identify any provision of the parties' contract that Wachovia breached in making those deductions.  In fact, the parties' contract expressly provides Wachovia the right to make such deductions.

Each of the Term Sheet, the Rate Lock Agreement, and the Loan Commitment Agreement makes clear that in all events – including where the Loan is not closed or funded for any reason – Wachovia's costs and expenses in connection with the contemplated loan are to be

borne by AAJ.  The Term Sheet, for example, provides that "Borrower shall be responsible for all costs and expenses incurred by lender relating to the financing," and contemplates that such amounts shall be deducted from the Good Faith Deposit.  Compl. Ex. A at 7.  The Rate Lock Agreement provides that AAJ is responsible for "Breakage Costs" in the event the Loan is not closed and funded *for any reason*.  It provides:

> In the event that . . . the Loan . . . shall not be closed and funded by Wachovia *for any reason* prior to the expiration of the Fixed Rate Period . . . Borrowers acknowledge and agree that Wachovia may suffer or incur damages, losses, liabilities, costs, fees and expenses (including breakage, unwind and similar costs, fees and expenses) (collectively the "Breakage Costs").  Borrowers shall be fully responsible for all Breakage Costs and the same shall be paid to Borrower upon demand to Wachovia.  Wachovia shall determine the amount of Breakage Costs in good faith using such methodology as Wachovia deems appropriate under the circumstances, and *such determination shall be conclusive and binding*.  Wachovia shall provide Borrowers with a statement setting forth its determination of Breakage Costs.

Compl. Ex. B § 3, at 2.  The Rate Lock Agreement further provides that AAJ's $1.79 million Mandatory Lock Fee "may, *at Wachovia's option*, be applied to the payment of all Breakage Costs."  *Id.* § 4, at 2.  Section 1.10 of the Loan Commitment Agreement also requires AAJ to pay all reasonable costs and expenses "*whether the Loan is closed or not, including appraisal fees, . . . [and] legal fees*."  It further provides that "the good faith deposit shall be applied against such costs and expenses," and that Wachovia "shall not bear any out-of-pocket costs or expenses whatsoever. . ."  Compl. Ex. C § 1.10, at 3.

In returning the balance of AAJ's deposits, Wachovia complied, to the letter, with the requirements of the parties' agreements.  Wachovia deducted its reasonable out of pocket expenses, including the appraisal fees and legal fees, which are expressly referenced in Section 1.10 of the Loan Commitment Agreement.  Wachovia also deducted $10,005 related to

"Breakage Costs," which reflects the net of its profits from its hedging position less its carrying costs. Such Breakage Costs were calculated under a methodology that Wachovia deemed appropriate, and Wachovia's determination is conclusive and binding pursuant to Section 3 of the Rate Lock Agreement. Wachovia provided Borrowers with a statement setting forth its determination of Breakage Costs, as required by Section 1.10 of the Loan Commitment Agreement.

Plaintiffs' contract claims are based on contractual provisions that are simply irrelevant. For example, Plaintiffs allege that the calculation of costs and expenses breached the express provision in paragraph 4(a) of the Rate Lock Agreement, which defines the Transaction Costs Fee in certain circumstances. Compl. ¶ 119. By its unambiguous language, however, paragraph 4 only governs the calculation of the Transaction Costs Fee "provided that the applicable Loan is actually closed and funded in accordance with this Agreement." It is uncontested that the Loan was never closed or funded; thus, the section of paragraph 4(a) cited by Plaintiffs has no bearing on the Parties' transactions, and cannot provide the basis for a breach of contract claim. Further, there was never any deduction for any "Transaction Costs." The only deduction (aside from legal and appraisal fees) was for "Breakage Costs," which are specifically permitted by the terms of the Loan Commitment Agreement.

Plaintiffs next argue that AAJ is not entitled to any "profits" from the hedging arrangements. This argument fails because, even assuming there were any "profits," AAJ has failed to identify any valid contractual basis for the payment of such "profits" to AAJ. Plaintiffs rely on a provision in paragraph 3 of the Rate Lock Agreement that applies only if the Lender does not issue a commitment by May 30, 2007. But the Loan Commitment Agreement, which AAJ acknowledges is a "lawful, binding, and enforceable contract," Compl. ¶ 103, is executed

by Wachovia "as of May 25, 2007," Compl. Ex. C at 6, and Plaintiffs further concede that Wachovia sent AAJ a proposed loan commitment agreement "on or about May 18. 2007." Compl. ¶ 52. In any event, even if that provision of paragraph 3 applied (which it does not), it would only entitle AAJ to "profits less costs" related to the rate lock. Thus, even under that provision, AAJ would be entitled to no more than that which Wachovia has returned to it.

Plaintiffs' unjust enrichment claim related to the Rate Lock Fee refund (Count IX) must be dismissed because the parties' contracts govern that matter. "[T]here can be no claim for unjust enrichment when an express contract exists between the parties." *Miranda v. Contreras*, 754 A.2d 277, 283 (D.C. 2000) (quoting *Schiff v. AARP*, 697 A.2d 1193, 1194 & n.2 (D.C. 1997) (holding the same, and dismissing an unjust enrichment claim upon determining that the existence of two express contracts between the parties could be determined from the allegations of the complaint). Here, the Complaint and contracts demonstrate that Wachovia is entitled to payment of its costs and expenses, and that AAJ is not entitled to any purported "profit" from the hedging contracts. Plaintiffs' unjust enrichment claim should thus be dismissed.[14]

---

[14] In any event, Plaintiffs have failed to allege facts sufficient to support their "unjust enrichment" claim. Plaintiffs concede that the "profits" associated with the hedge are more than offset by "carrying" charges. Compl. ¶ 211. The net result is a loss, and thus there could be no unjust enrichment. *See Rapaport v. U.S. Dept. of Treasury, Office of Thrift Supervision*, 59 F.3d 212, 217 (D.C. Cir. 1995) ("[U]njust enrichment simply does not lie when the plaintiff has not bestowed some sort of benefit upon the defendant."); *Minebea Co., Ltd. v. Papst*, 444 F.Supp.2d 68, 187 n.94 (D.D.C. 2006) (plaintiff failed to "demonstrate[] that [defendant] ever 'acquired' anything in this case, to say nothing of having done so at [plaintiff's expense"). To circumvent that obvious deficiency in their claim, Plaintiffs assert that the Rate Lock Agreement provides no basis for deducting "carrying" charges before remitting AAJ's Mandatory Lock Fee. This is wrong. In fact, the only provision that applies where the Loan is not funded is paragraph 3 of the Rate Lock Agreement, and it expressly permits Wachovia to deduct costs, fees and expenses.

**VII.    All Claims Against Wachovia Defendants Other than Wachovia Bank, N.A. Should Be Dismissed**

Wachovia Corporation, Wachovia Capital Markets, LLC; and Wachovia Securities, LLC should be dismissed as defendants in this action.  The Complaint defines all of these entities, together with Wachovia Bank, N.A., as "Wachovia," and then makes generalized allegations about the conduct of this group of entities.  However, the contracts at issue are signed by Wachovia Bank, N.A., not the other Wachovia entities, and the negotiation of those contracts is alleged to have been conducted by Sandor Biderman, who was employed by Wachovia Bank, N.A.  *See* Compl. Ex. B at 5 (Rate Lock Agreement signed by Sandor Biderman as Director of Wachovia Bank, N.A.); Ex. C at 6 (Loan Commitment Agreement signed by Sandor Biderman as Director of Wachovia Bank, N.A.).  The Complaint does not allege that the other Wachovia entities played any role in the matters in dispute, nor does it allege that any of them should be held liable under any *alter ego* or similar theory of liability.  "Except in unusual circumstances, courts will not disregard the separate identities of a parent and its subsidiary, even a wholly-owned subsidiary."  *United States ex rel. Debra Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 60 (D.D.C. 2007) (Lamberth, J.) (citing *Securities Industry Ass'n v. Federal Home Loan Bank Board*, 588 F. Supp. 749, 754 (D.D.C. 1984)).  The Wachovia defendants other than Wachovia Bank, N.A. should therefore be dismissed as defendants.

## CONCLUSION

For the foregoing reasons, Count II and Counts IV through X of Plaintiffs' Complaint should be dismissed, and all defendants other than Wachovia Bank, N.A. should be dismissed.

Respectfully submitted,


By:    /s/ Mark W. Ryan
      Mark W. Ryan (D.C. Bar No. 359098)
      Reginald R. Goeke (D.C. Bar No. 453613)
      Joseph R. Baker (D.C. Bar No. 490802)
      MAYER BROWN LLP
      1909 K Street, N.W.
      Washington, DC  20006-1101
      Telephone:   (202) 263-3000

      *Attorneys for Defendants Wachovia*
      *Corporation; Wachovia Bank, N.A.;*
      *Wachovia Capital Markets, LLC; Wachovia*
      *Securities, LLC; and Sandor Biderman*

Dated:   January 3, 2008

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph R. Baker, hereby certify that on January 3, 2008, I caused a true and correct copy of Defendants' Motion to Dismiss, Proposed Order, and Memorandum of Points and Authorities in Support of Defendants' Motion To Dismiss to be filed electronically and served electronically through the court's CM/ECF System.

Dated:  January 3, 2008

                                          /s/ Joseph R. Baker
                                    Joseph R. Baker (D.C. Bar No. 490802)
                                    MAYER BROWN LLP
                                    1909 K Street, N.W.
                                    Washington, DC  20006-1101
                                    Telephone:   (202) 263-3000
                                    *Attorney for Defendants Wachovia Corporation; Wachovia Bank, N.A.; Wachovia Capital Markets, LLC; Wachovia Securities, LLC; and Sandor Biderman*

**EXHIBIT 1**

Wachovia Capital Markets, LLC
301 South College Street
Charlotte, NC 28288



October 22, 2007

WACHOVIA SECURITIES

**VIA EMAIL**
Mr. Jon Haber
Chief Executive Officer
American Association for Justice
1050 31ˢᵗ Street, N.W.
Washington, D.C. 20007

Mr. John Gibb
Senior Vice President
The Staubach Company - Northeast
575 7ᵗʰ Street, N.W., Suite 400
Washington, D.C. 20004

> Re:    Termination of Loan Commitment
>        777 6ᵗʰ Street N.W., Washington, D.C.

Dear Messrs. Haber and Gibb:

As we have discussed, the purpose of this letter is to terminate our commitment to finance the subject premises and to offer you an alternative proposal that is consistent with the current pricing and underwriting requirements of Wachovia Securities.

Reference is made to (i) that certain letter agreement dated May 25, 2007 ("Letter Agreement"), by and between Wachovia Bank, National Association ("Lender"), and Capitol Justice LLC, a District of Columbia limited liability company ("Capitol"); (ii) a certain letter dated April 26, 2007 (the "Term Sheet"), from the Lender, addressed to Robert Michaels, Vice President/Finance for the American Association of Justice ("AAJ"), and Mr. John Gibb, Senior Vice President of The Staubach Company-Northeast, which Term Sheet is attached to and made a part of the Letter Agreement; and (iii) that certain Forward Rate Lock Agreement dated as of April 30, 2007 (the "Rate Lock Agreement"), by and between the Lender and AAJ, Capitol, and affiliates.

Pursuant to the Letter Agreement, the Lender agreed to provide Capitol with certain fixed rate mortgage financing (the "Loan"), subject to the satisfaction of certain conditions precedent that are described in the Letter Agreement and the Term Sheet. One such condition is set forth on page 6 of the Term Sheet, in the paragraph entitled "Securitization/Cooperation," which expresses the Lender's intention not to keep the Loan in its own portfolio, but rather to "sell all or a portion of the Financing [*i.e.*, the Loan] by certificates, participations, securities or pari passu notes evidencing whole or component interests therein, through one or more public or private offerings (each, a

Mr. Jon Haber
Mr. John Gibb
October 22, 2007
Page 2

"Securitization") . . ." In the same paragraph, Capitol and AAJ, as guarantor, agreed to cooperate with the Lender and its affiliates to achieve the Securitization of the Loan.

Due to a material and adverse change in the fixed income sector of the capital markets that has occurred since the date of the Letter Agreement, the Lender has determined that it would be unable to effect a Securitization of the Loan if the Loan were made upon the financial terms committed. Accordingly, you are hereby advised that the Lender has elected to terminate its commitment to make the Loan pursuant to Section 1.15 of the Letter Agreement, which provides:

> Lender may, at its option, terminate its agreement to make the Loan . . . (d) in the event of any material adverse change in the financial, banking or capital markets conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet; provided, however, that upon the termination of this Commitment by Lender pursuant to the terms of this subsection (d), Lender shall use its best efforts to offer a loan to Borrower in accordance with its then-current pricing and underwriting requirements.

Please be assured that the Lender does not lightly make this determination, but is compelled to do so by overwhelming market events affecting investor demand for commercial mortgage-backed securities ("CMBS"). As has been well-publicized in the national and financial media, the crisis in the sub-prime residential mortgage market has spread to the CMBS sector, and dramatically altered CMBS investor requirements have forced a sudden return to highly conservative underwriting standards among those commercial real estate lenders that make non-recourse loans for the purpose of securitization. This development has resulted in a profound reduction in the volume of new CMBS fixed-rate loan origination in recent months, and the market has witnessed a spike in the number of committed deals that have been called off, delayed or re-priced. Under present market conditions, we are not aware of any buyers or potential buyers in the CMBS market for the Loan under the terms proposed in the Letter Agreement.

As stated above, Section 1.15(d) of the Letter Agreement requires the Lender to offer alternative financing terms made in accordance with the Lender's current pricing and underwriting requirements. That proposal is described in the non-binding term sheet attached to this letter. Please let me know if you would like to proceed with the alternative financing proposal.

As we are terminating the Letter Agreement, please call me as soon as possible at 704-715-9959, to process the termination of the Rate Lock Agreement. Upon such termination, all deposits paid by AAJ or Capitol in connection with the Letter Agreement and the Rate Lock Agreement, adjusted for any loss incurred in breaking

Mr. Jon Haber
Mr. John Gibb
October 22, 2007
Page 3

the rate lock and any out-of-pocket expenses incurred by the Lender in connection
with the Loan to date, shall be immediately returned to AAJ.  An accounting of the net
amount to be remitted to AAJ shall be provided under separate cover.

 We regret that market conditions have forced us to terminate our commitment
and thank you for your interest.

    Sincerely,

    John Tinkey
    Managing Director

Enclosure

433240

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAPITOL JUSTICE LLC and AMERICAN
ASSOCIATION FOR JUSTICE,

       Plaintiffs,

    v.

WACHOVIA CORPORATION, WACHOVIA
BANK, N.A., WACHOVIA CAPITAL
MARKETS, LLC, WACHOVIA SECURITIES,
LLC, and SANDOR BIDERMAN,

       Defendants.

Civil Action No. 1:07-cv-02095-RCL

**[PROPOSED] ORDER**

AND NOW, this _____ day of _____, 2008, [for the reasons stated in the Court's Memorandum Opinion issued this date,] upon consideration of Defendants' Motion to Dismiss (Docket No. ___), the briefs in support of and opposition thereto, and the entire record herein, IT IS HEREBY

ORDERED that Defendants' Motion to Dismiss is GRANTED, and Counts II (Breach of Contract – Rate Lock Agreement), IV (Fraud), V (Breach of Fiduciary Duty), VI (Negligent Misrepresentation), VII (Breach of the Duty of Good Faith and Fair Dealing), VIII (Equitable Estoppel), IX (Unjust Enrichment), and X (Accounting) of the Amended Complaint are hereby DISMISSED with prejudice; and IT IS HEREBY FURTHER

ORDERED that the remaining Counts I (Breach of Contract – Money Damages), III (Breach of Contract – Specific Performance),  and XI (Declaratory Judgment) of the Amended Complaint are hereby DISMISSED with prejudice as to all Defendants other than Wachovia Bank, N.A.

SO ORDERED.

                               _____
                               ROYCE C. LAMBERTH
                               UNITED STATES DISTRICT JUDGE