**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CAPITOL JUSTICE LLC, *et al.,* <br><br>       Plaintiffs, <br><br> v. <br><br> WACHOVIA CORPORATION, *et al.,* <br><br>       Defendants. | Civil Action No. 1:07-cv-02095-RCL |

**PLAINTIFFS' MEMORANDUM OF POINTS AND
<u>AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

Jeremy W. Schulman (D.C. Bar No. 481755)
David S. Wachen (D.C. Bar No. 441836)
SHULMAN, ROGERS, GANDAL,
  PORDY & ECKER, P.A.
11921 Rockville Pike
Rockville, MD 20852
Telephone:  (301) 230-5200
Facsimile:  (301) 230-2891

*Attorneys for Plaintiffs Capitol Justice LLC
and American Association for Justice*

Dated:  January 28, 2008

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

ARGUMENT ......................................................................................................................... 13

I.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS A
PORTION OF THE AMENDED COMPLAINT BECAUSE AAJ HAS
PROPERLY STATED CLAIMS IN COUNTS II, IV, V, VI, VII, VIII, IX AND X ...... 13

    A.    AAJ's Amended Complaint States A Claim For Fraud And Negligent
Misrepresentation ............................................................................................... 13

        1.    The Amended Complaint Properly Alleges Fraud And Negligent
Misrepresentation Relating To The Rate Lock Agreement ...................................... 14

        2.    The Amended Complaint Alleges That Defendants Made Actionable
Misrepresentations About Their Present Intent To Perform And Their
Existing Knowledge Concerning The Likelihood That There Would Be
A Material Adverse Change In The Capital Markets................................................ 15

        3.    The Integration Clauses In No Way Preclude AAJ's Misrepresentation Claims,
Which Do Not Seek To Add Or Vary Terms To The Rate Lock And Loan
Commitment Agreements ......................................................................................... 18

        4.    Counts IV And VI Sufficiently Allege Knowledge And Intent With Respect
To Wachovia's Misrepresentations........................................................................ 22

        5.    Count VI Properly Establishes A Duty That Wachovia Breached............................ 23

    B.    Counts II, IX And X, Specifically Directed To The Rate Lock Agreement,
Properly State Claims For Relief............................................................................. 25

        1.    Count II States A Claim For Breach Of The Rate Lock Agreement......................... 25

        2.    Count IX States A Claim For Unjust Enrichment Relating To The $672,166
Wachovia Realized From AAJ's Rate Lock Fee ..................................................... 28

        3.    Count X States A Claim For An Accounting Relating To Wachovia's Handling
Of AAJ's Rate Lock Fee And Related Profits And Expenses ................................. 29

    C.    Count V States A Claim For Wachovia's Breach Of Its Fiduciary Duty To AAJ ....... 30

        1.    AAJ Sufficiently Alleges The Existence Of Special Circumstances That
Create A Fiduciary Relationship............................................................................. 31

        2.    AAJ Did Not Waive The Existence Of Wachovia's Fiduciary Duties .................... 32

D.    Count VII States A Claim For Breach Of The Covenant Of Good Faith And
        Fair Dealing .................................................................................................................. 33

E.    Count VIII States A Claim For Equitable Estoppel...................................................... 37

II.    THE COURT SHOULD DENY DEFENDANTS' REQUEST TO DISMISS
        THREE OF THE NAMED WACHOVIA DEFENDANTS............................................. 40

CONCLUSION........................................................................................................................ 41

# TABLE OF AUTHORITIES

**Cases**

*Allworth v. Howard Univ.*
   890 A.2d 194 (D.C. 2006) ................................................................................... 34, 36

*ATC Petroleum v. Sanders*
   860 F.2d 1104 (D.C. Cir. 1988) ................................................................................ 37

*Banks v. District of Columbia*
   377 F. Supp. 2d 85 (D.D.C. 2005) ...................................................................... 13, 33

*Bates v. Northwestern Human Services*
   466 F. Supp. 2d 69 (D.D.C. 2006) ........................................................................... 29

*Bell v. UFCW*
   191 F. Supp. 2d 10 (D.D.C. 2002) ........................................................................... 31

*Bennett v. Kiggins*
   377 A.2d 57 (D.C. 1977) ............................................................................. 16, 17, 34

*Bennett Enterprises v. Domino's Pizza*
   794 F. Supp. 434 (D.D.C. 1992) ......................................................................... 17, 18

*Benz v. Washington Newspaper Publ'g Co.*
   Civ. A. No. 05-1760, 2007 WL 1794104 (D.D.C. June 19, 2007) ...................... 18, 21

*Betz Labs. v. Hines*
   647 F.2d 402 (3rd Cir. 1981) ................................................................................... 20

*Bloomgarden v. Coyer*
   479 F.2d 201 (D.C. Cir. 1973) ................................................................................. 28

*Brewood v. Cook*
   207 F.2d 439 (D.C. Cir. 1953) ................................................................................. 21

*Burlington Ins. Co. v. Okie Dokie*
   329 F. Supp. 2d 45 (D.D.C. 2004) ...................................................................... 23, 24

*Cassidy v. Owen*
   533 A.2d 253 (D.C. 1987) ........................................................................................ 37

*Chedick v. Nash*
   151 F.3d 1077 (D.C. Cir. 1998) ................................................................... 14, 16, 17

*Computer Network Corp. v. Spohler*
  No. 82-0287, 1982 WL 1296 (D.D.C. March 23, 1982) ......................................................... 22

*Conte v. U.S. Alliance Federal Credit Union*
  303 F. Supp. 2d 220 (D. Conn. 2004) .................................................................................... 32

*Daisley v. Riggs Bank*
  372 F. Supp. 2d 61 (D.D.C. 2004) ........................................................................................ 40

*Devoine Co. v. Int'l Co.*
  136 A. 37 (Md. 1927) ............................................................................................................ 36

*First American Nat'l Bank v. Mitchell*
  359 So.2d 1376 (Miss. 1978) ................................................................................................. 31

*Food Fair Stores v. Blumberg*
  200 A.2d 166 (Md. 1964) ................................................................................................. 36, 37

*Hais v. Smith*
  547 A.2d 986 (D.C. 1988) ..................................................................................................... 34

*Hercules & Co. v. Shama Rest. Corp.*
  613 A.2d 916 (D.C. 1992) ..................................................................................................... 20

*High v. McLean Financial Corp.*
  659 F. Supp. 1561 (D.D.C. 1987) ......................................................................................... 24

*Hite v. Leeds Weld Equity Partners*
  429 F. Supp. 2d 110 (D.D.C. 2006) ................................................................................. 30, 31

*Howard v. Riggs Nat'l Bank*
  432 A.2d 701 (D.C. 1981) ..................................................................................................... 16

*Int'l Bus. Machines Corp. v. Medlantic Healthcare Group*
  708 F. Supp. 417 (D.D.C. 1980) ........................................................................................... 40

*In re IBP, Inc. S'holders Litig.*
  789 A.2d 14 (Del. Ch. 2001) ............................................................................................ 20, 21

*In re Monahan Ford Corp.*
  340 B.R. 1 (Bankr. E.D.N.Y. 2006) ...................................................................................... 32

*In re Polaroid*
  362 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................................................................... 31

*In re United States Office Prods. Co. Secs. Litig.*
  251 F. Supp. 2d 77 (D.D.C. 2003) ................................................................. 20, 40

*In re WorldCom*
  263 F. Supp. 2d 745 (S.D.N.Y. 2003) ................................................................. 31

*Int'l Telecoms. Satellite Org. v. Colino*
  Civ. A. Nos. 88-1266, 87-2749, 1992 WL 93129 (D.D.C. April 15, 1992) ................ 18, 19, 31

*Jacques v.  First Nat'l Bank of Maryland*
  307 Md. 527 (1986) ................................................................................ 24

*Klayman v. Judicial Watch*
  Civ. A. No. 06-670, 2007 WL 1034937 (D.D.C. April 3, 2007) ............................... 20

*Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Invs.*
  951 F.2d 1399 (3d Cir. 1991) ....................................................................... 19

*Miranda v. Contreras*
  754 A.2d 277 (D.C. 2000) ........................................................................... 28

*Nolan v. Nolan*
  568 A.2d 479 (D.C. 1990) ........................................................................... 38

*One-O-One Enterprises v. Caruso*
  848 F.2d 1283 (D.C. Cir. 1988) .............................................................. 19, 20, 21

*Overseas Private Inv. Corp. v. Industria de Pesca*
  920 F. Supp. 207 (D.D.C. 1996) ................................................................. 31, 35

*Pegram v. Herdnich*
  530 U.S. 211 (2000) ................................................................................. 8

*Primax Recoveries v. Lee*
  260 F. Supp. 2d 43 (D.D.C. 2003) .............................................................. 31, 32

*P.V. Props. v. Rock Creek Vill. Assocs.*
  549 A.2d 403 (Md. Ct. Spec. App. 1988) ...................................................... 29, 30

*Ron Greenspan Volkswagen v. Ford Motor Land Devel. Corp.*
  32 Cal. App.4th 985 (Cal. Ct. App. 1995) ........................................................ 20

*Rothenberg v. Rothenberg*
  203 B.R. 827 (Bankr. D.D.C. 1996) ................................................................ 21

*Schiff v. Ass'n of Retired Persons*
    697 A.2d 1193 (D.C. 1997) ........................................................................... 28

*Schmidt v. Interstate Federal Sav. and Loan Ass'n*
    74 F.R.D. 423 (D.D.C. 1977) ........................................................................ 33

*Scott v. District of Columbia*
    101 F.3d 748 (D.C. Cir. 1997) ............................................................... 28, 35

*Shekoyan v. Sibley Int'l Corp.*
    217 F. Supp. 2d 59 (D.D.C. 2002) ................................................................. 8

*Thrifty Rent-A-Car Sys. v. Brown Flight Rental One Corp.*
    24 F.3d 1190 (10th Cir. 1994) ...................................................................... 20

*Tilley v. District of Columbia Contract Appeals Bd.*
    912 A.2d 1169 (D.C. 2006) .......................................................................... 40

*Travellers Int'l v. Trans World Airlines*
    722 F. Supp. 1087 (S.D.N.Y. 1989) ........................................................ 38, 39

*United States v. Bernad*
    275 F. Supp.2d 1 (D.D.C. 2003) ................................................................... 13

*Uproar v. National B'casting Co.*
    81 F.2d 373 (1st Cir. 1936) ......................................................................... 34

*Urban Invest. v. Branham*
    464 A.2d 93 (D.C. 1983) .............................................................................. 31

*Wash. Metro Area Transit Auth. v. Quik Serve Foods*
    Nos. 04-838(RCL) & 04-687(RCL), 2006 WL 1147933 (D.D.C. April 28, 2006) ........... 34, 35

 *Whelan v. Abell*
    48 F.3d 1247 (D.C. Cir. 1995) ............................................................... 19, 20

*Williams v. Federal Land Bank*
    954 F.2d 774 (D.C. Cir. 1992) ...................................................................... 31

## Rules and Statutes

Federal Rule of Civil Procedure 8 ............................................................... 28, 35

Federal Rule of Civil Procedure 9(b) ............................................................ 8, 22

Federal Rule of Civil Procedure 12(b)(6) ............................................. 3, 8, 28, 29, 35

**Other Authorities**

RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981) ................................. 34

RESTATEMENT (SECOND) OF TORTS § 525 (1976) ................................... 15, 16

RESTATEMENT (SECOND) OF TORTS § 552 (1977) ............................................ 24

RESTATEMENT (SECOND) OF TORTS § 544 (2007) ........................................... 19

37 AM. JUR. 2D *Fraud and Deceit* § 68 (1968) ........................................... 16

2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.4 (1990) .................................... 20

1 GERARD L. BALNCHARD, LENDER LIABILITY §§ 2.9 & 2:10 (2003) ................... 34, 36

David L. Scott, *Wall Street Words* 86 (1997) ........................................... 26

Plaintiffs Capitol Justice LLC and American Association for Justice (collectively "American Association for Justice" or "AAJ"), submit this Memorandum in Opposition to Defendants' Motion to Dismiss Counts II, IV, V, VI, VII, VIII, IX and X of AAJ's eleven-count Amended Complaint ("Motion").

## PRELIMINARY STATEMENT

American Association for Justice, a non-profit organization whose mission is to promote a fair and effective justice system, seeks redress against Wachovia—the nation's largest lender in the commercial mortgage backed securities ("CMBS") market—for, among other things, fraudulently inducing AAJ into an $89.5 million loan commitment that Wachovia had no real intention of honoring. The loan, which Wachovia indicated it would sell or securitize in whole or part in the CMBS market or otherwise at some future time, was to be used for the purchase of an office building in downtown Washington to house AAJ's future headquarters. Despite numerous assurances that Wachovia would stand by its commitment, would not let AAJ down, and would not leave AAJ "alone at the altar," Wachovia, at the eleventh hour, did just that, reneging on its commitment to make the loan and leaving AAJ to scramble to somehow salvage the deal and its $5 million deposit.

As a result of Wachovia's actions, AAJ has sustained tens of millions of dollars in damages, stemming most notably from Wachovia's breach of the parties' loan commitment and rate lock agreements, as well as Wachovia and its loan officer Defendant Sandor Biderman's misrepresentations, upon which AAJ reasonably and detrimentally relied. Wachovia and Biderman fraudulently induced AAJ to enter the loan commitment agreement and to refrain from terminating the rate lock agreement in several ways. First, they misrepresented the meaning of a critical "material adverse change" or "MAC" provision that Wachovia later sought to rely upon

1

in trying to terminate its commitment to make the loan. Wachovia and Biderman specifically sought to allay AAJ's concerns regarding the ambiguously worded provision by assuring AAJ that it could be triggered only in the event of an unforeseeable "9/11-type meltdown" of the financial markets. In reality, Wachovia and Biderman secretly viewed the MAC clause as their "ace in the hole" for extricating themselves from a loan they had no intention of making, unless, against long odds, the market as they perceived it at the time (and about which they were exceedingly more optimistic in discussions with AAJ), substantially improved.

Wachovia and Biderman thus also misrepresented Wachovia's intention, willingness and ability to fund and sell the loan, and in doing so gave highly misleading assurances about the overall health of the CMBS market into which Wachovia said it would place the loan at some future time. Wachovia and Biderman told AAJ that it should trust Wachovia to fund and sell the loan, that it would do so in all but the most extreme and unforeseeable circumstances, all the while knowing that existing and forecasted market conditions made it impossible or extremely unlikely that it would do so.

Defendants' Motion to Dismiss a portion of AAJ's Amended Complaint implicitly concedes that AAJ has stated a claim for breach of the loan commitment agreement in Counts I and III, which, along with Count XI for declaratory relief, Defendants do not challenge. Instead, Defendants primarily attack AAJ's allegations of fraud and negligent misrepresentation, as well as AAJ's claims relating to the rate lock agreement. Defendants principally contend that AAJ does not allege misrepresentations of fact that may form the basis for fraud and negligent misrepresentation claims, that, in any event, those claims are barred by integration clauses in the parties' agreements, and that AAJ has not adequately alleged the requisite elements of knowledge and intent. Defendants can make these points only by significantly distorting AAJ's

claims and the applicable law, both of which Defendants quote from selectively or substantially out of context.

Properly construed, and assessed under controlling D.C. Circuit precedent that Defendants completely ignore, AAJ plainly states claims for fraud (Count IV) and negligent misrepresentation (Count VI), which claims are premised on Wachovia's and Biderman's inducement of AAJ to enter the loan commitment agreement and refrain from exercising its option to terminate the rate lock agreement.  AAJ also amply supports its claims for breach of the rate lock agreement (Count II), breach of fiduciary duty (Count V), breach of the duty of good faith and fair dealing (Count VII), equitable estoppel (Count VIII), unjust enrichment (Count IX), and accounting (Count X), which Defendants challenge unpersuasively on an array of mostly boilerplate grounds.

For the reasons that follow, the Court should deny Defendants' Motion in its entirety.

## STATEMENT OF FACTS

What follows is a summary of the facts, which are alleged in detail in the Amended Complaint, and which, for purposes of the Motion and in accordance with Rule 12(b)(6), must be taken as true, along with all reasonable inferences that flow from them.

On or about March 30, 2007, American Association for Justice, a non-profit corporation organized in the District of Columbia, contracted, pursuant to a Purchase and Sale Agreement ("Purchase Agreement"), to purchase a new commercial office building ("Property") at 777 6th Street, N.W. in Washington, D.C. for $105 million.  (Am. Compl. ¶¶ 11, 20, 21.)  The Property is located across from the Verizon Center in the heart of the fastest developing section of the central business district of Washington.  (*Id.* ¶ 21.)  AAJ intended to purchase the Property both for investment purposes and to house its future headquarters.  (*Id.* ¶ 112.)

AAJ made an initial $1 million deposit to purchase the Property. (*Id.* ¶ 23.) The Purchase Agreement also required AAJ to make a non-refundable deposit of $4 million following the expiration of a designated due diligence period, at which point the $1 million initial deposit would become non-refundable as well. (*Id.* ¶ 25.) The Purchase Agreement set December 17, 2007 as the closing date for the purchase. (*Id.* ¶ 26.)

In February 2007, AAJ engaged the Staubach Company ("Staubach") to secure approximately $89 million in financing for the purchase.[1] (*Id.* ¶ 29.) Staubach approached one or more of the Wachovia Defendants (collectively "Wachovia") regarding a loan to AAJ ("Loan") for the purchase of the Property. (*Id.* ¶ 31.) Wachovia touts itself as a market leader in commercial mortgage transactions. (*Id.* ¶ 32.) Wachovia is also the largest provider of CMBS financing, through which lenders extend large commercial purchase money loans and, at some later point, attempt to pool all or portions of these loans into securities that are then offered to investors. (*Id.* ¶ 30.) Wachovia holds itself out as a leading source of capital and strategic advice to certain commercial real estate borrowers, such as AAJ. (*Id.* ¶ 32.)

In response to Staubach's initial inquiry, Wachovia referred Staubach and AAJ to Defendant Sandor Biderman, who, at the time, was a Director of one or more of the Wachovia Defendants responsible for Wachovia's CMBS business in the Washington area.[2] (*Id.* ¶ 34.) Throughout the negotiations between AAJ and Wachovia that ultimately led to Wachovia's issuance of a written commitment to lend AAJ $89.5 million for the purchase of the Property, Biderman was AAJ and Staubach's principal point of contact with Wachovia. (*Id.* ¶ 34.)

---

[1] The remainder needed for the $105 million purchase price and associated costs was to be obtained from the sale of AAJ's then-current headquarters building in Washington, as well as cash raised from its membership. (*Id.* ¶¶ 27-28.)

[2] At various times in his dealings with AAJ and Staubach, Biderman represented himself in correspondence and other communications as acting on behalf of Defendants Wachovia Bank, N.A., Wachovia Securities, Wachovia Capital Markets, LLC and/or Wachovia Corporation.

AAJ provided Wachovia with extensive information about AAJ's financing requirements as well as the Property, which was to secure the proposed loan. (*Id.* ¶ 35.) AAJ informed Wachovia that it needed to borrow approximately $89 million for the purchase, that it wished to eliminate market risk by locking in a fixed interest rate, and that it needed a firm, binding loan commitment from its lender. (*Id.* ¶ 35(a)-(b).)

AAJ informed Wachovia that it needed to finalize its financing before the expiration of the Purchase Agreement's due diligence period, at which time AAJ would be required to make an additional deposit of $4 million, bringing its total non-refundable deposit to $5 million, if it wished to go forward with the purchase. (*Id.* ¶ 35(f)-(g).) AAJ informed Wachovia that, because of the size of this cash deposit, its decision to go forward with the purchase would be predicated upon obtaining a binding loan commitment. (*Id.* ¶ 35(h).)

On April 26, 2007, Biderman sent AAJ a term sheet that contemplated a ten-year, interest only, fixed-rate loan of $89.5 million. (*Id.* ¶ 37.) The term sheet, a copy of which is attached to the Amended Complaint as Exhibit A, appeared on letterhead referencing the names "Wachovia," "Wachovia Bank," "Wachovia Securities" and "Wachovia Corporation." The term sheet indicated that Wachovia "intends to sell all or a portion of the Financing by certificates, participations, securities or pari passu notes evidencing whole or component interests therein, through one or more public or private offerings (each a '<u>Securitization</u>')." (*Id.* ¶ 38.)

On April 30, 2007, AAJ sent Wachovia a good faith deposit of $20,000. (*Id.* ¶ 40.)

### <u>The Rate Lock Agreement</u>

To address AAJ's concerns about market risk from interest rate fluctuations prior to the closing of the Loan, Wachovia offered and prepared a Forward Rate Lock Agreement ("<u>Rate Lock Agreement</u>" or "<u>RLA</u>"), a copy of which is attached to the Amended Complaint as Exhibit

B.  (*Id.* ¶ 44.)  The parties executed the Rate Lock Agreement, which is dated April 30, 2007.[3]
(*Id.* ¶ 44.)  The Rate Lock Agreement provided for a fixed interest rate of 6.02% per year on a
loan from Wachovia, in return for a "Mandatory Lock Fee," or deposit, of $1.79 million, which
AAJ timely wired to Wachovia.  (*Id.* ¶¶ 44, 45.)  The Rate Lock Agreement indicates that, to
effectuate the rate lock transaction, "Wachovia shall enter into certain hedging arrangements in
its sole and absolute discretion through the purchase or sale of United States Treasury notes,
bonds or futures contracts, options or swaps on such notes, bonds or futures contracts or other
measures deemed necessary or appropriate by Wachovia."  (*Id.* ¶ 48.)

Paragraph 4 of the Rate Lock Agreement provides that "[t]he Mandatory Lock Fee shall
be refundable provided that the applicable Loan is actually closed and funded in accordance with
this Agreement."  (*Id.* ¶ 46.)  Although paragraph 4 indicates that "a portion of the Mandatory
Lock Fee shall be non-refundable (such non-refundable portion being the 'Transaction Costs
Fee') and may be retained by Wachovia on account, and as a reasonable estimate, of the costs
and expenses associated with and incurred by Wachovia in entering into and maintaining the
Hedging Arrangements (the 'Transaction Costs')," the Rate Lock Agreement further indicates
that the Transaction Cost Fee for purposes of the Agreement is $0.00.  (*Id.* ¶ 47.)

Paragraph 3 of the Rate Lock Agreement provides that, in the event Wachovia "does not
issue a [loan] commitment by May 30th 2007, and Borrower elects to terminate the rate lock
agreement, [Wachovia] shall not profit from any gains that are realized from the hedge
agreement and all profits less costs shall be released to the Borrower."  (*Id.* ¶ 49.)

---

[3] The Rate Lock Agreement was executed by Biderman on behalf of Wachovia Bank, N.A.  (*See id.* Ex. 4.)

**The Loan Commitment Agreement**

On May 18, 2007, Biderman sent AAJ a proposed loan commitment agreement drafted by Wachovia.  (*Id.* ¶ 52.)  After reviewing the proposed agreement, AAJ expressed concern to Biderman about certain provisions, including paragraph 1.15(d), which purported to permit Wachovia to terminate the proposed agreement to make the Loan "in the event of any material adverse change in the financial, banking or capital market conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet."  (*Id.*)  On May 23, 2007, AAJ proposed striking paragraph 1.15(d) from the proposed loan commitment, noting that, among other things, the phrase "material adverse change" was not defined, was subject to interpretation, and was ambiguous.  (*Id.* ¶ 53.)

In response, Biderman said that he understood AAJ's concerns and need to rely on a firm loan commitment so that it could move forward with its obligations under the Purchase Agreement, including the additional $4 million deposit it needed to make before expiration of the due diligence period.  (*Id.* ¶ 60.)  Biderman acknowledged the ambiguity of the MAC provision, but sought to induce AAJ's acceptance of the proposed loan commitment agreement with the MAC provision, as drafted by Wachovia, intact by:  misrepresenting Wachovia's intended meaning for the provision; misrepresenting Wachovia's ability, willingness and intention to fund the Loan; and misrepresenting the present and forecasted state of the CMBS market.  (*Id.* ¶¶ 60-65.)

The Meaning of the MAC Provision.  In explaining the ambiguous provision, Biderman said that Wachovia meant it to be invoked only in the case of an unforeseeable, "9/11-type meltdown," and that therefore AAJ had no need to worry.  (*Id.* ¶ 60.)  Contrary to its representations to AAJ, however, Wachovia planned to invoke paragraph 1.15(d) based on a

much lower threshold and interpretation unless, against the odds, the sale or securitization prospects for the loan improved considerably as the closing date neared. (*Id.* ¶¶ 65, 110.)

Wachovia's Ability, Willingness and Intention to Fund the Loan. Biderman told AAJ that it should not worry about paragraph 1.15(d) because Wachovia was the biggest CMBS lender in the United States, that Wachovia would stand by AAJ, that Wachovia would not let AAJ down, and that Wachovia would not leave AAJ "alone at the altar" when the Purchase Agreement was scheduled to close. (*Id.* ¶ 61.) To convince AAJ of its intention to close the Loan, Biderman specifically represented to AAJ during a telephone conference on May 25, 2007 that, if necessary, Wachovia would keep the Loan on its balance sheet until an opportune time arose to securitize the Loan, rather than seek to terminate the loan commitment upon a downturn in the capital markets.[4]

Biderman also said that Wachovia could be counted on to fund and sell AAJ's Loan as contemplated, and therefore there could be no occasion to invoke paragraph 1.15(d). (*Id.* ¶ 62.) Unbeknownst to AAJ at the time of Biderman's representations and assurances, Biderman and Wachovia knew that it would be impossible to securitize the Loan in a profitable manner, or that there was a substantial probability that Wachovia could not do so. (*Id.* ¶ 65.) Wachovia, however, deliberately concealed this information and risk from AAJ, and agreed to make the Loan with the secret knowledge and expectation that Wachovia would not, in fact, make the Loan as promised unless, against the odds, the sale or securitization prospects for the Loan significantly improved. (*Id.*)

---

[4] Although this is not expressly alleged in the Amended Complaint, the Court may consider an allegation in a brief in opposition to a Rule 12(b)(6) motion as a clarification of a pleading, such as the Amended Complaint here. *Pegram v. Herdrich*, 530 U.S. 211, 230 & n.10 (2000). The Court may also consider the allegation as a supplement to AAJ's fraud claims for purposes of the particularity requirement of Rule 9(b). *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 73-74 (D.D.C. 2002). If the Court considers it necessary, AAJ requests leave to amend its claims to add this allegation.

The State of the CMBS Market.    At the time of the negotiations over the loan commitment agreement, Biderman and Wachovia knew of the severe troubles and substantial instability in the CMBS market and that, in particular, loans with a profile similar to the proposed AAJ Loan could not be successfully sold in the secondary markets.  (*Id.* ¶¶ 54, 63.)  As a result, Wachovia had already begun withdrawing from CMBS loans with other borrowers, a fact it failed to share with AAJ at the time.  (*Id.* ¶ 68.)  Among the sources of Biderman and Wachovia's knowledge of the troubled market conditions were numerous reports by credit rating agencies and respected media outlets,[5] in addition to their first-hand, internal knowledge that was unavailable to AAJ.  (*Id.* ¶¶ 54-59, 63, 65.)  Nevertheless, Biderman misrepresented the state of the CMBS market, knowing that he and Wachovia had far superior expertise and knowledge regarding the CMBS market and whether market conditions would permit sale of the Loan as contemplated.  (*Id.* ¶ 63.)

Biderman and Wachovia knew at the time that they made these representations that they were false and misleading, and made them for the purpose of inducing AAJ to:  enter the loan commitment agreement; allow the due diligence period to expire; make its nonrefundable $5 million deposit; commit itself to purchase the Property; and forego alternative financing, perhaps from Wachovia's competitors.  (*Id.* ¶ 64.)  Moreover, Biderman and Wachovia knew that AAJ

---

[5] Most notable was a report by Moody's, one of the leading agencies involved in rating CMBS securities, that was widely distributed on April 10, 2007, and was entitled:  "US CMBS:  Conduit Loan Underwriting Continues to Slide—Credit Enhancement Increase Likely."  Moody's indicated that it intended to adjust its manner of rating CMBS securities to better reflect the risk associated with then-prevailing underwriting standards for loan originations by major banks such as Wachovia.  (*Id.* ¶ 55.)  Another market commentator observed on May 11, 2007 that "the CMBS market underwent an enormous adjustment seemingly overnight.  Banks re-traded loan [applications] on . . . some of their most successful and profitable clients, several banks made it be known that they are out of the 10-year interest-only lending business for good, some borrowers unable to obtain financing walked away from hard deposits, and one of the go-to funding sources for large deal financings went POOF – literally – overnight."  (Id. ¶ 58.)  Moreover, the Wall Street Journal reported in its "Heard on the Street" column on June 15, 2007 that the CMBS market had experienced a "meltdown" that had caused a "sea change" in the amount that real-estate investors could borrow.  As the Wall Street Journal reported on June 15, "The whole market is in upheaval," and, as a result, "a lot of CMBS issuers are running for their lives."  (Id. ¶ 59.)

had placed its trust in them based on their representations, including their representations about their ability to sell the Loan under foreseeable market conditions.  (*Id.* ¶ 63.)

**Defendants Induce AAJ To Forbear From Terminating The**
**Rate Lock Agreement And To Execute The Loan Commitment Agreement**

Although the parties' discussions continued, as of May 30, 2007, Wachovia had not issued a loan commitment.  Thus, under paragraph 3 of the Rate Lock Agreement, AAJ had the option to terminate that Agreement and have Wachovia return AAJ's $1.79 million rate lock fee along with any profits realized by Wachovia through its hedging transactions.  (*Id.* ¶ 49.) However, Biderman, through his misrepresentations described above, induced AAJ not to terminate the Rate Lock Agreement.  (*Id.* ¶ 50.)

As a result of and in reliance on Biderman and Wachovia's representations and assurances, on June 18, 2007, AAJ executed a loan commitment agreement ("Loan Commitment Agreement" or "LCA") on behalf of Capitol Justice LLC with Wachovia's paragraph 1.15(d) remaining in place.  (*Id.* ¶¶ 66-67.)  On June 20, 2007, Biderman and P. Zachary David, on behalf of Wachovia Bank, N.A., executed the Agreement.  (*Id.* ¶ 67.)  A true and correct copy of the Loan Commitment Agreement, which is misdated "May 25, 2007," is attached to the Amended Complaint as Exhibit C.  At the time, Wachovia knew that AAJ had relied upon Biderman and Wachovia's representations in entering the Loan Commitment Agreement and putting at risk its $5 million deposit and, in fact, the entire opportunity to acquire the Property. (*Id.* ¶ 63.)

The Loan Commitment Agreement obligated Wachovia to lend AAJ $89.5 million for ten years at a fixed interest rate of 6.02% per year.  (*Id.* ¶ 70.)

## Wachovia Reneges On The Loan Commitment

Less than two months from the closing date, Defendants Wachovia Capital Markets, LLC and Wachovia Securities sent AAJ a letter dated October 22, 2007, a copy of which Defendants have attached to their Motion as Exhibit 1, that purported to terminate the Loan Commitment Agreement.  (*Id.* ¶ 78.)  Invoking paragraph 1.15(d), Wachovia stated that there had been a "material adverse change in the fixed income sector of the capital markets" such that it had "determined that it would be unable to effect a Securitization of the Loan if the Loan were made upon the financial terms committed."[6]  (*Id.* ¶ 79.)

Contrary to Defendants' letter, there was no legitimate basis for terminating the Loan Commitment Agreement, particularly because there had not been a "material adverse change" in market conditions sufficient to invoke the termination provision of paragraph 1.15(d).  (*Id.* ¶¶ 84-86.)  Indeed, Wachovia's Senior Vice President for Lending admitted only two weeks later that Wachovia "is still quoting fixed-rate CMBS deals" on terms similar to those that Wachovia said it could no longer offer to AAJ.[7]  (*Id.* ¶ 83.)  Nevertheless, Defendants refused to honor their commitment to make the Loan as specified in the Loan Commitment Agreement.  (*Id.* ¶ 90.)

On November 16, 2007, John Tinkey, Managing Director of Defendant Wachovia Capital Markets, LLC, informed AAJ that the Rate Lock Agreement had been unilaterally terminated, and that Wachovia would "refund to the Borrowers all deposits paid by AAJ or Capitol [Justice] in connection with the rate lock transaction, adjusted for any loss incurred in breaking the rate lock and any out-of-pocket expenses incurred by the Lender in connection with the Loan to

---

[6] The letter indicates that its purpose is to "terminate *our* commitment" and "to offer an alternative proposal that is consistent with the current pricing and underwriting requirements of *Wachovia Securities.*"  (Mot. Ex. 1 at 1 (emphases added).)

[7] While Defendants focus on the less optimistic views referenced in the October 26, 2007 Financial Week article (Mot. at 7), it is in that very article where Wachovia's senior officer indicates that Wachovia is nevertheless *still* making the types of loans that it agreed to make to AAJ.  (Am. Compl. ¶ 83.)

date." (*Id.* ¶ 91.)  At the time of this termination, AAJ was in full compliance with its obligations under the Rate Lock Agreement. (*Id.* ¶ 93.)

On December 3, 2007, Wachovia sent AAJ what it claimed to be an "accounting of the net amount to be remitted to AAJ." (*Id.* ¶ 95.)  Wachovia's highly-opaque "accounting" appears to indicate that its hedging transactions had produced a profit of $672,166 on AAJ's rate lock deposit. (*Id.*)  However, Wachovia purported to offset that profit with undefined "carry" charges of $682,171, resulting in what it claimed was a net loss of $10,005. (*Id.*)  It then unilaterally deducted this amount, along with other expenses, before remitting to AAJ $1,781,895, which included none of the $672,166 profit realized by Wachovia in its hedging transactions with AAJ's deposit. (*Id.*)  The Rate Lock Agreement provides no basis for deducting "carry" charges before returning AAJ's deposit and profits earned on those deposits. (*Id.* ¶ 97.)  Despite AAJ's requests, Wachovia has refused to provide any further details or to return AAJ's entire rate lock deposit and Wachovia's $672,166 profit earned on that deposit. (*Id.* ¶ 96.)

As a result of Defendants' wrongful conduct, AAJ has sustained substantial damages. (*Id.* ¶¶ 9, 64, 69.)  On December 14, 2007, AAJ filed its Amended Complaint, asserting claims for:  breach of the Loan Commitment Agreement, seeking both damages and specific performance (Counts I and III respectively); breach of the Rate Lock Agreement (Count II); fraud (Count IV); breach of fiduciary duty (Count V); negligent misrepresentation (Count VI); breach of the covenant of good faith and fair dealing (Count VII); equitable estoppel relating to the Loan Commitment Agreement (Count VIII); unjust enrichment relating to the Rate Lock Agreement (Count IX); an accounting relating to the Rate Lock Agreement (Count X); and a declaratory judgment that there has been no material adverse change as that phrase is used in the

Loan Commitment Agreement (Count XI).  On January 3, 2008, Defendants moved to dismiss all Counts other than Counts I, III and XI.

## ARGUMENT

### I.    THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS A PORTION OF THE AMENDED COMPLAINT BECAUSE AAJ HAS PROPERLY STATED CLAIMS IN COUNTS II, IV, V, VI, VII, VIII, IX AND X

This Court has recognized that "a complaint should not be dismissed for failure to state a claim unless it appears *beyond doubt* that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief."  *Banks v. District of Columbia*, 377 F. Supp. 2d 85, 88 (D.D.C. 2005) (emphasis added) (Lamberth, J.).  In deciding a motion to dismiss under Rule 12(b)(6), the Court must assume the truth of all well-pleaded facts of the complaint and draw all reasonable inferences in favor of the non-movant.  *Id.* at 88 (citing *United States v. Bernad,* 275 F. Supp. 2d 1, 5 (D.D.C. 2003)).

Because AAJ has more than adequately alleged facts that, when proved at trial, will entitle it to substantial recovery on all of the causes of action asserted in the Amended Complaint, the Court should deny Defendants' Motion in its entirety.

### A.    AAJ's Amended Complaint States A Claim For Fraud And Negligent Misrepresentation

AAJ's fraud and negligent misrepresentation claims arise from Defendants' misrepresentations about the meaning of the "material adverse change" provision in the Loan Commitment Agreement, Wachovia's intention and ability to fund and sell the Loan, and the current and anticipated state of the CMBS market.  The foregoing misrepresentations caused AAJ to refrain from terminating the Rate Lock Agreement and induced AAJ to enter the Loan Commitment Agreement, resulting in substantial damage to AAJ.

In their Motion, Defendants do not specifically challenge AAJ's fraud and negligent misrepresentation allegations relating to the Rate Lock Agreement.  Instead, Defendants take issue with AAJ's fraud and negligent misrepresentation claims relating to the Loan Commitment Agreement, and argue for dismissal on three separate grounds, none of which has any merit.  Contrary to Defendants' assertions, AAJ has properly alleged that Defendants made actionable misrepresentations that are not, in any way, protected by the two agreements' integration clauses, which Defendants have mischaracterized.  And, AAJ has more than sufficiently pleaded "knowledge and intent" as to Defendants' misrepresentations.

### 1.    The Amended Complaint Properly Alleges Fraud And Negligent Misrepresentation Relating To The Rate Lock Agreement

AAJ's fraud and negligent misrepresentation claims relating to the Rate Lock Agreement are based on misrepresentations by Defendants *after* the Rate Lock Agreement was executed.[8] (Am. Compl. ¶ 50.)  Paragraph 3 of the Rate Lock Agreement provides that "[i]n the event Lender does not issue a commitment by May 30th 2007, and Borrower elects to terminate the rate lock agreement, Lender shall not profit from any gains that are realized from the hedge agreement."  Wachovia did not issue a commitment by May 30, 2007.  (*Id.*)  Defendants' conduct in misrepresenting Wachovia's intent and ability to make the Loan following execution of the Rate Lock Agreement, however, caused AAJ to refrain from terminating that Agreement after May 30, 2007, and is plainly actionable.  *Chedick v. Nash,* 151 F.3d 1077, 1081 (D.C. Cir. 1998) ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to *refrain from action* in reliance upon it, is subject to

---

[8] Thus, Defendants are incorrect in stating that "AAJ's fraud and negligent misrepresentation claims are based entirely on representations that predated … the final, integrated agreements."  (Mot. at 12-13.)

liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.") (emphasis added) (citing RESTATEMENT (SECOND) OF TORTS § 525 (1976)).

Defendants have not specifically challenged this aspect of AAJ's claims.  Nor could they for the reasons stated above.  Accordingly, the Court should permit AAJ to proceed with this aspect of Counts IV and VI.

> ### 2.    The Amended Complaint Alleges That Defendants Made Actionable Misrepresentations About Their Present Intent To Perform And Their Existing Knowledge Concerning The Likelihood That There Would Be A Material Adverse Change In The Capital Markets

Defendants induced AAJ to enter the Loan Commitment Agreement by misrepresenting the meaning of the ambiguous MAC provision as well as the circumstances under which Wachovia might invoke it.  (Am. Compl. ¶¶ 2, 60-65.)  In response to AAJ's concerns that the MAC provision was subject to interpretation and ambiguous, Defendants represented that it was meant to be invoked only in the case of a "9/11-type meltdown."  (*Id.* ¶¶ 149, 181.)  Defendants also represented that Wachovia could be trusted to fund and sell the Loan as contemplated, and that Wachovia would stand by AAJ and see to it that AAJ would proceed to closing.  (*Id.* ¶¶ 150, 182.)  Defendants made these representations knowing that existing and forecasted market conditions made it impossible or extremely difficult for Wachovia profitably to securitize a loan with a profile similar to that being offered, and that, therefore, Wachovia had no intention of honoring its loan commitment unless, against long odds, market conditions dramatically improved.  (*Id.* ¶ 65.)

Thus, Defendants misrepresented their present intention to follow through with the Loan, omitted material information with respect to the actual or foreseeable state of the CMBS market at the time that Wachovia entered into the Loan Commitment Agreement, and thereby concealed their existing knowledge of the extraordinary risk that future market conditions would cause

Wachovia to back out of the Loan.  (*Id.* ¶¶ 4, 6, 65, 183.)  By doing so, Wachovia and Biderman plainly engaged in actionable fraud.  *Chedick,* 151 F.3d at 1081-83 (holding party's intent not to perform contractual obligation it was about to undertake constitutes fraudulent misrepresentation).

     In *Chedick,* the D.C. Circuit upheld a finding of fraud against a mortgage lender where, at the time of executing the loan documents, the lender never intended to perform its obligations. *Id.* at 1083.  The D.C. Circuit held that "where a promisor misrepresents his *present* intent to perform an act in the future, the promisee may state a claim for tortious misrepresentation." [9]  *Id.* at 1081 (emphasis in original).  The court expressly distinguished misrepresentations about a *present* intention to perform or *existing* knowledge concerning the likelihood that an event would occur in the future, which are actionable, from opinions or future predictions, which are not.  *Id.* at 1081 (quoting 37 AM. JUR. 2D *Fraud and Deceit* § 68 (1968) ("The gist of the fraud in such cases is not the breach of the agreement to perform, but the fraudulent intent of the promisor, the false representation of an existing intention to perform where such intent is in fact nonexistent, and the deception of the obligee by such false promise."); RESTATEMENT (SECOND) OF TORTS § 525 (1976) ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.")).  Here, AAJ plainly and repeatedly alleges that Wachovia misrepresented its present intention to perform its obligation to make the Loan, as well as its

---

[9] It is curious that Wachovia makes no mention of the *Chedick* case, particularly given that this controlling D.C. Circuit authority specifically holds that two cases upon which Wachovia relies, *Bennett v. Kiggins* and *Howard v. Riggs Nat'l Bank*, do not preclude a fraud claim based on a misrepresentation of one's intent to perform an obligation.  *Chedick*, 151 F.3d at 1082-83.

existing knowledge concerning the likelihood that the capital markets would allow for the sale or securitization of the Loan.  (Am. Compl. ¶¶ 2-5, 60-65.)[10]  Accordingly, AAJ has properly stated claims for fraud and negligent misrepresentation.

In their Motion, Defendants deliberately overlook these many allegations, and instead seek to recharacterize AAJ's claims as "opinion" or "prediction" by quoting snippets of the Amended Complaint out of context.  Defendants also cite inapposite cases.  The court in *Bennett v. Kiggins*, upon which Wachovia relies, makes the same distinction as does *Chedick* between a "prophecy or prediction" and a "promise [] made without the intent to perform."  377 A.2d 57, 61-62 (1977) (recognizing that an action for fraud may arise from "a misrepresentation of fact where the evidence shows that the promise was made without the intent to perform, or that the promisor had knowledge that the events would not occur").  Thus, *Kiggins* provides no support for Defendants' Motion, but rather compels upholding AAJ's fraud and negligent misrepresentation claims concerning Wachovia's present intention to perform and existing knowledge about the likelihood of any significant market changes.

Defendants' reliance upon *Bennett Enterprises v. Domino's Pizza*, 794 F. Supp. 434 (D.D.C. 1992), is similarly misplaced.  In *Domino's*, the plaintiff alleged that, *following* execution of a franchise agreement, the defendant had inappropriately designated plaintiff's franchise as a "distressed store" and "in default" under the agreement to prospective buyers of the franchise.  *Id.* at 436.  Apart from the lack of particularity in the allegations, the court held that there could be no claim for fraud arising from the defendant's "legal conclusions and opinions" and "interpretation as to the legal effect of the 'distressed store' designation,"

---

[10] Wachovia's contentions that AAJ failed to allege material misrepresentations of fact or falsity of such facts (Mot. at 13-17) are misplaced.  Throughout the Amended Complaint, AAJ alleges that Defendants made false statements about their intention to make the Loan, the state of the CMBS market, and the strong likelihood that Wachovia would not fund the Loan.

particularly since defendant's comments were made to third parties. *Id.* at 437. Instead, the court found that plaintiff had stated a tortious interference claim. *Id.* at 436. This is wholly different from Defendants' misrepresentations to AAJ regarding their *present intent* to perform the Loan Commitment Agreement in the future, and about their *present* knowledge of the likelihood of their non-performance.

### 3. The Integration Clauses In No Way Preclude AAJ's Misrepresentation Claims, Which Do Not Seek To Add Or Vary Terms To The Rate Lock And Loan Commitment Agreements

Defendants argue that AAJ's reliance on their representations was unreasonable because the parties' agreements contain integration clauses. (Mot. at 10.) Defendants are incorrect with respect to the law governing the element of reliance, the application of integration clauses in fraudulent inducement cases, and the scope of the clause contained in the Loan Commitment Agreement.

As an initial matter, a claim for fraudulent misrepresentation "does not contain an explicit 'reasonable reliance' provision." *Benz v. Washington Newspaper Publ'g Co.,* Civ. A. No. 05-1760, 2007 WL 1794104, at *3 (D.D.C. June 19, 2007) (requiring an allegation only that "action is taken in reliance upon the representation"). Nonetheless, the Amended Complaint properly alleges that "AAJ's reliance was justifiable and reasonably foreseeable due to, among other things, the relationship between the parties and Wachovia's expertise and superior knowledge with respect to the Loan and CMBS market transaction." (Am. Compl. ¶ 153.) AAJ further alleges that it "justifiably relied upon Wachovia's misrepresentations and omissions, the falsity of which were neither known to nor readily discoverable by AAJ." (Am. Compl. ¶ 184.)

AAJ's reliance was presumptively justified, among other reasons, because of the fiduciary relationship alleged to exist with Wachovia. [11]    *See Int'l Telecoms. Satellite Org. v. Colino,* Civ. A. Nos. 88-1266, 87-2749, 1992 WL 93129, at *6 (D.D.C. April 15, 1992) ("Where a party making a representation occupies a fiduciary or other position of trust to the plaintiff, the plaintiff is justified in assuming the correctness not only of factual representations but also of opinions and conclusions."); *see also infra* at 31-33.    In addition, a recipient of a fraudulent misrepresentation of intention is justified in relying upon it if the existence of the intention is material and the recipient has reason to believe that it will be carried out.    RESTATEMENT (SECOND) OF TORTS § 544 (2007); *see Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Invs.,* 951 F.2d 1399, 1412 (3d Cir. 1991).    AAJ alleges both of these elements.    (Am. Compl. ¶¶ 3, 153-54.)

Wachovia attacks AAJ's reliance claims, citing *One-O-One Enterprises v. Caruso,* 848 F.2d 1283, 1287 (D.C. Cir. 1988), for the proposition that "an integration clause bars fraud or misrepresentation claims based on prior representations not contained in the contract 'even when the plaintiffs allege fraudulent inducement to enter the contract.'"    (Mot. at 11.)    This is not an accurate statement of the law.    Indeed, this same overly broad reading of *One-O-One* was specifically rejected in *Whelan v. Abell,* 48 F.3d 1247 (D.C. Cir. 1995), which Defendants neglect to cite.

In *One-O-One,* the plaintiff sought to impose obligations on the defendant that the parties purportedly agreed upon prior to entering their written agreement even though the written agreement was entirely silent as to such obligations. 848 F.2d at 1286-87. The court disallowed plaintiff's fraud claims based on the asserted obligations, citing concerns about the parol

---

[11] Am. Compl. ¶¶ 5, 60-63, 153, 158-160.

evidence rule. *Id.* In *Whelan,* the D.C Circuit expressly limited its holding in *One-O-One,* holding that "our conclusion in [One-O-One] was plainly not intended to say that an integration clause bars fraud-in-the-inducement claims generally or confines them to claims of fraud in execution." 48 F.3d at 1258. According to the court, "[s]uch a reading would leave swindlers free to extinguish their victims' remedies simply by sticking in a bit of boilerplate."[12]  *Id.; accord Ron Greenspan Volkswagen v. Ford Motor Land Devel. Corp.,* 32 Cal. App. 4th 985, 990-96 (Cal. Ct. App. 1995) (holding parol evidence is admissible to prove fraud in the inducement, even though contract recites that all conditions and representations are embodied therein); *Thrifty Rent-A-Car Sys. v. Brown Flight Rental One Corp.,* 24 F.3d 1190, 1195 (10th Cir. 1994) (recognizing that, despite integration clause, "[o]ne who is fraudulently induced to execute a written contract by the oral misrepresentation of the opposite party may always show that fact in evidence when he bases his defense on fraud in inducing the making of the contract"); *see also Betz Labs. v. Hines,* 647 F.2d 402, 407 (3d Cir. 1981); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.4 (1990) ("To the extent that evidence of misrepresentation is admissible even if the agreement is completely integrated, it is admissible in the face of the usual merger clause, since such a clause shows no more than that the contract is completely integrated.").

Unlike the plaintiff in *One-O-One*, AAJ does not seek to alter the Loan Commitment Agreement or include additional terms on which that agreement is silent. Rather, AAJ's claims stem from Defendants' misrepresentations about the meaning of the MAC provision, as to which

---

[12] The other cases cited by Wachovia are similarly distinguishable. *See In re United States Office Prods. Co. Secs. Litig.*, 251 F. Supp. 2d 77 (D.D.C. 2003) (involving fraud claims based on alleged obligations regarding future behavior not contained in the parties' agreement); *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 929 (D.C. 1992) ("None of these assurances of financial soundness made it into the written contract."); *Klayman v. Judicial Watch,* Civ. A. No. 06-670, 2007 WL 1034937, at *9 (D.D.C. Apr. 3, 2007) (involving inducement to sign agreement based on defendant's undertaking of an obligation, on which the agreement was "entirely silent").

Wachovia has now sought to ascribe a different meaning in purporting to terminate its obligations to fund the Loan, as well as Defendants' misrepresentations concerning their present intention to perform their obligations and their knowledge about the probability of non-performance. Because the MAC provision is inherently ambiguous, *see In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 65-66 (Del. Ch. 2001), AAJ's reliance on Wachovia's representations regarding the MAC provision is fully consistent with the parol evidence rule, the concern expressed in *One-O-One*.[13] Thus, the integration clauses do not bar AAJ's claims relating to Defendants' misrepresentations.

In addition, the integration clauses in the two agreements are quite different in words and scope. The Loan Commitment Agreement states that it supersedes "any and all prior written or oral *agreements*." (LCA ¶ 1.17 (emphasis added).) By contrast, the Rate Lock Agreement states that it "supersedes all oral *communications* and prior *writings*."[14] (RLA ¶ 9(g) (emphasis added).) Wachovia could have sought a broader integration clause in the Loan Commitment Agreement. It did not. Thus, the integration clause in the Loan Commitment Agreement does not affect prior *representations* by Wachovia to AAJ, and does not bar AAJ from relying on Wachovia's representations as to the meaning of the MAC provision, which representations induced AAJ to enter into the Loan Commitment Agreement.

---

[13] "Parol evidence may be admitted to explain ambiguous language of a contract, or to show a contemporaneous agreement in addition to and not inconsistent with or a variation of the written agreement between the same parties." *Rothenberg v. Rothenberg,* 203 B.R. 827, 843 (Bankr. D.D.C. 1996) (admitting extrinsic evidence to explain ambiguities in promissory note). Moreover, parol evidence is admissible "where a contemporaneous [oral] agreement [was] the inducement to one placed in writing." *Brewood v. Cook,* 207 F.2d 439, 441 (D.C. Cir. 1953). AAJ and Defendants' contemporaneous statements as to the meaning of the MAC provision at the time the Loan Commitment Agreement was executed are admissible to show that Defendants fraudulently induced AAJ to enter into that agreement, now that Wachovia seeks to terminate that agreement by attempting to ascribe a different meaning to the MAC provision.

[14] Although the Rate Lock Agreement is incorporated into the Loan Commitment Agreement (LCA ¶ 1.11(c)), the Rate Lock Agreement provides that "[n]othing herein shall be deemed a waiver or limitation of any term or condition contained in the Application or the [Loan] Commitment." (RLA ¶ 9(f).)

Finally, the question of reasonable reliance is a question of fact, and not appropriate for resolution at the motion to dismiss stage. *Benz,* 2007 WL 1794104, at *3 ("The reasonableness of the reliance upon a misrepresentation is a question of fact.") (internal citations omitted).

Accordingly, AAJ has more than adequately alleged reasonable reliance.

### 4. Counts IV And VI Sufficiently Allege Knowledge And Intent With Respect To Wachovia's Misrepresentations

Wachovia argues that AAJ has failed to adequately assert that Wachovia's misrepresentations were made with knowledge of their falsity or with the intent to mislead. (Mot. at 17-18.) Rule 9(b), however, specifically states that "malice, *intent, knowledge* and other condition of mind of a person *may be averred generally*." Fed. R. Civ. P. 9(b) (emphasis added). Thus, there is no heightened requirement for pleading the knowledge and intent elements of fraud. *Computer Network Corp. v. Spohler,* No. 82-0287, 1982 WL 1296, at *2 (D.D.C. March 23, 1982) (holding Rule 9(b) does not require pleading of circumstances or evidence from which fraudulent *intent* could be inferred).

In any event, AAJ has made numerous allegations concerning Wachovia's knowledge and intent. AAJ has pleaded that "Biderman and Wachovia knew at the time that they made the[ir] material representations and omissions that they were false and misleading and/or made with reckless disregard for the truth," and that "Biderman and Wachovia made these assurances and representations with the intention that AAJ rely upon them." (Am. Compl. ¶¶ 151, 152.) AAJ further alleges that Wachovia had superior knowledge and expertise with respect to the CMBS market and deliberately concealed what it knew about the risks of securitizing the Loan, at the same time it sought to reassure AAJ that these risks were negligible. (*Id.* ¶¶ 149-51.)

AAJ has not, as Wachovia contends, suggested that Wachovia intended to fund the Loan by asserting that Wachovia considered the Property to be a "trophy property." (Mot. at 18.) In

22

the very next sentence of the Amended Complaint after referencing the "trophy property," AAJ alleges that "[a]t the time the representations were made and AAJ's Loan was approved, Wachovia knew that it would be impossible to securitize the loan in a profitable manner, or alternatively, that there was a substantial probability it could not do so." (Am. Compl. ¶ 65.) There is no inconsistency at all in these allegations. (*Id.*) Wachovia was so eager for the chance to secure AAJ's business, and thus to aggressively expand its market share, that it was willing to take on a loan commitment that it knew it had only a small chance of actually closing. (*Id.* ¶ 65.) Wachovia was gambling that if, against all expectations, the market improved, it would reap large profits from the AAJ Loan; otherwise, Wachovia would leave AAJ to deal with the consequences. (Am. Compl. ¶ 5.)

### 5.   Count VI Properly Establishes A Duty That Wachovia Breached

AAJ's negligent misrepresentation claim arises from the same misrepresentations asserted in AAJ's fraud claim. In arguing that "Wachovia is under no duty of care" that would support AAJ's claim (Mot. at 15 n.7), Wachovia contends that "D.C. has not extended the duty of care" beyond the traditional scope of a non-adversarial relationship. Wachovia, however, has not cited a single D.C. case in support of its position. (*Id.*)

In fact, D.C. law *does* recognize that a duty of care may arise even in an "arm's-length commercial transaction." *Burlington Ins. Co. v. Okie Dokie,* 329 F. Supp. 2d 45, 48-49 (D.D.C. 2004). The defendant in *Burlington* was an insurance broker that supplied allegedly false information to an insurer, and was sued for negligent misrepresentation. *Id.* The court rejected the insurance broker's assertion that there is generally no duty of care owed by parties to an arm's-length commercial transaction. *Id.* The court noted that D.C. law on this subject is drawn from the Restatement of Torts, which establishes a duty of care owed by commercial suppliers of information to those who are intended to receive the information:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id.* (citing RESTATEMENT (SECOND) OF TORTS § 552 (1977)); *High v. McLean Financial Corp.*, 659 F. Supp. 1561 (D.D.C. 1987) (holding that lender owed borrower duty of care where lender had guaranteed the interest rate and borrower had paid a fee in connection with loan). In *High*, a loan applicant alleged that a bank had negligently processed its loan application after the bank had told the loan applicant that there were "no problems" with the application. In assessing whether the bank owed a duty of care to the loan applicant, the court found that "where the defendant held itself out as the possessor of some skill in a public calling and the plaintiff relied on that skill when agreeing to the transaction, the defendant owed a duty of care to the plaintiff." *Id.* at 1570 (citing *Jacques v. First Nat'l Bank of Maryland*, 307 Md. 527 (1986)). The *High* court found that the bank owed a duty of care to the loan applicant because the bank's statement that there were "no problems" with the loan application "implie[d] that defendant actually examined whether problems existed," and "understood itself to have a duty to plaintiffs." *Id.*

In the instant case, AAJ has pleaded that Wachovia supplied false information for the guidance of AAJ in connection with the Loan transaction. (Am. Compl. ¶ 183.) Specifically, like the bank in *High,* Wachovia told AAJ that there would be "no worries" that Wachovia would fund and sell the Loan and that AAJ had "no need to worry" about the MAC provision. (Am. Compl. ¶¶ 180, 181.) AAJ has further alleged various facts supporting its claim that its relationship with Wachovia was not at arm's length, but rather was a fiduciary relationship. (*See infra* at 32-33.) These allegations establish the "duty" element required to maintain a claim for negligent misrepresentation.

For the above reasons, the Court should deny Wachovia's motion to dismiss AAJ's fraud and negligent misrepresentation claims.

**B.    Counts II, IX And X, Specifically Directed To The Rate Lock Agreement, Properly State Claims For Relief**

### 1.    Count II States A Claim For Breach Of The Rate Lock Agreement

Wachovia breached the Rate Lock Agreement when it unilaterally terminated that Agreement and failed to return AAJ's $1.81 million deposits plus the $672,166 profit Wachovia earned on AAJ's money.  (Am. Compl. ¶¶ 95-96.)  Instead, Wachovia remitted only $1.78 million of the $2.48 million due AAJ, in violation of paragraphs 3 and 4 of the Rate Lock Agreement.  (*Id.* ¶ 99.)  Although Wachovia argues that paragraph 3 permits it to deduct "Breakage Costs" before returning AAJ's deposit and any realized profit, Wachovia has improperly attempted to deduct other, unspecified "carry" charges that are not Breakage Costs. (*Id.* ¶ 95.)

Paragraph 3(a) states that, in the event the Loan "shall not be closed and funded by Wachovia for any reason … Borrowers acknowledge and agree that Wachovia may suffer or incur damages, losses, liabilities, costs, fees and expenses (including breakage, unwind and similar costs, fees and expenses) (collectively, the 'Breakage Costs')."  It further states that "Borrowers shall be fully responsible for all Breakage Costs."  What paragraph 3(a) does not say, however, is that AAJ is responsible for *any and all* charges Wachovia wishes to assess. Paragraph 3(a) is limited only to Breakage Costs incurred by Wachovia as a result of the Loan not being closed, which in this case was entirely within Wachovia's control and was the result of Wachovia's unilateral decision to terminate its Loan Commitment Agreement at a time when AAJ had complied with its obligations and was ready, willing and able to proceed with the Loan.

AAJ has properly alleged that Wachovia's undefined, unexplained and unsupported "carry" charges of $682,171 are not "Breakage Costs," for which AAJ might be responsible. (Am. Compl. ¶¶ 96-97, 118.)   In addition, Wachovia has refused to provide any detail concerning its $682,171 charge, despite AAJ's requests.  (*Id.* ¶ 96.)  Its refusal violates paragraph 3, which requires Wachovia to "provide Borrowers with a statement setting forth its determination of Breakage Costs."   Wachovia's bare-bones statement that simply lists the number $682,171 as "carry" without any explanation, is plainly insufficient.  (*Id.* ¶ 117.)

This is particularly so given that the Rate Lock Agreement provides that certain expenses incurred by Wachovia in connection with the Hedging Arrangements are *not* recoverable from AAJ.  Paragraph 4, titled "Hedging Fees," defines certain "Transaction Costs"—*i.e.,* "costs and expenses associated with and incurred by Wachovia in entering into and maintaining the Hedging Arrangements"—for which AAJ is *not* responsible by virtue of the Transaction Costs Fee[15] having been set at "$0.00."  (RLA ¶ 4(a) ("The non-refundable Transaction Costs Fee shall be the amount set forth in the applicable Confirmation."); RLA Confirm. ¶ 3 (indicating that the Transaction Costs Fee equals $0.00).)   Because the $682,171 represent "costs and expenses associated with and incurred by Wachovia in entering into and *maintaining* [*e.g.,* "carrying"[16]] the Hedging Arrangements," they were "Hedging Fees," for which AAJ was not responsible.

Moreover, at this stage of the proceedings, it is, at best, premature for the Court to make any other determination in light of AAJ's allegations that it is not responsible under the Rate

---

[15] The "Transaction Costs Fee" is described as a "reasonable estimate of[] the costs and expenses associated with and incurred by Wachovia in entering into and maintaining the Hedging Arrangements (the 'Transaction Costs')." (RLA ¶ 4(a).)   The term "Transaction Costs" is used throughout the Rate Lock Agreement and, contrary to Wachovia's assertion, the terms Transaction Costs and "Transaction Costs Fee" are not limited to the circumstances described in paragraph 4, in which the terms are simply defined for purposes of the entire Agreement.

[16] The American Heritage Dictionary defines "carry" as to "maintain or support."  Likewise the "cost of carry" means the "[d]irect costs paid by an investor to *maintain* a security position."  David L. Scott, *Wall Street Words* 86 (1997).

Lock Agreement for this $682,171 charge, which does not represent Breakage Costs. This is especially true in light of Wachovia's failure to provide any support for this charge, which the Agreement requires to be determined "in good faith." (RLA ¶ 3.)

Finally, Wachovia's suggestion that AAJ might somehow not be entitled to the profits that were realized on the hedging transactions[17] using AAJ money (Mot. at 27-28) is belied not only by its own conduct, but also by the language of the Rate Lock Agreement. In deducting what it claims were its Breakage Costs, Wachovia deducted these costs along with claimed appraisal and legal fees from AAJ's $1.81 million in deposits *plus* the $672,166 profit to arrive at the balance of $1.78 million that it remitted to AAJ.[18] Moreover, nothing in the Rate Lock Agreement would permit Wachovia to keep any profit realized on AAJ's money in these circumstances. Indeed, paragraph 3 provides that "[i]n the event Lender does not issue a commitment by May 30th 2007 … Lender shall not profit from any gains that are realized from the hedge agreement."[19] Here, contrary to its misleading assertion (Mot. at 28), and as it well knows, Wachovia did not issue a loan commitment until June 20, 2007. (Am. Compl. ¶ 67 (noting that Loan Commitment Agreement was misdated "May 25").)

Accordingly, the Court should deny Defendants' request to dismiss Count II.

---

[17] Paradoxically, Wachovia both acknowledges and appears to deny that it realized any profits. (*Compare* Mot. at 26-27 (noting "$10,005 … reflects the net of its profit from its hedging position") *with id.* at 27 (suggesting, "even assuming there were any 'profits'").)

[18] Presumably, if Wachovia truly believed that AAJ was not entitled to the $672,166 profit, it would have deducted its Breakage Costs and other charges directly from AAJ's $1.81 deposit and returned only $1.11 million to AAJ.

[19] Although paragraph 3 also refers to situations in which "Borrower elects to terminate the rate lock agreement," here Wachovia unilaterally and improperly terminated the Rate Lock Agreement before AAJ could do so. Under such circumstances, Wachovia should not be allowed to profit simply because it acted first, particularly given that AAJ's forbearance resulted from its being defrauded into entering the Loan Commitment Agreement and then its subsequent efforts to get Wachovia to honor its commitment to make the Loan in spite of Wachovia's improper termination of the Loan Commitment Agreement. Were it otherwise, Wachovia would realize a windfall in the form of the hedging profit as a result of its breach of the two agreements and fraudulent conduct.

### 2.     Count IX States A Claim For Unjust Enrichment Relating To The $672,166 Wachovia Realized From AAJ's Rate Lock Fee

AAJ states a claim for unjust enrichment relating to the $672,166 profit that Wachovia realized in its hedging transactions with AAJ's funds, which amount represents a monetary benefit conferred upon Wachovia.  (Am. Compl. ¶¶ 96, 126, 205-16.)[20]  Wachovia seeks dismissal of this claim, arguing that "the parties' contracts govern that matter" and "the 'profits' associated with the hedge are more than offset by 'carrying' charges."  (Mot. at 28 & n.14.) Neither argument provides a basis for dismissal of this claim at this time.

Rule 8(e)(2) permits AAJ to plead claims in the alternative—in this case a contract-based claim and an unjust enrichment claim.  The case Wachovia cites, *Miranda v. Contreras*, 754 A.2d 277, 283 (D.C. 2000), does not hold to the contrary.  Rather, *Miranda* merely states that the trial court's award of damages on a complaint styled as one for "unjust enrichment" (although it also alleged breach of contract) was not erroneous.[21]  Should the Rate Lock Agreement somehow be deemed unenforceable, for example, because of Wachovia's fraud, then AAJ's unjust enrichment claim would unquestionably be viable.  Thus, particularly at this early stage of the proceedings, the Court should permit AAJ to pursue these alternate theories of recovery.  *See* Fed. R. Civ. P. 8(e)(2); *Scott v. District of Columbia*, 101 F.3d 748, 754 (D.C. Cir. 1997).

---

[20] Contrary to Wachovia's assertion, AAJ does not concede in paragraph 211 of the Amended Complaint (or anywhere else) that Wachovia's profits are "more than offset by 'carrying' charges." (Mot. at 28.)  Rather, AAJ alleges only that Wachovia *claims* to have incurred "carrying costs." (Am. Compl. ¶ 211.)  At no point does AAJ "concede" that Wachovia, in fact, incurred such costs, that it is entitled to offset such costs against profits realized on AAJ's money, or that, to the extent Wachovia incurred carry costs, they totaled $682,171. (*Id.* ¶¶ 95, 117, 210.)

[21] *Miranda* cites *Schiff v. American Ass'n of Retired Persons*, 697 A.2d 1193, 1194 n.2 (D.C. 1997), for the proposition that "there can be no claim for unjust enrichment when an express contract exists between the parties." *Schiff*, however, does not hold that a party cannot plead alternative theories of recovery based on the same set of operative facts (*i.e.,* express contract and unjust enrichment), as Rule 8(d)(2) and D.C. Circuit precedent clearly allow. *Schiff*, in turn, cites *Bloomgarden v. Coyer*, 479 F.2d 201, 210 (D.C. Cir. 1973), merely for the proposition that, "to claim a remedy for unjust enrichment, there must be *no* contract, either express or implied." *Bloomgarden*, however, was decided on a motion for summary judgment, and noted that there would be "no need to resort to [a quasi-contract theory] when the *evidence* sustains the existence of a true contract, either express or implied in fact." 479 F.2d at 210 (emphasis added).  Such a statement makes perfect sense in the context of summary judgment, where evidence is considered.  But it is no authority in the context of a Rule 12(b)(6) motion.

### 3. Count X States A Claim For An Accounting Relating To Wachovia's Handling Of AAJ's Rate Lock Fee And Related Profits And Expenses

In Count X, AAJ seeks a complete accounting of how AAJ's deposits were handled by Wachovia, including the extent of profits realized at relevant times. (Am. Compl. ¶¶ 101, 224.)

Paragraph 3 of the Rate Lock Agreement requires Wachovia to "provide [AAJ] with a statement setting forth its determination of Breakage Costs" for purposes of what, if any, amounts might be deducted from AAJ's deposits and any profits realized by Wachovia on them before returning them to AAJ. Thus, Wachovia's obligation to provide an accounting does not depend on the presence of viable tort and fiduciary claims (both of which exist here) or the lack of an adequate remedy at law, as Wachovia erroneously contends. (Mot. at 24.)

In support of its position, Wachovia cites *Bates v. Northwestern Human Services,* 466 F. Supp. 2d 69, 103-04 (D.D.C. 2006), in which the court actually *upheld* an accounting claim on a Rule 12(b)(6) motion even though it was joined with claims for legal remedies. *Id.* at 103 (noting an "accounting is a detailed statement of the debits and credits between parties arising out of a *contract* or a fiduciary relation") (emphasis added; internal quotation marks omitted).[22]

Wachovia also argues that AAJ has an adequate remedy at law in the form of "an action for breach of the Loan Commitment Agreement, together with the opportunity for discovery and determination of damages that such an action entails." (Mot. at 24-25.) One appellate court called that same argument "ludicrous, and certainly not one that leads to an adequate remedy at law." *P.V. Props. v. Rock Creek Vill. Assocs.*, 549 A.2d 403, 410 (Md. Ct. Spec. App. 1988). As

---

[22] Wachovia also overlooks that there is a basis for AAJ to claim an equitable right to an accounting. Because Wachovia had exclusive control over AAJ's Mandatory Lock Fee and how that fee was invested, AAJ lacks the means to determine whether Wachovia honestly calculated its true profits and losses and properly returned realized profits to AAJ. As a result, AAJ must rely on Wachovia's good faith in making such calculations. Such reliance creates a limited fiduciary relationship between AAJ and Wachovia and a corresponding equitable duty to account by Wachovia. *See P.V. Props.*, 549 A.2d at 409-10 (cited in *Bates*).

the court noted, suggesting that discovery could provide an adequate remedy at law would turn accepted litigation procedure on its head, and force a plaintiff to sue to discover whether he has a cause of action. *See id.*

By submitting an accounting to AAJ (incomplete though it was) that purported to show how the amount of the Mandatory Lock Fee required to be refunded to AAJ was calculated, Wachovia conceded that it was under a contractual duty to account. The real dispute here therefore involves the inadequacy of Wachovia's purported accounting, not the underlying contractual duty to provide one. Wachovia's purported accounting is indecipherable, listing figures and abbreviations that reveal little of how AAJ's Mandatory Lock Fee was invested and how Wachovia's claimed profits and losses were calculated. (Am. Compl. ¶¶ 221, 225.) These items must be explained and documented in greater detail.

For these reasons, AAJ has adequately pled a claim for an accounting in Count X.

### C.    Count V States A Claim For Wachovia's Breach Of Its Fiduciary Duty To AAJ

Wachovia owed a fiduciary duty to AAJ because of the special circumstances surrounding the parties' relationship, through which Wachovia held itself out as an expert and expressly sought to induce AAJ to place its trust in Wachovia. (Am. Compl. ¶¶ 166-68.) Based on Wachovia's advice and superior knowledge in connection with the Loan, AAJ placed its complete trust and confidence in Wachovia. (*Id.* ¶ 158.)

Wachovia now argues that AAJ has not alleged facts sufficient to create a fiduciary relationship. Wachovia seeks to place a higher pleading standard on AAJ than is required at this early stage of the proceedings. AAJ is required only to assert, not prove, the existence of a fiduciary relationship in its Amended Complaint at this juncture. *See Hite v. Leeds Weld Equity Partners,* 429 F. Supp. 2d 110, 113-14 (D.D.C. 2006) (denying motion to dismiss where

30

complaint contained sufficient allegations of fiduciary status) (citing *Bell v. UFCW,* 191 F. Supp. 2d 10, 16 & n.10 (D.D.C. 2002)); *In re Polaroid,* 362 F. Supp. 2d 461 (S.D.N.Y. 2005); *In re WorldCom,* 263 F. Supp. 2d 745, 759-60 (S.D.N.Y. 2003); *Primax Recoveries v. Lee,* 260 F. Supp. 2d 43, 47 (D.D.C. 2003)).  Count V more than satisfies this standard.

### 1.    AAJ Sufficiently Alleges The Existence Of Special Circumstances That Create A Fiduciary Relationship

To assert a cause of action for breach of fiduciary duty, a plaintiff must allege the existence of a fiduciary relationship, and that the defendant breached that duty.  *See Colino,* 1992 WL 93129, at *10.  Wachovia and the cases it cites acknowledge that a fiduciary relationship may arise between a bank and a borrower where there exist "special circumstances" that support the creation of a fiduciary relationship.  (Mot. at 19-20.)  *See Williams v. Federal Land Bank,* 954 F.2d 774, 777 (D.C. Cir. 1992) (recognizing mortgage lenders may have fiduciary duty to their borrowers); *Urban Invest. v. Branham,* 464 A.2d 93, 96-97 (D.C. 1983) (outlining examples where special circumstances create fiduciary relationship, such as where broker told clients he would "take care of them" after they expressed hesitation); *cf. Overseas Private Inv. Corp. v. Industria de Pesca,* 920 F. Supp. 207, 210 (D.D.C. 1996) (holding defendants failed to identify "special circumstances" in counterclaim).

Notwithstanding that the *Williams* case, upon which Wachovia relies, addresses Mississippi, not D.C. law, the court in that case specifically recognized that a fiduciary relationship may arise between a bank and a borrower where the parties "are in a relationship of trust," especially where "fraudulent misrepresentations" are involved.  954 F.2d at 777 (citing *First American Nat'l Bank v. Mitchell,* 359 So. 2d 1376, 1380 (Miss. 1978)).

Here, AAJ has alleged facts indicating the existence of a relationship of trust and confidence, coupled with fraudulent misrepresentations by Wachovia upon which AAJ relied to its detriment.  Specifically, AAJ has alleged:

> AAJ placed its complete trust and confidence in Wachovia because Wachovia offered financial advice to AAJ and possessed superior knowledge or access to material facts in connection with the CMBS market and other secondary lending markets.  Additionally, Wachovia held itself out as an expert in CMBS and other secondary market-based commercial loan transactions, and expressly sought to induce AAJ to place its trust in Wachovia's ability to fund and sell the Loan.

> The representations and promises of Wachovia's expertise in CMBS and other secondary market transactions, its superior market knowledge, the fact that Wachovia held itself out to AAJ as a trusted commercial mortgage advisor, and AAJ's foreseeable and reasonable reliance on Wachovia, gave rise to a fiduciary relationship between and Wachovia.

(Am. Compl. ¶¶ 158-59.)

These allegations readily satisfy the criteria for establishing a fiduciary relationship.  *See Primax Recoveries,* 260 F. Supp. 2d at 46-47 (holding that, at the motion to dismiss stage, plaintiff need only assert, not prove, fiduciary status).  At the very least, AAJ has pleaded facts sufficient to create a question of fact as to the existence of a fiduciary relationship.  *See In re Monahan Ford Corp.,* 340 B.R. 1, 41 (Bankr. E.D.N.Y. 2006) (denying dismissal because whether fiduciary duties arose between parties is question of fact not properly addressed on motion to dismiss); *Conte v. U.S. Alliance Federal Credit Union,* 303 F. Supp. 2d 220, 227-28 (D. Conn. 2004) (denying motion to dismiss where, construing record in favor of plaintiff, sufficient facts were alleged regarding existence of fiduciary relationship).

## 2.    AAJ Did Not Waive The Existence Of Wachovia's Fiduciary Duties

Wachovia's assertion that AAJ "has expressly disclaimed, and thereby waived, the existence of a fiduciary duty" has no merit.  (Mot. at 19.)  Wachovia points to paragraph 6(d) of

the Rate Lock Agreement, which states that "Wachovia has been and will be acting on an arm's length basis with Borrowers and not as Borrowers' agent, fiduciary, broker, advisor or consultant." However, paragraph 6 represents that the parties were acting on an arm's length basis only "as of the date of a Transaction," and only "with respect to a Transaction." Paragraph 1(a) of the Rate Lock Agreement limits the definition of a "Transaction" specifically to "a Rate Lock transaction with regard to the Loan." Thus, paragraph 6's limitation of Wachovia's fiduciary duties is restricted solely to the rate lock transaction.

The Loan Commitment Agreement contains no similar provision.[23] Moreover, notwithstanding that the Rate Lock Agreement is incorporated into the Loan Commitment Agreement, paragraph 9(f) of the Rate Lock Agreement specifically provides that "[n]othing herein shall be deemed a waiver or limitation of any term or condition contained in … the Commitment." It is axiomatic that "waiver requires a showing of a voluntary relinquishment of a known right." *Schmidt v. Interstate Federal Sav. and Loan Ass'n,* 74 F.R.D. 423, 428 (D.D.C. 1977). Contrary to Wachovia's baseless assertion, AAJ never waived the existence of a fiduciary relationship between itself and Wachovia in connection with the Loan Commitment Agreement.

For these reasons, the Court should deny Wachovia's request to dismiss Count V.

### D. Count VII States A Claim For Breach Of The Covenant Of Good Faith And Fair Dealing

Defendants seek to dismiss AAJ's claim for breach of the duty of good faith and fair dealing by arguing that such claim is unavailable when it conflicts with the express terms of the

---

[23] If Wachovia intended a similar provision to apply to the Loan Commitment Agreement, it would have added it to that Agreement. At this stage, AAJ is certainly entitled to that inference. *See Banks,* 377 F. Supp. 2d at 88.

33

contract or when identical independent claims exist. (Mot. at 23.) Defendants' arguments lack merit and should be rejected.

Incorporated into every contract is an implied covenant of good faith and fair dealing, the breach of which creates a cognizable cause of action. *Hais v. Smith*, 547 A.2d 986, 987-88 (D.C. 1988) (per curiam) ("This duty prevents a party from evading the spirit of the contract, willfully rendering imperfect performance or interfering with the other party's performance.") (quoting *Uproar v. National B'casting Co.*, 81 F.2d 373, 377 (1st Cir. 1936), and citing RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)). AAJ has properly alleged that Wachovia evaded the spirit of the Loan Commitment Agreement by entering it without a present intention to perform or with reckless disregard for a prospective inability to perform.[24] (Am. Compl. ¶¶ 65, 110, 150-51, 168, 172, 191.) *See Allworth v. Howard Univ.*, 890 A.2d 194 (D.C. 2006); 1 GERARD L. BLANCHARD, LENDER LIABILITY § 2:9 (2003) (entering a deal not intending to perform or recklessly disregarding prospective inability to perform is bad faith). Such conduct also serves as a predicate to fraud (assuming, as is the case here, the other elements of that claim, including reliance, are met). *Bennett*, 377 A.2d at 60-61 (holding that promissory representation can constitute a misrepresentation of fact "where the evidence shows that the promise was made without the intent to perform, or that the promisor had knowledge that the events would not occur"). It is, by definition, an example of bad faith conduct.

Defendants principally rely on *Washington Metro Area Transit Authority v. Quik Serve Foods,* Nos. 04-838(RCL) & 04-687(RCL), 2006 WL 1147933 (D.D.C. Apr. 28, 2006), to support their argument that AAJ's claim for breach of the implied covenant of good faith and fair

---

[24] AAJ has further alleged that Wachovia acted in bad faith by attempting to apply a different interpretation to the ambiguous MAC clause from that represented to AAJ when Defendants induced AAJ to enter into that Agreement. (Am. Compl. ¶ 2.)

dealing should be dismissed because it allegedly overrides the express terms of the parties' agreements and is duplicative of AAJ's claims for breach of contract and fraud.[25]  (Mot. at 23.)  In *Quik Serve*, however, the conduct alleged to constitute a breach of the duty of good faith and fair dealing was identical to that alleged to have breached an express contract.  Here, AAJ's bad-faith claim is based principally on Defendants' intention not perform at the time they entered the Loan Commitment Agreement, while AAJ's fraud claim involves additional elements, such as affirmative misrepresentation or concealment, as well as reliance.

In addition, AAJ's bad-faith claim is not duplicative of its claim that Wachovia breached an express term of the Loan Commitment Agreement, namely, paragraph 1.15(d).  The factual premise for the latter claim is that "there has been no material adverse change in the financial, banking or capital market conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet."  (Am. Compl. ¶ 108.)  AAJ has separately alleged in Count VII that Wachovia breached the duty to exercise the discretionary power it had under paragraph 1.15(d) in good faith by misrepresenting its interpretation of an inherently ambiguous term and invoking the provision under a much different interpretation, and based on knowledge of the capital markets, never shared with AAJ.  (Am. Compl. ¶¶ 84, 196.)  The facts underlying Counts I and VII are therefore not at all duplicative.[26]

---

[25] Wachovia also cites *Overseas Private Inv. Corp. v. Industria de Pesca, N.A.*, 920 F. Supp. 207, 211 (D.D.C. 1996) ("*OPIC*"), for the general proposition that the duty of good faith and fair dealing "cannot be used to 'supplant the terms actually contained in the contract.'"  (Mot. at 23 (quoting *OPIC*).)  *OPIC* held that the exercise of a power to demand payment of an obligation expressly made payable "on demand" was not inherently susceptible to a bad-faith claim.  There is no parallel with the inherently ambiguous MAC clause here.  In any event, the *OPIC* court refused to dismiss under Rule 12(b)(6) a counterclaim alleging that the plaintiff had violated a duty to exercise a purely discretionary power under the contract in good faith.  This is precisely what AAJ claims Wachovia did here.

[26] Regardless of whether AAJ's claims for breach of express contract and breach of the implied covenant of good faith and fair dealing share a common nucleus of operative fact, AAJ should be permitted to maintain them both at this stage.  Rule 8(d)(2) permits a party to "set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."  *See Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1997) (recognizing litigants may "properly plead alternative theories of liability, regardless of whether such theories [a]re consistent with one another").

Moreover, a party that has complied with the literal terms of a contract cannot invoke discretionary rights without limits. For example, the implied covenant of good faith prevents a party from exercising an express power to terminate the contract on a pretextual basis, as Wachovia did here, especially when Wachovia itself had represented that such power could be exercised only under extraordinary circumstances (*i.e.*, a "9/11-type meltdown") not present in this case. *See Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006) (explaining that "subterfuges and evasions" are not examples of good faith and that "abuse of a power to specify terms" involves bad faith). Given Wachovia's prior, narrow interpretation and explanation of the ambiguous MAC clause, Wachovia's subsequent invocation of the clause under much broader circumstances was done for the purpose of recapturing foregone economic opportunities or avoiding the economic effects of a bad bargain. (Am. Compl. ¶ 196.) Because such purposes were not within the contemplation of the parties when they entered into the Loan Commitment Agreement, Wachovia's exercise of this discretionary power amounts to a failure to perform the Loan Commitment Agreement in good faith. *See* LENDER LIABILITY §§ 2:9 & 2:10 (noting bad faith conduct includes abuse of a power to terminate and use of discretionary authority for purpose not within contemplation of parties); *see also Devoine Co. v. Int'l Co.*, 136 A. 37, 38 (Md. 1927) ("And in those cases in which there may be a question [of performance referred by the contract to the decision of the other party] open to decision, if the person to whom it is referred decides, not on the question submitted, but on some question of interest or advantage not made the basis of rights or obligations by the contract, the decision is outside of the contract and is given no effect by it."); *Food Fair Stores v. Blumberg*, 200 A.2d 166, 174 (Md. 1964) (recognizing that application of good-faith performance doctrine "depends upon the intention with which the parties entered into the contract of lease, as expressed in the contract, construed

in the light of the circumstances in which the contract was made") (internal quotation marks omitted).

For these reasons, the Court should permit AAJ to proceed with its claim in Count VII.

### E.    Count VIII States A Claim For Equitable Estoppel

In arguing for dismissal of AAJ's equitable estoppel claim, Wachovia's relies principally on *ATC Petroleum v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988), claiming that "equitable estoppel is not a freestanding claim." (Mot. at 21.) Wachovia's reliance is misplaced for several reasons. First, the case was not applying District of Columbia law on equitable estoppel and cited no decisional authority for its statement that the "doctrine of equitable estoppel is not, in itself, either a claim or a defense." Second, just the year before *ATC Petroleum* was decided, the District of Columbia Court of Appeals acknowledged that "[a]lthough traditionally asserted as a defense, or as a defense to a defense (such as statute of limitations or statute of frauds), equitable estoppel may also be asserted as a ground for affirmative relief." *Cassidy v. Owen*, 533 A.2d 253, 255 n.5 (D.C. 1987) (upholding affirmative claim of equitable estoppel).

The "elements of an equitable estoppel claim are: (1) conduct amounting to a false representation or concealment of material fact; (2) made with actual or constructive knowledge of the true facts; and (3) with the intention that another person act in reliance upon it; (4) the other person's lack of knowledge and of the means of knowledge concerning the truth of the representation; (5) and his reliance upon the misrepresentation; (6) causing him to act so as to change his position prejudicially." *Id.* at 255.

Here, AAJ has adequately pled the requisite elements of the claim. Specifically, AAJ has alleged that: (1) Biderman and Wachovia (a) falsely represented to AAJ that Wachovia interpreted the ambiguous MAC language as applying "only in the case of an unforeseeable, '9/11-type meltdown'" (Am. Compl. ¶ 60), (b) fraudulently concealed that Biderman and

Wachovia intended to invoke the clause using a different, much broader standard (*id.* ¶ 65), and (c) falsely represented to AAJ that Wachovia's expertise, sophistication, resources, and leadership role in the CMBS market assured that Wachovia would fund and sell AAJ's Loan as contemplated and made it unnecessary to invoke paragraph 1.15(d) (*id.* ¶ 62); (2) Biderman and Wachovia made these misrepresentations with actual knowledge that Wachovia (secretly) entertained a much broader interpretation, *i.e.*, that a "material adverse change" encompassed not just a "9/11-type meltdown" but any circumstances where "it would be impossible to securitize the loan in a profitable manner" or "that there was a substantial probability [Wachovia] could not do so" (*id.* ¶ 65); (3) Biderman and Wachovia made these misrepresentations with the intent that AAJ enter into the Loan Commitment Agreement and contract to acquire the Property in reliance upon that misrepresentation (*id.* ¶¶ 64, 69); (4) AAJ lacked knowledge and the means of knowledge of Wachovia's true interpretation of the clause and of Wachovia's true capabilities to place the Loan in the CMBS market before the issuance of the Termination Letter (*id.* ¶ 202); (5) AAJ actually relied on these misrepresentations in deciding to enter into the Loan Commitment Agreement and contract to acquire the Property (*id.* ¶¶ 63, 69); and (6) AAJ's reliance caused it to change its position prejudicially (*id.* ¶¶ 69, 112, 153).[27]

Moreover, regardless of whether District of Columbia law recognizes an affirmative claim of equitable estoppel, the doctrine would still provide a basis for preventing Wachovia from invoking the MAC clause to terminate the contract. *See Travellers Int'l v. Trans World Airlines,* 722 F. Supp 1087, 1098 (S.D.N.Y. 1989) ("The general principle of equitable estoppel prevents one party from enforcing rights which would result in a fraud or injustice upon a second

---

[27] *Nolan v. Nolan,* 568 A.2d 479 (D.C. 1990) is of no help to Wachovia. In *Nolan,* the defendant-husband's defense of equitable estoppel against the plaintiff-wife's claim for breach of a separation agreement was held properly rejected because he failed to prove *at trial* that his ex-wife had made a representation upon which he detrimentally relied. The standard of review applicable to Wachovia's Motion to Dismiss requires the Court to assume as true AAJ's well-pleaded allegations of detrimental reliance upon specific misrepresentations.

party who, in justifiable reliance upon the former parties' words or conduct, had been misled into acting upon the belief that such enforcement would not be sought.")

In *Travellers*, Defendant Trans World Airlines ("TWA") sought to terminate its vacation tour contract with Travellers on the basis of a "key management team" clause that, in relevant part, allowed TWA to terminate "if during any consecutive twelve month period, a substantial portion of the then key management team of [Travellers] and its related companies involved in activities related to the performance of this Agreement leaves or is otherwise no longer available to plan and supervise such activities." *Id.* at 1097. For more than a year before it purported to invoke the clause, however, TWA knew that a substantial portion of Travellers' key management team had departed in connection with a planned sale of Travellers to a third-party buyer. In purchasing Travellers for consideration that included what the buyer thought were enforceable rights under the contract, the buyer relied on TWA's representations that it approved the sale of Travellers and that TWA would continue to honor the contract after the sale. Importantly, TWA never revealed to the buyer, before the sale, that TWA was secretly reserving the right to invoke the "key management team" termination clause at any time if (as actually happened) the sale resulted in the departures of a substantial portion of this team. As a result of TWA's representations and conduct, the court held that TWA would be equitably estopped from invoking the "key management team" clause as a ground for rightful termination.

Wachovia should be similarly estopped from invoking the MAC clause under the circumstances of this case. Because Wachovia's misrepresentation that the clause would be invoked in the case of only "an unforeseeable '9/11-type meltdown'" caused detrimental reliance

on the part of AAJ, Wachovia's attempt to invoke the clause other than in such a "meltdown" constitutes a material breach of the Loan Commitment Agreement.[28]

Accordingly, Count VIII states a claim for equitable estoppel.

## II. THE COURT SHOULD DENY DEFENDANTS' REQUEST TO DISMISS THREE OF THE NAMED WACHOVIA DEFENDANTS

The Court should deny Defendants' request to dismiss Defendants Wachovia Corporation, Wachovia Capital Markets, LLC and Wachovia Securities, LLC because, based on the information available at this time, each of these entities appears to have played a role in the conduct at issue.

One need look no further than the Termination Letter that Defendants have attached to their Motion and asked the Court to consider in adjudicating this Motion (*see* Mot. at 8 & n.3) to see the apparent role of Wachovia Capital Markets, LLC and Wachovia Securities. The Termination Letter is written on letterhead of Wachovia Capital Markets, LLC and Wachovia Securities. It indicates that "the purpose of this letter is to terminate **our** commitment to finance the subject premises and to offer you an alternative proposal that is consistent with the current pricing and underwriting requirements of **Wachovia Securities**." (Mot. Ex. 1 at 1 (emphasis added).) It is signed by John Tinkey, who has identified himself as a Managing Director of Wachovia Capital Markets, LLC (among other possible Wachovia entities).

---

[28] Although Wachovia argues that AAJ should not be allowed to pursue a claim of *promissory* estoppel, AAJ has not even asserted such a claim in its Amended Complaint. In addition, Wachovia's promissory estoppel cases nowhere suggest that an integration clause precludes the use of *equitable* estoppel to bar invocation of an ambiguous contractual provision contrary to a party's prior representations as to its meaning. To the extent that Wachovia's promissory estoppel cases—specifically *Daisley v. Riggs Bank*, 372 F. Supp. 2d 61 (D.D.C. 2005), *In re United States Office Prods. Co. Secs. Litig.*, 251 F. Supp. 2d 77 (D.D.C. 2003), and *Int'l Bus. Machines Corp. v. Medlantic Healthcare Group*, 708 F. Supp. 417 (D.D.C. 1989)—rely on the parol evidence rule to bar a claim for promissory estoppel, the rule has no application where, as here, a disputed term is ambiguous. *See Tilley v. District of Columbia Contract Appeals Bd.*, 912 A.2d 1169 (D.C. 2006) (affirming that "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking") (alteration in original; internal citations omitted).

Likewise, the Term Sheet, which is incorporated by reference into the Loan Commitment Agreement, appears on Wachovia Securities letterhead and indicates that "Wachovia Securities is the trade name for the corporate and investment banking services of **Wachovia Corporation** and its subsidiaries." (Am. Compl. Ex. A (emphasis added).) In addition, correspondence that AAJ received from Biderman during the parties' negotiations of the Rate Lock Agreement and Loan Commitment Agreement indicated that Biderman was a Director of Wachovia Capital Markets, LLC in addition to his apparent role as a Director of Wachovia Bank, N.A., as reflected on the Loan Commitment Agreement and Rate Lock Agreement. (Am. Compl. Exs. B, C.)

Since it appears that all of these Wachovia entities, who are all being represented by the same counsel in this action, may have been complicit in the wrongful conduct perpetrated against AAJ and for which AAJ seeks to hold them accountable, the Court should deny Defendants' request to dismiss any of these entities at this early stage of the proceedings before any discovery into the various roles and relationships of these different entities in the matters at issue.[29]

## CONCLUSION

For these reasons, the Court should deny in its entirety Defendants' Motion to Dismiss.

Dated: January 28, 2008                Respectfully submitted,

       /s/ Jeremy W. Schulman
Jeremy W. Schulman (D.C. Bar No. 481755)
David S. Wachen (D.C. Bar No. 441836)
SHULMAN, ROGERS, GANDAL,
 PORDY & ECKER, P.A.
11921 Rockville Pike
Rockville, MD 20852
Telephone:    (301) 230-5200
Facsimile:    (301) 230-2891

*Attorneys for Plaintiffs Capitol Justice LLC and*
*American Association for Justice*

---

[29] To the extent the Court believes it is necessary for AAJ to expand on its allegations regarding the roles of the various Wachovia entities, AAJ requests leave to amend its claims to spell out these allegations in greater detail.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAPITOL JUSTICE LLC, *et al.,* | |
| Plaintiffs, | Civil Action No. 1:07-cv-02095-RCL |
| v. | |
| WACHOVIA CORPORATION, *et al.,* | |
| Defendants. | |

**ORDER**

AND  NOW,  this  _____  day  of  _____,  2008,  upon  consideration  of
Defendants' Motion to Dismiss (Doc. No. 21), and the parties' briefs in support of and
opposition thereto, **IT IS HEREBY ORDERED** that Defendants' Motion is **DENIED**.

SO ORDERED.

_____
ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE