UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAPITOL JUSTICE, LLC, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 07-2095 (RCL) |
| ) | |
| WACHOVIA CORPORATION, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Now before the Court comes defendant Wachovia Corporation's Motion to Dismiss [21]. Upon consideration of the motion, plaintiffs' opposition [24], defendants' reply [25], plaintiffs' supplement [26], defendants' response to plaintiffs' supplement [27], the entire record herein, and applicable law, the Court will GRANT defendants' motion as to Counts II, IV, V, VI, VII, VIII, and IX, and as to claims against Wachovia defendants other than Wachovia Bank, N.A., and DENY defendants' motion as to Count X.

**I.      BACKGROUND**

Plaintiffs Capitol Justice, LLC ("Capitol Justice") and American Association for Justice ("AAJ") filed this suit against defendants Wachovia Corporation, Wachovia Bank, N.A., Wachovia Capital Markets, LLC, Wachovia Securities, LLC (collectively "Wachovia"), and Sandor Biderman, seeking compensation for alleged injuries incurred as a result of Wachovia's termination of a loan agreement.

1

A.  **Negotiation of Financing Arrangements**

Plaintiffs entered into an agreement to purchase a commercial office building for $105 million on March 30, 2007. (Compl. ¶ 20.) The agreement allowed plaintiffs until June 18, 2007 to terminate their obligation to purchase the property. (*Id.* ¶ 24.) Within three days after the expiration of this due diligence period, plaintiffs were to make an additional deposit of $4 million, increasing their total investment in the property to $5 million. (*Id.* ¶ 25.)

In an effort to secure financing for the purchase of the property, plaintiffs, through their representatives The Staubach Company, approached a number of lenders, focusing on obtaining commercial mortgage-backed securities ("CMBS") financing (*Id.* ¶¶ 29-32.) Businesses engaged in CMBS financing pool loans in sets of securities, bonds from which are offered to investors. (*Id.* ¶ 30.) Plaintiffs eventually engaged in complex negotiations with Wachovia and its representative Biderman, which resulted in a number of agreements. (*See id.* ¶¶ 32-34, 36, 44, 67.)

On April 26, 2007, Wachovia sent to plaintiffs a Term Sheet featuring proposed conditions for making the loan. (*Id.* ¶ 36.) In accordance with the Term Sheet, plaintiffs returned a signed copy of the agreement along with a deposit of $20,000. (*Id.* ¶ 40.) The parties subsequently produced a Forward Rate Lock Agreement ("Rate Lock Agreement"), which froze a fixed interest rate for the term of the loan. (*Id.* ¶¶ 41-44.) Plaintiffs paid $1,790,000 to Wachovia upon signing the Rate Lock Agreement, increasing their total deposit to $1.81 million (*Id.* ¶ 45.) Though the agreement allowed plaintiffs the option of terminating its obligations if a loan commitment was not issued by May 30, 2007, plaintiffs elected not to do so. (*Id.* ¶¶ 49-50.)

The parties moved forward in their negotiations, ultimately producing a Loan Commitment Agreement, which provided for a loan of $89.5 million. (*Id.* ¶ 52.) Plaintiffs were initially worried about the "material adverse change" ("MAC") provision in the agreement, which allowed Wachovia to terminate its obligations in connection with making the loan "in the event of any material adverse change in the financial, banking or capital market conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet." (*Id.*) After being reassured that the MAC provision likely would not hinder Wachovia's performance, on June 18, 2007 plaintiffs executed the Loan Agreement. (*See id.* ¶¶ 52-66.)

B.     **Termination of the Agreements**

About four months after the conclusion of negotiations, Wachovia informed plaintiffs that it was exercising its power under the MAC clause and terminating the Loan Agreement. (*Id.* ¶ 78.) Wachovia explained that market conditions had changed such that it could no longer make the loan as contemplated in the Term Sheet. (*Id.* ¶¶ 78-79.) Wachovia further submitted a new loan proposal boasting terms more disadvantageous to plaintiffs than those of the original agreement. (*Id.* ¶¶ 80-81.) Skeptical of the firmness of Wachovia's legal position, plaintiffs demanded the lender honor its commitment, but Wachovia summarily refused. (*See id.* ¶¶ 89-90.)

Wachovia subsequently informed plaintiffs on November 16, 2007 that it was terminating the Rate Lock Agreement, invoking the MAC provision in that document. (*See id.* ¶ 91.) Wachovia also sent defendants a brief accounting, asserting it had incurred about $700,000 in expenses in connection with preparing to issue plaintiffs' loan, and agreeing to return to plaintiffs $1,781,895 of the initial $1,810,000 deposit. (*Id.* ¶ 95.) Wachovia claimed that its deduction

from the deposit, combined with money gained from investing the deposit, would offset the losses incurred in readying the loan. (*Id.*) Rejecting these assertions, plaintiffs demanded immediate payment of the rest of the deposit and profits earned from the deposit, but defendants refused to comply. (*Id.* ¶ 96.)

    C.    **Plaintiffs' Claims**

Plaintiffs allege they suffered a variety of injuries based on defendants' conduct during negotiations and termination of the loan agreements. Specifically, plaintiffs claim they lost both their former headquarters building and the opportunity to purchase the desired commercial property, and they forfeited the original deposit made in connection with purchase of the commercial property. Plaintiffs allege the following substantive claims: breach of Loan Commitment Agreement; breach of Rate Lock Agreement; fraud; breach of fiduciary duty; negligent misrepresentation; breach of the duty of good faith and fair dealing; equitable estoppel; unjust enrichment; and accounting.

    D.    **Defendants' Motion to Dismiss**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants filed a motion to dismiss with prejudice eight of the eleven counts of plaintiffs' complaint: breach of Rate Lock Agreement; fraud; breach of fiduciary duty; negligent misrepresentation; breach of the duty of good faith and fair dealing; equitable estoppel; unjust enrichment; and accounting. Defendants have further moved to dismiss with prejudice all claims against Wachovia Corporation, Wachovia Capital Markets, LLC, and Wachovia Securities, LLC, leaving Wachovia Bank, N.A. as the lone Wachovia defendant.

## II.    ANALYSIS

### A.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) states that a pleading "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." FED R. CIV. P. 8(a)(2). The import of this language is necessarily implicated when determining the threshold over which a plaintiff's pleadings must cross in order to survive a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Bell Atl. Corp v. Twombly*, 127 S. Ct. 1955, 1964-70 (2007).

When evaluating motions to dismiss, courts must "accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema, N. Am.*, 534 U.S. 506, 508 n.1 (2002). Though leaving this formulation intact, the Supreme Court has recently altered the standards courts must employ in ruling on motions to dismiss. *See Twombly*, 127 S.Ct. at 1964-70. Conceding that "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," the Court nevertheless held that a plaintiff must provide "more than labels and conclusions" and that a "formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (internal quotation marks omitted). The Court expressly rejected the previously controlling "no set of facts" standard, reasoning that such a standard would allow a "wholly conclusory statement of claim [to] survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery." *Id.* at 1968 (internal quotation marks omitted).

The D.C. Circuit has been careful to stress that the import of *Twombly* does not extend to the imposition of a heightened pleading standard, holding that "in general, a complaint should simply identify the circumstances, occurrences, and events giving rise to the claim."

*Aktieselskabet AF 21, Nov. 2001 v. Fame Jeans, Inc.*, F.3d 8 (D.C. Cir. 2008) (internal quotation marks omitted). The *Aktieselskabet* court drew a distinction between the "plausibility of an inference" and the "plausibility of a claim," determining that the Court in *Twombly* confined itself to elucidating the former concept while leaving the latter standard unchanged. *Id.* Indeed, the D.C. Circuit emphasized that "a court deciding a motion to dismiss must not make any judgment about the probability of the plaintiff's success, for a complaint may proceed even if it appears that a recovery is very remote and unlikely." *Id.* (internal quotation marks omitted).

### B. Breach of the Rate Lock Agreement (Count II)

Plaintiffs allege that Wachovia breached the Rate Lock Agreement by failing to refund to them all deposits made in conjunction with the loan. Though Wachovia realized a "profit" of $672,166 in hedging transactions with plaintiffs' $1.79 million rate lock deposit, its claimed "carry" charges of $682,171 offset this gain. (Compl. ¶ 117.) Moreover, Wachovia stated it spent $12,000 for appraisal fees, $1,400 for appraisal review, and $4,700 for legal fees. (*Id.*) After deducting these expenses from plaintiffs' initial deposits totaling $1.81 million, Wachovia returned $1,781,895 to plaintiffs. (*Id.* ¶¶ 117, 120.) Plaintiffs claim these deductions constituted a breach of the Rate Lock Agreement for three reasons: (1) the Rate Lock Agreement does not provide for deducting "carry" charges from plaintiffs' deposit; (2) the parties agreed that the Transaction Costs Fee would be $0.00; and (3) Wachovia agreed not to profit from gains realized from the hedging transactions. Plaintiffs ultimately fail to state a claim for relief based on breach of the Rate Lock Agreement, and accordingly dismissal is proper.

The express terms of the Rate Lock Agreement foreclose plaintiffs' claims for breach. Courts have long recognized "where the terms of an agreement are clear and unambiguous, the

intent of the parties is determined from the plain words of the agreement and parol evidence is not considered." *Weaver v. Bratt*, 421 F. Supp. 2d 25, 34 (D.D.C. 2006). The Rate Lock Agreement states that "[b]orrowers acknowledge and agree that Wachovia may suffer or incur damages, losses, liabilities, costs, fees and expenses . . . (collectively the 'Breakage Costs')" and maintains that plaintiffs will be "fully responsible for all Breakage Costs." (Compl. Ex. B at 2.) Moreover, the contract provides for the retention of plaintiffs' deposit "as a reasonable estimate [] of the costs and expenses associated with and incurred by Wachovia in entering into and maintaining the Hedging Arrangement." (*Id.*) Though the Rate Lock Agreement does not expressly mention "carry" charges, these expenses were suffered by Wachovia as a result of performing the Hedging Arrangement and hence constituted Breakage Costs. As such, the deduction of the fees from plaintiffs' deposit is expressly provided for in the contract. Furthermore, the parties agreed that Transaction Costs would amount to $0.00 only if "the applicable Loan [was] actually closed and funded in accordance with this Agreement prior to the expiration of the applicable Fixed Rate Period." (*Id.*) Because the loan was never closed, plaintiffs fail in their argument that the Transaction Costs provision prohibited Wachovia from making deductions.

      Finally, Wachovia did not profit from the Hedging Transactions. Though Wachovia recognized a gain from performing Hedging Transactions, it was more than offset by expenses incurred in preparing to make the loan (i.e. Breakage Costs). Indeed, the Rate Lock Agreement specifically provides that "all profits less costs shall be released to the Borrower." (*Id.*) Hence, even conceding that Wachovia's gains from the Hedging Transactions can be characterized as profit, its actions did not constitute breach of the contract.

## C. Fraud (Count IV) and Negligent Misrepresentation (Count VI)

Plaintiffs' claims for fraud and negligent misrepresentation are substantially similar. Plaintiffs allege that defendants made a number of false statements with the intent to induce plaintiffs to enter into the loan agreements. (*See* Compl.) Specifically, plaintiffs allege defendants made the following misrepresentations: (1) once the Rate Lock Agreement was executed, there would be "no worries" moving forward with the loan as contemplated in the Term Sheet; (2) the MAC provision would be invoked only in the case of a "9/11-type meltdown"; and (3) based on Wachovia's expertise, it could be trusted to fund the loan in accordance with the Term Sheet (Compl. ¶¶ 143-52.) Moreover, plaintiffs claim defendants deliberately failed to disclose information about deteriorating market conditions, secretly knowing they would likely invoke the MAC clause as an "escape route" since the loan would prove disadvantageous to finance. (*See Id.* ¶ 154.) As a result of these alleged misrepresentations, plaintiffs claim they suffered great damages in deciding to commit to the purchase of the commercial property and to cease looking for alternative financing. (*See id.* ¶ 153.) Though plaintiffs' allegations of fraud and negligent misrepresentation are sweeping, they nevertheless fail to constitute a claim, and hence dismissal is proper.

The Federal Rules of Civil Procedure provide for a heightened pleading standard for allegations of fraud: "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED R. CIV. P. 9(b); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) ("The Federal Rules do address in 9(b) the question of the need for greater particularity in pleading certain actions."). A more rigorous pleading standard is necessary in fraud cases, as courts have

recognized that such a standard "discourage[s] meritless fraud accusations, . . . prevent[s] serious damage to the reputation of the defending party from baseless claims, and . . . deter[s] claimants from adding broad fraud allegations to induce advantageous settlements." *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 73 (D.D.C. 2002).

To satisfy the particularity requirement of Rule 9(b), allegations of fraud must include "the identity of the person who made the fraudulent statement, the time, place, and content of the misrepresentation, the resulting injury, and the method by which the misrepresentation was communicated." *Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 105 (D.D.C. 2006). Moreover, "'allegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient.'" *Id.* (quoting *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992)).

Plaintiffs have failed to plead allegations of fraud and negligent misrepresentation with particularity sufficient to satisfy Rule 9(b). To begin with, plaintiffs rely on mere conclusory statements that Wachovia harbored secret intentions of not fulfilling its performance under the agreements and that they deliberately misled plaintiffs in an effort to induce them into signing the contracts. (*See, e.g.*, Compl. ¶ 4 ("Wachovia secretly viewed [the MAC] provision as its 'ace in the hole' for extricating itself from a loan it knew it was likely later to abandon.").) Though Rule 9(b) states that "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally," such claims still must be accompanied by sufficiently probative evidence. *See, e.g.*, *Chedick v. Nash*, 151 F.3d 1077, 1083 (D.C. Cir. 1998) (holding generalized allegations of intent were sufficient only because they claimed defendant had actively tried to thwart agreement from outset by manipulating performance and defendant had a history of

9

similar practices). Plaintiffs' allegations fail to reach even this threshold, since they allege neither of the factors deemed central by the court in *Chedick* nor provide any further basis for the claims.

Plaintiffs' other allegations of fraud and negligent misrepresentation suffer from similar defects. Both claims require "proof of a false representation made in reference to a material fact." *Id.* at 1081. However, some purported fraudulent statements alleged by plaintiffs were not even false. (*See, e.g.*, Compl. ¶ 150 (recalling how Biderman told plaintiffs "not [to] worry" because "Wachovia was the biggest CMBS lender in the United States, that, based on its expertise, resources, and sophistication, it could be trusted to fund and sell the Loan as contemplated in the Term Sheet, and that Wachovia would stand by AAJ and see to it that AAJ would proceed to closing . . . ").) For example, plaintiffs allege that defendants told them that once the Rate Lock Agreement was executed, "there would be . . . 'no worries' with respect to AAJ's ability to count on Wachovia's making a loan in accordance with the Term Sheet." (Compl. ¶ 43.) This statement was neither false nor misleading, as the Term Sheet contained the very same MAC clause that defendants ultimately invoked to terminate the agreement. (Compl. ¶ 91.) Other alleged misrepresentations are similarly unfounded. (*See* Compl. ¶¶ 140-156.)

The remainder of plaintiffs' allegations of fraudulent statements are not factual in nature and thus fail to meet the standards articulated by the *Chedick* court. 151 F.3d at 1081. These claims focus on defendants' representations about the MAC provision. Plaintiffs allege that defendants told them "not to worry" about the provision because it would be invoked only in the event of a "9/11-type meltdown." (*See* compl. ¶ 149.) Such representations are opinions, not facts, and therefore do not constitute an actionable fraud or negligent misrepresentation claim.

*See, e.g.*, *Bennett Enter. Inc. v. Domino's Pizza, Inc.*, 794 F. Supp. 434, 437 (D.D.C. 1992) (holding defendants' alleged misrepresentations about the import of certain contractual terms were not actionable since they represented legal opinion rather than fact).

Finally, plaintiffs' allegations of fraudulent nondisclosure fail for related reasons. To survive a motion to dismiss, plaintiffs must plead allegations of nondisclosure with sufficient particularity. *See, e.g.*, *Kowal v. MCI Commc'n Corp.*, 16 F.3d 1271, 1278-79 (D.C. Cir. 1994) (citing *Roots P'ship v. Land's End, Inc.*, 965 F.2d 1411 (7th Cir. 1992)) (approving Seventh Circuit's dismissal for lack of particularity where plaintiffs pleaded allegations of nondisclosure in vague terms, thereby failing to adequately show why defendants lacked basis for optimism). Here, plaintiffs allege that defendants failed to inform them about the state of the nebulous "market conditions," yet provide no claim as to when defendants should have provided them with that information or why defendants should have possessed that information at the time. (*See* compl. ¶ 4.) Even disregarding the failure to allege fraudulent nondisclosure with the requisite particularity, plaintiffs' claims fail because defendants had no duty to disclose such information to them, as shown below. *See, e.g.*, *Cadet v. Draper & Goldberg, PLLC*, No. 05-2105, 2007 WL 2893418, at *11 (D.D.C. Sept. 28, 2007) (holding fraudulent nondisclosure claim not actionable where defendants had no duty to disclose relevant information).

Though the preceding analysis is sufficient to satisfy the standards for dismissal, the agreements' integration clauses also compel dismissal. Courts have held that an integration clause bars fraud claims stemming from alleged oral promises of future behavior not encompassed by the final written agreement. *E.g.*, *Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995); *see also In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 102 (D.D.C.

2003) (dismissing fraud and misrepresentation claims because contract was integrated and alleged promises were not found in the agreement). Both the Rate Lock Agreement and Loan Commitment Agreement contain integration clauses. (*See* Compl. Ex. A & B.) As such, plaintiffs' allegations of fraud and negligent misrepresentation are barred.

Plaintiffs attempt to resist this conclusion by pointing to differences in the integration clauses found in the two documents. (Reply 21.) The Loan Commitment Agreement states that it supersedes "any and all prior written or oral agreements" whereas the Rate Lock Agreement states that it supersedes "all oral communications and prior writings." (*Id.*) Plaintiffs argue that the integration clause does not bar fraud claims stemming from the Loan Commitment Agreement, since the alleged misrepresentations do not constitute "oral agreements." (*Id.*). According to applicable precedent, however, this distinction is immaterial. *See, e.g. Hercules*, 613 A.2d at 928 n.17. A writing that states the document "contains the entire agreement," as both the Rate Lock Agreement and Loan Commitment Agreement state, compels the conclusion that the contract is completely integrated, notwithstanding other differences in precise language used. *Id.* Moreover, both agreements expressly prohibit subsequent oral modification, so the written contracts illustrate the final binding terms.

### D.     **Breach of Fiduciary Duty (Count V)**

Plaintiffs allege the existence of a fiduciary relationship between the parties, pointing to Wachovia's expertise in the lending market and its boasts that it is a trusted financial advisor. (Compl. ¶ 159.) Plaintiffs further allege that Wachovia breached this fiduciary duty by "overstating its intention and ability to follow through with its loan commitment," failing to disclose information about the CMBS market, refusing to return all "profits realized on hedging

transactions placed with [their] deposits," and refusing to account for the use of the deposits. (*Id.* ¶ 172.) Plaintiffs have failed to adequately state a claim for relief in this context, since express contractual terms disclaiming a fiduciary relationship, as well as the lack of a special relationship, compel dismissal.

Courts have held that no fiduciary duty arises where a contract expressly disclaims such a duty, even if the parties' relationship could conceivably be characterized as fiduciary in nature. *E.g.*, *Bynum v. Equitable Mortgage Group*, No. 99-2266, 2005 WL 818619 (D.D.C. April 7, 2005) ("[E]ven if [defendant's] position as a broker could arguably create a fiduciary relationship, [plaintiff] acknowledged that no fiduciary relationship existed."). The Rate Lock Agreement explicitly states that "Wachovia has been and will be acting on an arm's length basis with Borrowers and not as Borrowers' . . . fiduciary . . . ." (Compl. Ex. B.) This language is also implicitly incorporated into the Loan Commitment Agreement as part of the parties' final agreement. (*See* Compl. Ex. C.)

Plaintiffs argue that a mere allegation that a fiduciary relationship existed is sufficient to survive dismissal. (*See* Opp. 31.) Not only does the Supreme Court's recent decision in *Twombly* reject this contention, but courts have long required more than a conclusory allegation of a fiduciary relationship. *See, e.g.*, *Overseas Private Inv. Corp. v. Industria de Pesco, N.A., Inc.*, 920 F. Supp. 207, 210 (D.D.C. 1996). The court in *Overseas* dismissed defendant's counterclaim for failing to properly allege a claim of breach of fiduciary duty. *Id.* That court reasoned that "[t]he relationship between a debtor and creditor in a loan transaction is ordinarily a contractual relationship . . . and is not fiduciary in nature." *Id.* (holding also that defendant had failed to identify any circumstances beyond those normally existing in a lender-client

relationship).

Plaintiffs alternatively maintain that a fiduciary relationship arose out of both Wachovia's representations that it was a trusted lender and its superior knowledge of the finance industry. (*See* Compl. ¶ 159.) However, the lender-client relationship between plaintiffs and Wachovia falls under the compass of *Overseas*, which held that such a relationship is normally a purely contractual relationship. 920 F. Supp. at 210. Moreover, plaintiffs' argument that Wachovia's expertise and superior knowledge gave rise to a fiduciary relationship is similarly misplaced and not sufficient to resist dismissal. *See Prunte v. Universal Music Group*, 484 F. Supp. 2d 32, 43 (D.D.C. 2007) (holding that fiduciary relationship did not exist where plaintiff alleged defendant held itself out as capable of providing expertise in songwriting).

E. **Breach of the Duty of Good Faith and Fair Dealing (Count VII)**

Plaintiffs allege defendants' actions in negotiating and subsequently terminating the agreements constitute a breach of the implied duty of good faith and fair dealing. Specifically, plaintiffs allege Wachovia breached the duty through misrepresentation, nondisclosure, refusal to return the entire hedging "profits," and failure to provide reasonable notice of its decision to terminate the loan agreements. (Compl. ¶¶ 191-95.) Because these claims merely duplicate other substantive claims made by plaintiffs, dismissal is proper.

D.C. courts recognize a cause of action for breach of the duty of good faith and fair dealing where a party "'evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party.'" *Wash. Metro. Area Transit Auth. v. Quik Serve Foods, Inc.*, No. 04-838, 2006 WL 1147933, at *5 (D.D.C. April 28, 2006) (quoting *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006). However, these claims are not

"independent cause[s] of action when the allegations are identical to other claims for relief under an established cause of action." *Id.* (internal quotation marks omitted) (granting motion to dismiss when plaintiff was seeking to get "two bites at the same apple.").

Plaintiffs' claims must be dismissed, because they are patently identical to other established causes of action. The allegations centering on misrepresentations and nondiclosure are repeated in plaintiffs' claims for fraud and negligent misrepresentation. *See* Part II C, *supra*. Plaintiffs' claims stemming from Wachovia's alleged refusal to return "profits" made in hedging transactions are incorporated into their claim for breach of the Rate Lock Agreement. *See* Part II B, *supra*. Finally, the allegation that Wachovia failed to provide reasonable notice of its decision to terminate the loan agreements is subsumed under plaintiffs' cause of action for breach of the Loan Commitment Agreement. (*See* Compl. ¶ 135.) Accordingly, plaintiffs' claim that Wachovia breached the duty of good faith and fair dealing must be dismissed.

### F. Equitable Estoppel (Count VIII)

Plaintiffs further assert that they are entitled to relief under an equitable estoppel theory. They contend that Wachovia knowingly made false representations to them with the intent to induce them into committing to purchase the commercial property. (*See* Compl. ¶ ¶ 198-203.) Plaintiffs' claims rest upon a misguided interpretation of equitable estoppel, and, as such, dismissal is proper.

Parties seeking to raise a claim of equitable estoppel "must show that they changed [their] position prejudicially in reasonable reliance on a false representation or concealment of material fact which the party to be estopped made with knowledge of the true facts and intent to induce the other to act." *Nolan v. Nolan*, 568 A.2d 479, 484 (D.C. 1990). Moreover, a party must state

such a claim with sufficient particularity in order for the claim to be actionable.  *See United States v. Philip Morris, Inc.*, 300 F. Supp. 2d 61, 71 (D.D.C. 2004).  Finally, equitable estoppel "necessarily precludes reliance on representations of prior or future intention, since representations of intention are by their nature uncertain and likely to change, and therefore . . . the party to whom the representation was made would have no right to rely upon it and could not reasonably do so."  4 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 8.3 (4th ed. 1993).

Plaintiffs' claims necessarily fail when viewed through this prism.  The alleged misrepresentations projected by Wachovia fall into three categories: factual representations about its market position; statements about its ability and willingness to complete the loan transaction; and undisclosed facts about the state of the CMBS market.  To begin with, Wachovia's alleged misrepresentations about its market position either were  not false or not stated by plaintiffs with the requisite particularity.  *See* Part II C, *supra*.  Additionally, the accepted formulation of equitable estoppel precludes a party from making a claim based on alleged representations of "prior or future intention," such as Wachovia's statements assuring plaintiffs that it would go forward with the loan transaction.  *See* WILLISTON, *supra*.  Finally, the nondisclosure claims fail both for lack of particularity and absence of duty on the part of Wachovia.  *See* Part II C-D, *supra*.

   G. <u>**Unjust Enrichment (Count IX)**</u>

Plaintiffs further contend that Wachovia was unjustly enriched when it failed to return "profits" realized from using plaintiffs' deposits in hedging transactions.  This, plaintiffs allege, directly contradicts the text of the Rate Lock Agreement.  Even conceding the validity of these

arguments, the unjust enrichment claim nevertheless necessarily fails as a result of improper pleading, and it must be dismissed.

     A claim of unjust enrichment is not available when a transaction is covered by an express contract. *See Ellipso*, 460 F. Supp. 2d at 104. Though plaintiffs are correct in their assertion that Rule 8(e)(2) allows a party to claim both that there was a contract (for breach claims) and that there was not a contract (for unjust enrichment claims) (Opp. 28), "the assertion of one theory is not implicit in the other such that a party need only plead one to proceed on both," *Bingham v. Goldberg, Marchesano, Kohlman, Inc.*, 637 A.2d 81, 94 n.30 (D.C. 1994). Plaintiffs' complaint alleges that they and Wachovia had a contract, but it fails to plead in the converse. Since courts will not construe pleadings so as to remedy this defect, *id.*, plaintiffs' unjust enrichment claim fails, and dismissal is proper.

     **H.**    <u>**Accounting (Count X)**</u>

     Plaintiffs additionally seek to compel Wachovia to provide a detailed accounting regarding the handling of their deposits. Defendants respond by arguing that the claim should be dismissed, because no fiduciary relationship existed between the parties and plaintiffs cannot maintain an action for equitable accounting so long as there is an adequate legal remedy. (*See* Mot. Dismiss, 24.) Defendants further contend that the express terms of the contract preclude plaintiffs' accounting action. (Reply 21.) Defendants' arguments are unpersuasive, and accordingly dismissal is improper at this juncture.

     The right to an accounting can arise out of a contract, even where a fiduciary relationship is not present. *See Bates v. Nw. Human Services, Inc.*, 466 F. Supp. 2d 69, 103-04 (D.D.C. 2006). Such a remedy is appropriate "when a plaintiff is unable to determine how much, if any,

money is due him from another." *Id.* at 103 (internal quotations omitted) (denying motion to dismiss accounting claim where plaintiffs alleged defendants were under a duty to disclose records of benefits payments to them). Contrary to defendants' assertions, then, the right to an accounting does not require a fiduciary relationship; a mere contractual relationship is sufficient. *Id.* at 103-04. Since plaintiffs allege the existence of a contract, this claim cannot be dismissed for lack of a duty to account.

Defendants are accurate in their assertion that a party cannot maintain an action for accounting unless it has no available legal remedy. *Id.* at 102. At this juncture, however, such concerns are immaterial: "it is inappropriate, in light of the express language of Rule 8(e)(2), to dismiss such theories at this early stage in the litigation merely because the plaintiff has requested both legal and equitable remedies." *Id.* (citations omitted). Though plaintiffs will not ultimately be entitled to recovery on both accounting and breach of contract theories, dismissal of these inconsistent claims is unwarranted at this point.

Defendants finally contend that the express language of the contract, which states that Wachovia "shall provide Borrowers with a statement setting forth its determination of Breakage Costs" and that "such determination shall be binding," precludes plaintiffs from seeking an accounting. (*See* Reply 21.) This argument fails to consider the ambiguity inherent in the term "statement." Courts have recognized that "[c]ontractual language is ambiguous if it is susceptible to more than one reasonable interpretation." *Sobelsohn v. Am. Rental Mgmt.*, 926 A.2d 713, 718 (D.C. 2007) (internal quotation marks omitted). If a court deems terms ambiguous, parol evidence may be admitted for explanatory purposes, thereby making the "ultimate interpretation . . . a question for the finder of fact." *Id.* The term "statement" is

nowhere defined or elucidated in any of the agreements forged by plaintiffs and Wachovia. Moreover, there is no single common definition of "statement" that would make further inquiry into its meaning inappropriate in this context. Whether the term allows Wachovia to provide a skeletal summary of the disposition of plaintiffs' deposit, or whether it compels Wachovia to compile a more detailed listing of the transactions, cannot be determined at this stage. Therefore, dismissal is improper.

### I.     Dismissal of Claims Against Wachovia Defendants

Defendants finally move to dismiss all claims against defendants Wachovia Corporation, Wachovia Capital Markets, LLC, and Wachovia Securities LLC, leaving Wachovia Bank, N.A. as the sole Wachovia defendant. Since Wachovia Bank, N.A. was the lone Wachovia signatory to the parties' agreements, defendants contend that plaintiffs have no basis for naming the other Wachovia defendants in this suit. (*See* Reply 24.) In response, plaintiffs point to a hodgepodge of instances where the other Wachovia defendants were mentioned in connection with the ongoing negotiations. (*See* Opp. 40-41.) Plaintiffs' rebuttal argument is wholly unpersuasive, and therefore claims against Wachovia entities other than Wachovia Bank, N.A. must be dismissed.

Courts have held that contractual causes of action can proceed against only those parties who actually signed the contracts. *See, e.g.*, *Shoreham Hotel Ltd. P'ship v. Wilder*, 866 F. Supp. 1, 3-4 (D.D.C. 1994). At this stage in the litigation, only plaintiffs' contractual claims remain (breach of Loan Commitment Agreement and accounting). Since Wachovia Bank, N.A. was the only Wachovia entity to sign the Loan Commitment Agreement and Rate Lock Agreement, and these documents serve as the basis for all remaining claims, dismissal of the other Wachovia

defendants is proper.

### III.   CONCLUSION AND ORDER

Upon full consideration of the motion, plaintiffs' opposition, defendants' reply, plaintiffs' supplement, defendants' response to plaintiffs' supplement, the entire record herein, and applicable law, it is hereby, for the reasons set forth above,

ORDERED that defendants' motion is GRANTED as to dismissal with prejudice of Counts II, IV, V, VI, VII, VIII, and IX, and as to claims against Wachovia defendants other than Wachovia Bank, N.A.  It is further hereby

ORDERED that defendants' motion is DENIED as to Count X.

SO ORDERED.


Signed by Chief Judge Royce C. Lamberth, on June 11, 2008.