<u>**ORAL ARGUMENT REQUESTED**</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAPITOL JUSTICE LLC, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>WACHOVIA CORPORATION, *et al.*,<br><br>    Defendants. | Civil Action No. 1:07-cv-02095-RCL |

**PLAINTIFFS' MOTION FOR RECONSIDERATION OF
<u>DISMISSAL OF COUNT II OF THE AMENDED COMPLAINT</u>**

  Plaintiffs Capitol Justice LLC and American Association for Justice (collectively "AAJ") respectfully move the Court to reconsider the portion of its Memorandum Opinion and Order of June 11, 2008 [30] dismissing Count II of the Amended Complaint for breach of the parties' Forward Rate Lock Agreement, and to reinstate the claims for breach of that Agreement in Count II. Further, to the extent the Court believes that the Amended Complaint does not provide sufficient detail to support these claims, AAJ respectfully requests that the Court grant AAJ leave to amend Count II to correct any perceived deficiency.

  In support of this Motion, AAJ refers the Court to the accompanying Memorandum of Points and Authorities.

Pursuant to Local Civil Rule 7(f), AAJ respectfully requests oral argument on this Motion.

Dated: July 18, 2008

Respectfully submitted,

*s/David S. Wachen*
Jeremy W. Schulman (D.C. Bar No. 481755)
David S. Wachen (D.C. Bar No. 441836)
SHULMAN, ROGERS, GANDAL,
 PORDY & ECKER, P.A.
11921 Rockville Pike
Rockville, MD 20852
Telephone:   (301) 230-5200
Facsimile:    (301) 230-2891

*Attorneys for Plaintiffs Capitol Justice LLC and American Association for Justice*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAPITOL JUSTICE LLC, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> WACHOVIA BANK, N.A., <br><br> Defendant. | Civil Action No. 1:07-cv-02095-RCL |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR RECONSIDERATION OF
<u>DISMISSAL OF COUNT II OF THE AMENDED COMPLAINT</u>**

**PRELIMINARY STATEMENT**

Plaintiffs Capitol Justice LLC and American Association for Justice ("AAJ") request that the Court reconsider the portion of its Memorandum Opinion and Order of June 11, 2008 dismissing AAJ's claims for breach of the Rate Lock Agreement in Count II of the Amended Complaint. The Court should reinstate these claims because controlling provisions of the Rate Lock Agreement and North Carolina law clearly prohibited Wachovia from deducting $682,171 in so-called "carry" charges before returning AAJ's $1,781,895 cash deposit made pursuant to the Agreement. The Court erred by overlooking these clear provisions, instead applying other demonstrably inapplicable contractual provisions, in dismissing Count II. Dismissal of Count II was also improper because it stripped AAJ of valid claims for breach of the Rate Lock Agreement based on Wachovia's failure to provide a proper statement of account of its hedging transactions, its bad faith and unfair dealing, and its unreasonable delay in terminating the Rate Lock Agreement.

***First***, the Court erred by concluding that Wachovia could deduct $682,171 in "carry" charges before returning AAJ's $1,781,895 cash deposit. The Court premised this conclusion on an incorrect assumption that "carry" charges represented recoverable "Breakage Costs"—an assumption belied by the express language of the Agreement and the presumptively true allegations in the Amended Complaint. As commonly understood, and as specifically alleged in the Amended Complaint, "carry" is the cost associated with entering into and maintaining hedging arrangements. The Rate Lock Agreement, in turn, expressly defines the costs of entering into and maintaining hedging arrangements as "Transaction Costs," not Breakage Costs. The Agreement simply does not permit Wachovia to recover Transaction Costs (or anything other than Breakage Costs) if a loan does not fund.

***Second***, even if Wachovia's "carry" charges could legitimately be characterized as Breakage Costs (which they cannot be), Wachovia's breach of the Loan Commitment Agreement, as specifically alleged in the Amended Complaint, would preclude Wachovia from recovering even Breakage Costs. The Rate Lock Agreement provides that Wachovia may recover Breakage Costs when the loan "shall not be closed and funded by Wachovia for any reason." However, under North Carolina law,[1] courts construe the phrase "any reason" as "any ***lawful*** reason," such that if, as AAJ has expressly alleged, the loan did not close because of Wachovia's breaches of contract or other unlawful acts, the contractual condition precedent for Wachovia's recovery of any Breakage Costs would not have been satisfied. In short, taking AAJ's allegations as true, as the Court must, Wachovia was not entitled to keep ***any*** of AAJ's money, since the loan did not fund because of Wachovia's unlawful breach of contract. The Court's dismissal of AAJ's claim for recovery of all of its money was, therefore, clear error.

---

[1] The parties expressly agreed in section 9(c) that the Agreement would be governed by and construed in accordance with North Carolina law.

***Third***, the Court's dismissal of AAJ's claim for breach of the Rate Lock Agreement conflicts with the Court's rulings in other parts of its decision. For instance, the Court correctly declined to dismiss AAJ's accounting claim in Count X, finding that Wachovia's statement of account to AAJ ("Statement") may have failed to comply with (*i.e.,* breached) the requirements of the Agreement. Implicitly, therefore, the Court found that Wachovia may have breached the Agreement; yet, in dismissing Count II, the Court struck AAJ's cause of action asserting that very breach. Likewise, the Court dismissed AAJ's claim in Count VII for breach of the covenant of good faith and fair dealing, which claim was founded, in part, on the allegation that Wachovia's bad faith conduct induced AAJ to refrain from terminating the Rate Lock Agreement while the Loan Commitment was being negotiated. Although the Court dismissed Count VII because it found the claim duplicative of Count II, it also dismissed Count II, leaving AAJ with—to paraphrase the decision—no "bites of the apple." This too is clear error.

***Finally***, in dismissing Count II, the Court has prevented AAJ from recovering damages resulting from Wachovia's substantial and unjustified delay in terminating the Rate Lock Agreement following its refusal to fund AAJ's loan. This delay, as alleged in the Amended Complaint, constitutes a breach of the Rate Lock Agreement under North Carolina law, and is an additional ground for reinstating Count II of the Amended Complaint.

For these reasons, the Court should reinstate Count II of the Amended Complaint and permit AAJ to pursue its claims for Wachovia's breach of the Rate Lock Agreement.

# FACTS[2]

On or about April 30, 2007,[3] AAJ and Wachovia entered into a Rate Lock Agreement (Am. Compl. [17] ¶ 44), which, for the Court's convenience, is attached as Exhibit 1. On or about June 20, the parties entered into a separate Loan Commitment Agreement. (*Id.* ¶¶ 66-67.)

On October 22, Wachovia improperly terminated the Loan Commitment Agreement. (*Id.* ¶ 78.) On November 16, Wachovia improperly terminated the Rate Lock Agreement, based on its prior breach of the Loan Commitment Agreement.[4] (*Id.* ¶ 91.) On December 3, Wachovia sent AAJ its two-page Statement, which it claimed was an "accounting of the net amount to be remitted to AAJ" under the Rate Lock Agreement. (*Id.* ¶ 95.) The Statement, which failed to provide sufficient information as required by the Agreement and was not computed in good faith, indicates that, with the use of AAJ's rate lock deposit of $1,781,895, Wachovia's hedging transactions produced a "profit" of $672,166 prior to Wachovia's termination of the Rate Lock Agreement.[5] (*Id.*) The Statement also references "carry" of $682,171 that Wachovia deducted from the $672,166 profit, resulting in a claimed loss of $10,005 that it then deducted from AAJ's deposit before remitting those funds to AAJ. (*Id.*) Wachovia provided no information whatsoever regarding this carry charge; its Statement simply contains the word "carry" with

---

[2] At this stage, the Court must accept as true AAJ's allegations in the Amended Complaint.

[3] Unless otherwise indicated, all dates are from 2007.

[4] Although the Court says that Wachovia terminated the Rate Lock Agreement by "invoking the MAC provision in that document," Mem. Op. & Order [30] at 3 (D.D.C. June 11, 2008), the Rate Lock Agreement does not contain a MAC provision.

[5] The Court suggests that "Wachovia did not profit from the Hedging Arrangements" but may have "recognized a gain from performing Hedging Transactions." Mem. Op. & Order at 7. It should be noted that Wachovia's Statement contains a section titled "WB Hedge Profit (Loss)" with an entry labeled "Total Hedge P&L" equal to $672,166. Based on this and other information, AAJ has alleged that a profit was realized on the Hedging Arrangements. (Am. Compl. ¶ 117.) As the Court recognized, "When evaluating motions to dismiss, courts must 'accept as true all of the factual allegations contained in the complaint.'" Mem. Op. & Order at 5 (quoting *Swierkiewicz v. Sorema,* 534 U.S. 506, 508 n.1 (2002)). Thus, for present purposes, a profit was realized on the hedging arrangements here.

"(682,171)" beside it.[6] (*Id.* ¶¶ 95-96.) Wachovia's Statement identifies no "Breakage Costs." Indeed, the word "Breakage" does not even appear in the Statement.

Wachovia offered no explanation for the 25-day delay in terminating the Rate Lock Agreement following its termination of the Loan Commitment Agreement, a delay that adversely impacted profits from Wachovia's hedging arrangements through the use of AAJ's deposit and costs associated with the hedging arrangements. (Am. Compl. ¶ 92.)

## ARGUMENT

The Court should reconsider a prior ruling to correct a clear error and prevent manifest injustice. *See Lance v. United Mine Workers,* 400 F. Supp. 2d 29, 31 (D.D.C. 2005); *Broudy v. Mather,* 335 F. Supp. 2d 1, 4 (D.D.C. 2004). The Court should reinstate AAJ's claims for breach of the Rate Lock Agreement because its dismissal of those claims rests on a clearly erroneous application of the facts as alleged, and it ignores express language of the Agreement and controlling legal principles that are dispositive of Wachovia's position. When properly considered, the facts, operative contractual provisions, and applicable law all plainly support AAJ's claims for breach of the Rate Lock Agreement.

### A.   The Rate Lock Agreement Permits Wachovia To Deduct, At Most, Only Breakage Costs Here, And Wachovia Did Not Incur Any Breakage Costs

#### 1.   Wachovia Incurred No Breakage Costs

The Court recognized that "where the terms of an agreement are clear and unambiguous, the intent of the parties is determined from the plain words of the agreement." Mem. Op. & Order at 6-7 (quoting *Weaver v. Bratt,* 421 F. Supp. 2d 25, 34 (D.D.C. 2006)). The Rate Lock Agreement is clear and unambiguous: Wachovia can recover, in specified circumstances, Breakage Costs, and only Breakage Costs, when a loan does not fund. Wachovia, however, did

---

[6] The only other reference to "carry" in the Statement is in a section labeled "Market Info at Lock," which lists "Carry cost" with "1.625" beside it.

5

not incur any Breakage Costs, which are defined in the Agreement as "damages, losses, liabilities, costs, fees and expenses" suffered as a result of Wachovia having to *break* hedging arrangements when a loan does not close or fund. The so-called "carry" charges claimed by Wachovia are not Breakage Costs. Under the plain terms of the Agreement, "carry" charges are Transaction Costs, which are not recoverable.

Specifically, as the Court recognized, the Rate Lock Agreement never explicitly refers to "carry." Mem. Op. & Order at 7. The Court, therefore, must apply the ordinary and usual meaning in determining how to classify "carry" in the context of the Agreement. *See National Symph. Orch. Ass'n v. Konevsky,* 44 A.2d 694, 695 (D.C. 1945). The ordinary and usual meaning of "carry" in this context is to "maintain or support." AMERICAN HERITAGE DICTIONARY 215 (3d ed. 1997). The "cost of carry" means the "[d]irect costs paid by an investor to *maintain* a security position." David L. Scott, *Wall Street Words* 86 (1997) (emphasis added). Although the Court correctly recognized that "carry" charges likely relate to the performance of Hedging Arrangements, Mem. Op. & Order at 6, such charges simply do not fit within the definition of "Breakage Costs." *Cf. id.* at 7.

Rather, under the Agreement, "carry" charges are "Transaction Costs," which are not chargeable to AAJ here.[7] Transaction Costs are defined in section 4 as "the costs and expenses associated with and incurred by Wachovia in entering into and *maintaining* the Hedging

---

[7] The Agreement makes clear in at least three places that Transaction Costs and Breakage Costs are mutually exclusive. Section 2(b) provides that, in the event AAJ were to fail to pay Wachovia an Additional Mandatory Lock Fee, Wachovia could declare a default. At that point, Wachovia would be obligated "to return [to AAJ] the Mandatory Lock Fee less any (X) Transaction Costs (as hereinafter defined), (Y) Breakage Costs (as hereinafter defined), and (Z) fees and expenses (including attorney's fees) incurred by Wachovia in connection with the Loan (collectively "Wachovia's Expenses")." Wachovia's own definition of expenses and terminology explicitly confirm that Transaction Costs and Breakage Costs are different and mutually exclusive. Were it otherwise, Wachovia would have the ability to deduct twice for the same expenses, resulting in a windfall. *See Marcoin v. McDaniel,* 320 S.E.2d 892, 897 (N.C. App. 1984) (noting "a contract must be construed as a whole, considering each clause and word with reference to all other provisions and giving effect to each whenever possible"). There is no indication that the parties contemplated, much less agreed, to such an anomalous outcome. Sections 4(b) and 8 similarly confirm that Breakage and Transaction Costs are separate.

6

Arrangements." (Emphasis added.) Indeed, Wachovia's Statement specifically refers to a "Carry Cost" factor of 1.625 in a section titled "Market Info *at Lock*" (emphasis added), further demonstrating that the "carry" charge relates to making, not breaking, the hedging arrangements.

Carry charges are not "Breakage Costs." As their name suggests, "Breakage Costs" arise not from *maintaining* a hedging position, but from *breaking* a hedging position when a loan is not funded. The language and structure of section 3 make clear that Breakage Costs arise only when a loan does not go forward; they are the result of having to prematurely unwind hedging arrangements that would otherwise stay in effect if the loan were to close as contemplated.

Section 3 provides, "*In the event* that a [Rate Lock] Transaction shall be entered into … and … *the Loan* related thereto *shall not be closed and funded* by Wachovia for any reason … [*then*] Borrowers acknowledge and agree that *Wachovia may suffer or incur* damages, losses, liabilities, costs, fees and expenses (including breakage, unwind and similar costs, fees and expenses) (collectively the '**Breakage Costs**')." (Emphasis added; bold in original.) The language makes clear that Breakage Costs arise only in the event and as a result of a loan not closing or funding. Contrary to page 7 of the Court's decision, Breakage Costs are thus not "expenses incurred in preparing to make the loan"; they are expenses incurred in *not* making the loan and *breaking* the hedging arrangements.

In addition, it simply cannot be ignored that Wachovia—one of the five largest banks in the country—prepared the Rate Lock Agreement, prepared the Statement, and used the term "carry," not "Breakage," in that Statement to describe the $682,171 charge at issue. Had these charges been Breakage Costs, Wachovia could have written "Breakage" on the Statement. It did not. At this stage, AAJ is entitled to all favorable inferences flowing from Wachovia's conduct.

*Browning v. Clinton,* 292 F.3d 235, 242 (D.C. Cir. 2002). The appropriate inference here is that Wachovia incurred no Breakage Costs.

### 2. The Rate Lock Agreement Does Not Permit Wachovia To Deduct "Carry" Charges Or Other Transaction Costs When A Loan Does Not Close Or Fund

In suggesting an alternate basis for Wachovia's charging AAJ $682,171 in "carry," the Court relies on language in sections 3 and 4 of the Agreement. Neither provision, when read in its entirety, supports that conclusion.

#### a. Section 4 Does Not Permit Deduction Of "Carry" Charges

The Court quotes section 4, stating that "the contract provides for the retention of plaintiffs' deposit 'as a reasonable estimate [] of the costs and expenses associated with and incurred by Wachovia in entering into and maintaining the Hedging Arrangements.'" Mem. Op. & Order at 7. As an initial matter, what section 4 really says is that only "*a portion* of the deposit" may be retained. (Emphasis added.) Regardless, when read in full and in context, the language quoted by the Court does not support Wachovia's deduction of "carry" charges here.

The complete sentence from the part of section 4 referenced by the Court states:

> The Mandatory Lock Fee shall be refundable provided that the applicable Loan is actually closed and funded in accordance with this Agreement prior to the expiration of the applicable Fixed Rate Period; provided, however, that <u>*a portion* of the Mandatory Lock Fee shall be non-refundable (such non-refundable portion being the "**Transaction Costs Fee**") and may be retained by Wachovia</u> on account, and as a reasonable estimate, of the costs and expenses associated with and incurred by Wachovia in entering into and maintaining the Hedging Arrangements (the "**Transaction Costs**").

(Emphasis added; bold in original.) Section 4 defines the "non-refundable portion" of AAJ's deposit as the "Transaction Costs Fee," which the parties explicitly agreed would equal *zero*. (RLA at 6.) That is, the parties agreed Wachovia would bear all costs associated with entering and maintaining the Hedging Arrangements, regardless of what those costs actually were.

8

As stated previously, the quoted provision offers an alternate basis for precluding Wachovia from recovering Transaction Costs—including, in particular, the "carry" charges at issue here—because the parties plainly agreed that the Transaction Costs Fee would equal zero. (Pls. Opp. [24] at 26.) To be sure, the Court concluded that this Transaction Costs Fee provision could be applied only if the loan actually closed and funded. *See* Mem. Op. & Order at 7.[8] However, if this conclusion were correct, then there would be no logical or consistent basis to invoke this very same provision as a justification to deduct Transaction Costs where, as here, the loan did not fund. But this is precisely what the Court does on page 6 of its decision to uphold Wachovia's deduction of the "carry" charges.

Simply put, Wachovia cannot have it both ways: either Wachovia is not permitted to deduct Transaction Costs because the loan did not fund, or Wachovia is permitted to deduct Transaction Costs, but those costs are zero, as the parties negotiated and expressly agreed. No other interpretation makes sense under the language of this key provision.

### b. Section 3 Does Not Permit Deduction Of "Carry" Charges

Referencing language in section 3, the Court states that the Agreement "specifically provides that 'all profits less costs shall be released to the Borrower'" as another basis for justifying Wachovia's deduction of "carry." *Id.* at 7. In full, however, the sentence reads,

> In the event Lender does not issue a commitment by May 30th 2007, *and Borrower elects to terminate the rate lock agreement*, [then] Lender shall not profit from any gains that are realized from the hedge agreement and <u>all profits less costs shall be released to the Borrower</u>.

(Emphasis added.)

Quite simply, Wachovia may not rely upon the underlined language quoted by the Court

---

[8] Although the Court found that the Transaction Costs Fee provision did not apply because the loan did not close and fund, the Court nevertheless quoted the very definition of Transaction Costs Fee (*i.e.*, "a reasonable estimate" of the Transaction Costs) to support its conclusion that "carry" costs could be deducted by Wachovia. *See id.*

9

because AAJ, the "Borrower," never elected to terminate the Agreement. Rather, Wachovia terminated it and then arrogated to itself costs that it had agreed to bear if it had fulfilled its agreements. (Am. Compl. ¶ 91.) In fact, Wachovia itself argued that this language was inapplicable.[9] (*See* Defs. Ry. Br. [25] at 23.) Moreover, the word "costs" is ambiguous in the context of the Agreement, which defines and references at least three different, mutually exclusive categories of "costs"—Breakage Costs, Transaction Costs, and Wachovia's Expenses. Thus, to the extent the Court found that this provision somehow applied, it would be premature to dismiss AAJ's claim at this juncture, given the ambiguity of the word "costs" and the uncertain classification of "carry" charges. *See* Mem. Op. & Order at 18-19 (finding dismissal of accounting claim "improper" because "statement" in section 3 of the Agreement was ambiguous) (citing *Sobelsohn v. American Rental Mgmt.*, 926 A.2d 713, 718 (D.C. 2007)).

    3.    **In Light Of AAJ's Allegations, The Court Should, At A Minimum, Permit Discovery And Consider Evidence Regarding The "Carry" Charge Before Reaching Conclusions Based On Adverse Inferences**

To the extent the Court is willing to allow Wachovia to argue that its "carry" charges are nevertheless Breakage Costs, despite the plain meaning of "carry," the language of the Agreement defining it otherwise, the allegations in the Amended Complaint, and the inferences to be drawn from them,[10] the Court should at least allow AAJ to pursue discovery into what Wachovia's carry charges actually were and whether they were determined in good faith, as required by section 3 of the Agreement.

---

[9] As AAJ alleged in its breach of the covenant of good faith and fair dealing, fraud, and negligent misrepresentation claims, had Wachovia not induced AAJ to enter into the Loan Commitment Agreement on June 18, AAJ would have promptly terminated the Rate Lock Agreement and recovered what it was due under this provision. (*See* AAJ Opp. Br. at 14.)

[10] As the Court recognized, "When evaluating motions to dismiss, courts must 'accept as true all of the factual allegations in the complaint.'" Mem. Op. & Order at 5 (quoting *Swieriewicz, supra*); *see Browning*, 292 F.3d at 242 ("[W]e accept the plaintiff's factual allegations as true and construe the complaint "liberally," "grant[ing] plaintiff[ ] the benefit of all inferences that can be derived from the facts alleged....") (citations omitted).

AAJ has alleged that Wachovia's "carry" charge was improperly deducted. (Am. Compl. ¶ 97.) It is reasonable to infer that "carry" in this context is not Breakage Costs, but either Transaction Costs or some other type of costs. This is particularly so, given that the Statement identified "Carry Cost" as a charge applicable "at Lock"—that is, when the parties first entered the Agreement, not when Wachovia terminated the Agreement and broke the transaction. Moreover, AAJ should be given the opportunity to discover and prove what these "charges" are, in the same way and for the same reason that the Court has permitted AAJ to pursue its accounting claim. *See* Mem. Op. & Order at 18-19 (allowing claim to proceed because it "cannot be determined at this stage" whether Wachovia's Statement satisfied requirements of section 3).

### B. The Agreement Does Not Permit Recovery Of Even Breakage Costs, Because Wachovia's Unlawful Conduct Caused The Loan Not To Fund

Although section 3 of the Agreement states that Wachovia may recover Breakage Costs when the loan does not close or fund "for any reason," contrary to the Court's assumption, that provision cannot apply when the reason for the loan's failure to close or fund is Wachovia's unlawful conduct—here, Wachovia's breach of the Loan Commitment Agreement, as alleged in Count I and not challenged in Wachovia's Motion to Dismiss. (Am. Compl. ¶¶ 94, 107-12.)

A party to a contract may not rely on its own unlawful conduct as a predicate for burdening or charging the other party with some obligation under the contract. *Harwood v. Shoe,* 53 S.E. 616 (1906) ("[O]ne who prevents the performance of a condition, or makes it impossible by his own act, will not be permitted to take advantage of the nonperformance."); *Cater v. Barker,* 617 S.E.2d 113, 117 (N.C. App. 2005); *Propst Const. Co. v. North Carolina Dep't of Trans.,* 290 S.E.2d 387, 388 (N.C. App. 1982). Simply put, parties may not "take advantage of their own wrong"; they may not "profit by their wrongful acts." *Harwood,* 53 S.E.

11

at 116. Thus, "prevention by one party excuses nonperformance of an antecedent obligation of the adversary party, and, ordinarily, the party whose performance is thus prevented is discharged from further performance." *Goldston Bros. v. Newkirk,* 64 S.E.2d 424, 432 (1951).[11]

In *In re Bigelow,* 649 S.E.2d 10 (N.C. App. 2007), a lender sought to foreclose on a borrower's property. Because the lender's failure to timely receive mortgage payments was the result of unjustifiable conduct on the lender's part, the court denied foreclosure, even though the relevant mortgage documents contained no qualification on the lender's right to foreclose for failure to receive payment. According to the court, the lender "may not take advantage of its own nonperformance" to invoke foreclosure rights against the borrower. *Id.* at 13.

It would be unlawful and contrary to any reasonable intent to construe the Rate Lock Agreement to mean that Breakage Costs "may" be deemed to have been incurred where the loan is not closed or funded on account of Wachovia's own unlawful conduct.[12] And, for present purposes, the Court must assume that Wachovia breached the Loan Commitment Agreement, as alleged in Count I, which still stands.

---

[11] Precluding Wachovia's own breach and frustration of the parties' contractual objectives as a "reason" for then permitting it to recover Breakage Costs is merely a special case of the broader proposition applied in other contexts that rejects illegal conduct as being a "reason" for anything. *See, e.g., Elrod v. Burns,* 427 U.S. 347, 360-61 (1976) (holding discharge of at-will employee not a matter of absolute discretion and may not be done for unlawful purpose); *Venable v. Vernon,* 592 S.E.2d 256, 258 (N.C. 2004) (holding privilege to terminate employment "without any reason" is not absolute and precludes termination "for an unlawful reason or purpose that contravenes public policy"). Indeed, Wachovia's unlawful breach of the Loan Commitment Agreement is not a "reason" for the failure of the loan to fund and close; it is simply a lawless act, just as race, gender, or age are not "reasons" for terminating an employee who can be fired "for any reason."

[12] *See DeBruhl v. Highway Comm'n,* 95 S.E.2d 553, 557 (N.C. 1956) (holding instruments should receive only sensible and reasonable constructions, not ones leading to absurd consequences or unjust results); *Ollis v. Drexel Furniture Co.,* 92 S.E. 371, 373 (N.C. 1917) (holding party "must abide by the fair and reasonable construction of his own contract"); *Conrad v. Morehead,* 89 N.C. 31(1883) (recognizing covenant to mine land in a reasonable manner implied, as a matter of law, under 99-year lease); *Dysart v. Cummings,* 640 S.E.2d 832, 836 (N.C. App. 2007) (noting party's privilege to act in its discretion limited by implied requirement that party act reasonably); *see also Lane v. Scarborough,* 200 S.E.2d 622, 625 (N.C. 1973) (holding policy of the law is to supply what is considered perfectly obvious by the contracting parties, so that which is necessarily implied in the language of a contract is as much a part of it as that which is expressed, including stipulations they ought to have made as honest, fair and just); *Strader v. Sunstates Corp.,* 500 S.E.2d 752, 756 (N.C. App. 1998) (same).

Because Wachovia had no right to deduct Breakage Costs (or, more precisely, "carry" masquerading as Breakage Costs) in the face of its own breach, the Court should reinstate Count II to permit AAJ to recover these and other damages under the Agreement.

### C.   Dismissal Of Count II Is Inconsistent With the Court's Recognition That AAJ Has Viable Claims for Breach of the Rate Lock Agreement Arising From the Inadequacy Of Wachovia's Statement, As Well As From Wachovia's Bad Faith

In refusing to dismiss Count X (Accounting), the Court said that it could not be determined at this stage whether Wachovia's Statement satisfied the requirements of section 3 of the Agreement, which requires Wachovia to provide AAJ "with a statement setting forth its determination of Breakage Costs." Section 3 further requires Wachovia to determine the amount of Breakage Costs "in good faith." Thus, it remains an open issue whether Wachovia complied with the statement requirements of section 3, or whether Wachovia breached that provision by failing to deliver what was required. If later in the proceedings it were determined that Wachovia's Statement was inadequate and/or that Wachovia failed to compile the Statement in good faith, Wachovia will have breached section 3.

It is simply premature, therefore, to dismiss AAJ's Count II claim for breach of the Agreement. A necessary conclusion from the Court's ruling on Count X is that Wachovia may have breached the Agreement, at least as it pertains to the statement requirements of section 3. That being so, AAJ should remain free, as it would with and only with Count II intact, to pursue any relief revealed and needed, once an appropriate statement is rendered.

Likewise, the Court dismissed Count VII, which alleged a claim for breach of the duty of good faith and fair dealing, because it found that Count VII "merely duplicate[d] other substantive claims," including the portion of Count II directed toward Wachovia's refusal to return the hedging profits. Mem. Op. & Order at 14. To be sure, the Court was concerned about

giving AAJ "two bites of the same apple." *Id.* at 15. But why, then, dismiss *both* Counts II and VII? Now, the Court has taken away the apple before AAJ has been able to attempt even a single bite. Moreover, AAJ's claims of bad faith and unfair dealing are not limited just to the return of profits issue. They extend to Wachovia's conduct that induced AAJ to remain in the Agreement in the May/June 2007 timeframe while the Loan Commitment was being negotiated, Wachovia's failure to timely terminate the Loan Commitment Agreement and Rate Lock Agreement, and Wachovia's attempt to recover Breakage Costs, even though its unlawful action (*i.e.*, breaching the Loan Commitment Agreement) is what caused the loan not to fund and what led to its termination of the Rate Lock Agreement. At a minimum, AAJ should be permitted to pursue these matters in Count II, as even the Court itself seems to suggest.

> D. **Dismissal of Count II Precludes AAJ From Pursuing The Portion Of Its Claim Relating To Wachovia's Failure To Mitigate**

Although Wachovia terminated the Loan Commitment Agreement on October 22, it waited almost a month (and perhaps longer depending on when Wachovia, in fact, decided not to fund the loan), without any justification, before terminating the Rate Lock Agreement on November 16. (Am. Compl. ¶¶ 78, 91, 92.) Wachovia's unjustified delay resulted in damage to AAJ in at least two different ways. (*Id.* ¶ 92.)

First, it appears that the gains realized on the hedging arrangements decreased over this period. Second, to the extent Wachovia may come forward with as yet undisclosed Breakage Costs or the Court affirms its earlier ruling and permits Wachovia's deduction of "carry" charges, despite the clear language of the Agreement discussed above, Wachovia's unjustified delay likely increased the amount of one or both of these costs, resulting in a larger deduction from the proceeds to AAJ. (*Id.*)

14

Once Wachovia determined on October 22 (or perhaps even earlier) that it had no intention of funding the loan, it had a duty to terminate the Agreement in a timely manner to maximize the gain, minimize the cost, and avoid further financial harm to AAJ.[13] *Tillis v. Calvin Cotton Mills,* 111 S.E.2d 606, 613 (N.C. 1959) (holding party to contract "is required by law to exercise reasonable diligence to minimize damages"). Wachovia's failure to do so provides an additional basis for AAJ's Count II claim for breach of the Agreement that AAJ should be permitted to pursue, particularly at this early stage, when there has been no discovery into the impact Wachovia's delay had on gains and losses arising from the hedging arrangements.

Accordingly, the Court should permit AAJ to proceed with Count II, especially given the Court's refusal to dismiss AAJ's accounting claim, which will, among other things, shed light on profits and losses incurred at various times during the pendency of the Rate Lock Agreement. Otherwise, AAJ may be left without a mechanism to recover for the lost gains and/or increased costs suffered as a result of Wachovia's delay.

---

[13] While Wachovia may argue that AAJ could have terminated the Rate Lock Agreement following Wachovia's termination of the Loan Commitment Agreement, AAJ rejected Wachovia's refusal to fund the loan and insisted that it honor its commitment to fund the loan at the locked rate. (Am. Compl. ¶ 89.) Because AAJ wanted Wachovia to fund the loan as agreed, it had no interest in terminating the Rate Lock Agreement and providing Wachovia with another purported basis for not making the loan at the locked rate.

## CONCLUSION

For these reasons, AAJ respectfully requests that the Court reconsider its decision and reinstate the claims for breach of the Rate Lock Agreement in Count II of the Amended Complaint. Further, to the extent the Court believes that the Amended Complaint does not provide sufficient detail to support the claims, AAJ respectfully requests that the Court grant AAJ leave to amend Count II to correct any perceived deficiency.

Dated:  July 18, 2008                             Respectfully submitted,

                                                  _____s/David S. Wachen_____
                                                  Jeremy W. Schulman (D.C. Bar No. 481755)
                                                  David S. Wachen (D.C. Bar No. 441836)
                                                  SHULMAN, ROGERS, GANDAL,
                                                   PORDY & ECKER, P.A.
                                                  11921 Rockville Pike
                                                  Rockville, MD 20852
                                                  Telephone:   (301) 230-5200
                                                  Facsimile:   (301) 230-2891

                                                  *Attorneys for Plaintiffs Capitol Justice LLC and*
                                                  *American Association for Justice*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAPITOL JUSTICE LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WACHOVIA CORPORATION, *et al.*,<br><br>Defendants. | Civil Action No. 1:07-cv-02095-RCL |

# **ORDER**

AND NOW, this ____ day of _____, 2008, upon consideration of Plaintiffs' Motion for Reconsideration of Dismissal of Count II of the Amended Complaint, and the parties' briefs in support of and opposition thereto, **IT IS HEREBY ORDERED** that Plaintiffs' Motion is **GRANTED** in that the Court's Memorandum Opinion and Order of June 11, 2008 [30] is vacated and modified to the extent it dismissed Count II of the Amended Complaint for breach of the Forward Rate Lock Agreement, and, accordingly, Plaintiffs' claims in Count II are hereby reinstated.

SO ORDERED.

_____
ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE