# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAPITOL JUSTICE LLC, *et al.*, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Action No. 07-2095 (RCL) |
| WACHOVIA BANK, N.A., | )<br>)<br>) |
| Defendant. | )<br>)<br>) |

## MEMORANDUM OPINION

Before the Court is Wachovia Bank, N.A.'s ("Wachovia") Motion [81] for Summary Judgment. Wachovia argues that there are no genuine issues of material fact as to: (1) whether Wachovia breached its Loan Commitment Agreement with the American Association for Justice ("AAJ"); (2) whether AAJ suffered any damages as a result of the alleged breach; and (3) whether Wachovia provided a sufficient accounting of the rate lock agreement breakage costs. For the reasons discussed below, the Court finds that there are genuine issues of material fact as to whether Wachovia breached the Loan Commitment Agreement and whether AAJ suffered damages as a result of the alleged breach. The Court also finds that there is no genuine issue of material fact in dispute as to whether Wachovia provided a sufficient accounting of the rate lock agreement breakage costs. Accordingly, the Court will grant in part and deny in part Wachovia's motion for summary judgment.

## I. BACKGROUND

This case concerns a breach of contract claim brought by AAJ against Wachovia. AAJ and Wachovia had entered into a Loan Commitment Agreement ("LCA") in which Wachovia

agreed to provide financing for AAJ's purchase of a new office building in Washington, D.C. AAJ alleges that Wachovia breached the LCA when it invoked the LCA's material adverse change ("MAC") clause to terminate the LCA and seeks to recover damages.

A. **AAJ Seeks Commercial Mortgage-Backed Security Financing**

On March 30, 2007, AAJ entered into a Purchase and Sale Agreement to purchase a brand-new office building located at 777 6th Street in Washington, D.C., for $105 million. (Pls.' Opp'n Ex. 71 at 6 [hereinafter Pls.' Ex.].) The sale was to close on December 17, 2007. (*Id.* at 7.) AAJ paid a $5 million deposit for the building and determined it needed to obtain financing to complete the purchase. (*Id.* at 6.) As a result, AAJ, through its financial advisor the Staubach Company, began to solicit interest-only financing offers from several lenders, including Wachovia ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Pls.' Ex. 93.) Specifically, AAJ sought commercial mortgage-backed security ("CMBS") financing because it offered favorable terms. (Am. Compl. ¶ 30.)

CMBS are debt instruments that are secured by one or more commercial mortgages. (Def.'s Mem. in Supp. of Summ. J. Ex. 9 [hereinafter Def.'s Ex.].) The lender makes a loan to a purchaser of commercial property and places the loan with other similar loans in a trust. (*Id.*) The lender then sells bonds, secured by the trust, to investors. (*Id.*) Thus, issuers of CMBS loans serve as a conduit between borrowers and investors. (*Id.*)

A loan may be sold into a CMBS securitization in one of two ways. It can either be sold in its entirety, or in part through the use of an A/B note structure. (Def.'s Ex. 12.) Through the A/B structure, the loan is split into an A-note and a B-note. (*Id.*) The A-note is included in the securitization, and the B-note is separately sold. (*Id.*) The A/B structure is commonly used to

2

reduce CMBS investors' risk of nonpayment. (*Id.*)

B. **AAJ Obtains CMBS Financing from Wachovia**

In response to AAJ's solicitation, Wachovia offered AAJ a ten-year, interest-only loan for $89.5 million, which Wachovia intended to sell into a CMBS securitization. (Pls.' Ex. 12.) On April 27, 2007, AAJ and Wachovia executed a Term Sheet for the loan, which provided that AAJ could not seek financing from another lender and that any loan commitment would include a MAC clause. (*Id.*) Then, on May 2, 2007, the parties entered into a Rate Lock Agreement ("RLA"), which fixed the interest rate at 6.02% per annum through December 17, 2009. (Pls.' Ex. 16.) AAJ paid $1.81 million for the RLA.[1] (*Id.*) AAJ entered into the RLA because interest rates were increasing and ███████████████████████████████████ ███████████████████████ Pls.' Exs. 6, 10.)

Following the execution of the RLA, the parties negotiated the LCA. On May 18, 2007, Wachovia sent a draft LCA to AAJ. (Pls.' Ex. 24.) The draft LCA contained a MAC clause, which provided that "Lender may, at its option, terminate its agreement to make the Loan . . . in the event of any material adverse change in the financial, banking or capital market conditions that could impair the sale of the Loan by Lender as contemplated in the Term Sheet." (*Id.*) AAJ expressed concerns about the MAC clause and asked for it be deleted because AAJ feared that the clause would allow Wachovia to renege on its obligations. (Pls.' Ex. 93.) Wachovia refused to delete the MAC, but did add a provision requiring Wachovia to offer substitute financing if Wachovia invoked the MAC to terminate the LCA. (Pls.' Ex. 33.)

---

[1] AAJ's payment for the RLA consisted of a $1.79 million rate lock deposit and a $20,000 good faith deposit. (Pls.' Ex. 67.)

3

In addition, Wachovia's loan officer stated that the MAC clause would only be invoked in the event of an ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████ (Pls.' Ex. 93.) Relying on these assurances, AAJ signed the LCA, which was executed on June 20, 2007. (Pls.' Exs. 33, 43; Def.'s Ex. 3.)

C. Before Executing the LCA, Wachovia Knew the CMBS Market Was in Decline and Began to Change Its CMBS Financing Practices

Early in 2007 and unknown to AAJ, ██████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████ (Pls.' Exs. 8, 39.) In addition, outside trade publications and investor reports expressed concerns over the CMBS market in April and May. (*See, e.g.*, Pls.' Exs. 40, 61 (reports issued by Moody's, a top credit rating agency for CMBS securities); Pls.' Ex. 61 (report issued by Standard & Poor's, another top credit rating agency); Pls.' Exs. 41, 105 (reports issued by Commercial Mortgage Alert, a trade publication); Pls.' Ex. 107 (an article in the *New York Times*); Pls.' Ex. 108 (an analyst report by Merrill Lynch).) Despite these concerns, the second largest monthly volume of CMBS issuances occurred in June 2007. (Def.'s Ex. 43.)

In response to CMBS market concerns, ████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████



███ Nevertheless, as discussed above, Wachovia entered into the LCA with AAJ on June 20, 2007.

D. **The CMBS Market Continues to Decline and Wachovia Terminates the LCA and RLA**

Following the execution of the LCA, the CMBS continued to decline. A decrease in the liquidity of the capital markets meant that less funds were available for CMBS investment. (Def.'s Ex. 9.) The loss in liquidity also led to unprecedented increases in the spreads for CMBS securities. (*Id.*)

As a result of the continued decline of the CMBS market, Wachovia contacted AAJ to discuss restructuring the LCA on August 6, 2007. (Pls.' Ex. 124.) AAJ refused to "re-trade" or "re-price" the loan because AAJ paid for the RLA, which locked the interest rate at 6.02% per annum for ten years. (Pls.' Ex. 95.) Then, on October 22, 2007, Wachovia invoked the MAC clause to terminate the LCA because there had been "a material and adverse change in the fixed income sector of the capital markets." (Def.'s Ex. 44.) In its termination letter, Wachovia explained that "it would be unable to effect a Securitization of the Loan" under the loan's current terms because "the crisis in the sub-prime residential mortgage market has spread to the CMBS

sector, and dramatically altered CMBS investor requirements have forced a sudden return to highly conservative underwriting standards among those commercial real estate lenders that make non-recourse loans for the purpose of securitization." (Pls.' Ex. 36.)

Wachovia's last CMBS securitization occurred on November 13, 2007. (Def.'s Ex. 19.) Other lenders, however, securitized CMBS loans into early 2008, but by the end of the second quarter of 2008, CMBS issuances ceased entirely. (Def.'s Ex. 43.)

### E. AAJ Obtains Alternative Financing

Pursuant to the LCA, Wachovia provided an alternative financing proposal when it invoked the MAC. (Pls'. Ex. 37.) Wachovia offered a three-year bridge loan for up to $80.6 million with a floating interest rate. (*Id.*) AAJ declined this offer because it was not able to afford the terms. (Opp'n at 13.) As a result, AAJ sought alternative financing. (Def.'s Ex. 27.)

After soliciting several offers, AAJ entered into an LLC agreement with the Multi-Employer Property Trust ("MEPT") to purchase the building. (Pls. Ex. 74.) ███████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████

████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

[redacted]

### F. Wachovia Terminates the RLA

On November 16, 2007, Wachovia terminated the RLA. (Am. Compl. ¶ 91.) Then on December 3, 2007, Wachovia refunded AAJ's rate lock fee minus certain expenses, including breakage costs, appraisal fees, and legal fees. (*Id.* ¶ 95.) In total, Wachovia refunded $1,781,895 of AAJ's $1,810,000 rate lock fee and deposit. (Pls.' Ex. 67.) AAJ disputed Wachovia's deductions and sought further clarification. (Pls.' Ex. 128.)

On December 9, 2008, Wachovia sent AAJ a revised accounting of its deductions. (Notice of Filing [54], Dec. 9, 2008.) The revised accounting showed that the hedge breakage loss calculation was $62,504, not $10,005 as originally calculated. (*Id.*) As a result, Wachovia refunded AAJ over $50,000 more than it should have.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party's evidence is to be believed, and all reasonable inferences from the record are to be drawn in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). It is not enough, however, for the non-moving party to show that there is "*some* factual dispute." *Id.* at

247. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## III. ANALYSIS

Affording AAJ all reasonable inferences from the record, the Court finds that there are genuine issues of material fact as to whether Wachovia breached the LCA and as to whether AAJ suffered damages as a result of the alleged breach. There is no genuine issue of material fact, however, as to whether Wachovia provided a sufficient accounting of the RLA breakage costs. Accordingly, Wachovia's motion shall be granted in part and denied in part.

### A. There Are Genuine Issues of Material Fact as to Whether Wachovia Breached the LCA

#### 1. *Wachovia Has the Burden to Prove That a MAC Occurred*

This Circuit has not yet addressed the question of whether a party invoking a MAC clause has the burden to prove that a MAC occurred or whether the party challenging the use of a MAC clause has the burden to prove that a MAC did not occur. In deciding this question of first impression, this Court agrees with AAJ and the Delaware Chancery Court, and concludes that the party invoking the MAC clause has the burden to prove that a MAC occurred. *See Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715 (Del. Ch. 2008)

In *Hexion*, the court stated that "absent clear language to the contrary, the burden of proof with respect to material adverse effect rests on the party seeking to excuse its performance under the contract." *Id.* at 739. Wachovia attempts to distinguish this case from *Hexion* because the party invoking the MAC was a plaintiff in a declaratory judgment action, and "a plaintiff in a declaratory judgment action should always have the burden of going forward." *Id.* The court in

*Hexion*, however, did not place the burden on the plaintiff because it was a declaratory judgment action. Rather, the court placed the burden on the party asserting the existence of a MAC because MAC clauses are "*sui generis* among their contract clause brethren." *Id.* Indeed, the court only noted that the plaintiff has the burden of going forward in a declaratory judgment action as further justification for its holding. *Id.*

Wachovia also argues *Hexion* does not apply because the non-occurrence of a MAC is a condition precedent to the LCA on which AAJ has the burden of proof at trial. *See Banze v. American Internat'l Exports, Inc.*, 454 A.2d 816, 817 (D.C. 1983) (stating that the plaintiff has the burden to prove all elements in an action for breach of contract); *see also Heights Driving Sch. v. Top Driver*, 51 Fed. App'x 932, 937 n.3 (6th Cir. 2002) (noting that a plaintiff generally bears the burden of proof with respect to conditions precedent). The court in *Hexion*, however, rejected this argument. Because MAC clauses are *sui generis*, the burden of proof is not determined by the form in which the MAC clause is drafted. *Hexion*, 965 A.2d at 739.

Accordingly, the Court concludes that Wachovia, as the party seeking to excuse its performance under the contract because of a MAC, has the burden to prove that a MAC occurred.

### 2. The MAC Clause is Ambiguous

The Court finds that the MAC clause is ambiguous. Whether a contract clause is ambiguous is a question of law for the court. *Holland v. Hannan*, 456 A.2d 807, 814-15 (D.C. 1983). A contract clause is only ambiguous if it is "reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings." *Burbridge v. Howard Univ.*, 305 A.2d 245, 257 (D.C. 1973). "If there is more than one interpretation that a reasonable person could ascribe to the contract, while viewing the contract in context of the circumstances

surrounding its making, the contract is ambiguous." *Wash. Metro. Area Transit Auth. v. Quik Serve Foods, Inc.*, No. 04-838, 2006 U.S. Dist. LEXIS 24510, at *11 (D.D.C. 2006) (Lamberth, J.) (citing *Morgan v. American Univ.*, 534 A.2d 323, 330 (D.C. 1987)). If the Court finds a contract clause is ambiguous, the choice among reasonable interpretations is for the fact-finder. *Id.*

The MAC clause provides that Wachovia may terminate the LCA if there is "material adverse change in the capital, banking and financial market conditions that could impair the sale of the loan by Lender as contemplated in the term sheet." (Pls.' Ex. 33 § 1.15(d).) The MAC clause is clear that Wachovia may terminate the loan if a MAC could impair the sale of the loan. What constitutes a MAC, however, is ambiguous because there is more than one interpretation that a reasonable person could give to the MAC clause, when viewing the contract in the context and circumstances surrounding the agreement. On the one hand, a reasonable fact-finder could conclude that a MAC, as Wachovia suggests, is any meaningful or significant change in the market conditions, whether foreseeable or not. (Mem. at 12.) Indeed, it is reasonable that Wachovia inserted the clause in the contract because they foresaw a potential significant change in the CMBS market. (Reply at 6-7.) It is also reasonable that Wachovia's assurance that it would only invoke the MAC in the event of a 9/11 type event referred only to the magnitude of the event, not its unforeseeability. (*Id.* at 7.)

On the other hand, a reasonable fact-finder could conclude, as AAJ suggests, that a MAC is only an unforeseeable change in the market conditions. (Opp'n at 19-22.) This interpretation is reasonable in the context of the parties' agreement because parties often include MAC clauses to protect against unknown, not known, events. *See Hexion*, 965 A.2d at 738. Here, Wachovia

was aware that the CMBS market was experiencing turbulence, and AAJ purchased the RLA to protect against the known risk of increased rate spreads. Moreover, a reasonable fact-finder could conclude that Wachovia's assurance that it would only invoke the MAC clause in the event of a 9/11 type event referred to the unforeseeability of the event. (Pls.' Ex. 90.)

Accordingly, the Court concludes that the MAC clause is ambiguous, and it is for the fact-finder to decide whether a MAC is any meaningful or significant adverse change, or whether a MAC is an unforeseeable adverse change. Because the contract is ambiguous, the parties may use extrinsic evidence to interpret the meaning of a MAC. *See Kelley v. Broadmoor Coop. Apts.*, 676 A.2d 453, 458 (D.C. 1996) (explaining that extrinsic evidence may not be used to interpret the contract only where the contract is unambiguous).

### 3. *There Is A Genuine Issue of Material Fact as to Whether the Events After the Execution of the LCA Were Unforeseeable*

If the fact-finder determines that the MAC clause applies only to unforeseeable events, there is a genuine issue of material fact as to whether the events after the execution of the LCA were unforeseeable. In the beginning of 2007, there were numerous signs that the CMBS market was experiencing turbulence, and the CMBS spreads began to increase. (*See, e.g.*, Pls.' Exs. 5, 21, 40, 41, 60.) As a result, AAJ entered into the RLA with Wachovia to guard against further increases in the CMBS spreads. (Pls.' Ex. 16.) The parties then negotiated and executed the LCA.

Following the execution of the LCA, the CMBS spreads continued to increase. (Def.'s Ex. 9.) As a result, on October 22, 2007, Wachovia terminated the LCA pursuant to its MAC clause. (Pls. Ex. 36.) Despite terminating the LCA in October, Wachovia securitized a different

11

CMBS loan on November 13, 2007, and CMBS securitizations occurred in early 2008 before ceasing entirely. (Def.'s Exs. 19, 43.)

In viewing these facts, a reasonable fact-finder could conclude that the further increases in the CMBS spreads were foreseeable to Wachovia and that AAJ allocated the risk of increased spreads to Wachovia through the RLA. Indeed, as a leader in the CMBS market, Wachovia was in the excellent position to foresee changes in the CMBS market. A reasonable fact-finder, however, could also conclude that the increase in spreads between the execution and termination of the LCA was so drastic that it was unforeseeable, even to a market leader like Wachovia. Accordingly, there is a genuine issue of material fact as to whether the increase in CMBS spreads after the execution of the LCA was foreseeable.

### 4. *There Is a Genuine Issue of Material Fact as to Whether a MAC Could Impair the Sale of the Loan*

Even if the fact-finder concludes that the MAC clause applies to unforeseeable events, and even if the MAC clause were unambiguous, the Court finds that a genuine issue of material fact remains as to whether a MAC could impair the sale of the loan. The parties dispute whether the changes in the capital markets in the summer and fall of 2007 could have impaired the sale of the loan. AAJ argues that the changes in the capital markets between June and December could not have impaired the sale of the loan, and Wachovia contends that the changes in the capital markets could have impaired the sale of the loan.

AAJ's expert contends that in June 2007 Wachovia could only have securitized the loan in part, and not as a whole, and that in December 2007 Wachovia was still able to securitize the loan in part. (Pls.' Ex. 77.) Indeed, lenders securitized loans into early 2008. (Def.'s Ex. 43.)

As a result, AAJ maintains that the market changes could not have impaired the loan because Wachovia's options with respect to the loan were no different in December than in June. (Pls. Ex. 77.)

Wachovia contends that it is irrelevant whether Wachovia could have securitized the loan in June because the loan was set to close in December. (Mem. at 17-18.) Even if Wachovia were unable to securitize the loan in June due to the market conditions, Wachovia may have anticipated that the market would improve prior to closing, or funded the loan at a loss. (*Id.* at 18.) The market conditions of June, however, did not merely persist. They worsened and further impaired Wachovia's ability to sell the loan. (Def.'s Ex. 9.) According to Wachovia, this impairment was such that it could not have sold the loan as contemplated in the Term Sheet in December 2007. (Reply at 13-14.) Indeed, because of the change in the CMBS market, Wachovia's last CMBS securitization occurred on November 13, 2007. (Def.'s Ex. 19.)

In addition, Wachovia contends that even if only a portion of the loan were salable in June, the changes in the market could have impaired the sale of that portion of the loan in December. (Mem. at 21.) For example, if Wachovia were unable to sell the portion of the loan in December, or sold a portion of the loan for a *de minimis* amount, the loan could have been impaired. (Def.'s Ex. 19.)

Wachovia, however, offers no evidence to support that it could not have sold the loan in part, or that it would have sold the loan for a *de minimis* amount. Indeed, Wachovia contends that such evidence is unnecessary because the LCA only requires that a MAC "could impair the sale of the loan." (Reply at 14.) Simply stating that the changes in the markets could have impaired the sale of the loan, however, is insufficient to entitle Wachovia summary judgment.

13

Wachovia must make some tangible showing as to how the sale of the loan, in whole or in part, could have been impaired.[2]

Affording all reasonable inferences in AAJ's favor, a reasonable fact-finder could conclude that the changes that occurred between the execution and termination of the LCA, even if material, could not have impaired the sale of the loan. Accordingly, the Court concludes that there is a genuine issue of material fact as to whether a MAC could have impaired the sale of the loan.

**B.  There Is A Genuine Issue of Material Fact as to Whether AAJ Suffered Damages**

Wachovia argues that there is no genuine issue of material fact as to whether AAJ suffered damages because the opinions of AAJ's damages expert are inadmissible. In the alternative, AAJ's alleged damages are not recoverable as a matter of law. In a separate Memorandum Opinion issued this date, the Court concludes that the opinions of AAJ's damages expert are admissible. Accordingly, the only question is whether AAJ's alleged damages are recoverable as a matter of law.

*1.  Legal Standard*

In a breach of contract action to lend money, there are two potential measures of damages. One measure is the difference in value between the contract interest rate and the rate available at the time of the breach. *See St. Paul at Chase Corp. v. Mfrs. Life. Ins. Co.*, 278 A.2d 12, 35-36 (Md. 1971). The other measure, which is the measure generally followed, is that the

---

[2] Wachovia's experts only state that the increase in spreads could have impaired the sale of the loan. (*See* Def.'s Exs. 9 at 16, 10.) They do not offer an opinion on whether the loan could have been sold in its entirety or in part, nor do they offer an explanation as to how a partial sale in December would differ from a sale in June. (*Id.*)

breaching party is liable for any damages that were foreseeable to it at the time the parties executed the contract. *Id.*

Contrary to Wachovia's argument, "the basic measure of damages for a frustrated purchaser of real property" is not applicable to this case. (Mem. at 26.) In a breach of contract action for the sale of real property, the measure of damages is the "difference between the sales contract price and the fair market value of the property at the time that the property should have been conveyed." *Basiliko v. Pargo Corp.*, 532 A.2d 1346, 1348 (D.C. 1987). Here, AAJ seeks to recover for a breach of contract to lend money, not a contract for the sale of real property. Accordingly, the Court concludes that *Basiliko* does not apply to this case. The proper measures of damages are the difference between the contract interest rate and the rate available at breach and any damages that were foreseeable at the time of the contract was executed.

### 2. *Equity Value*

Wachovia challenges AAJ's equity value damages calculation on three grounds: (a) that D.C. law bars recovery of damages for equity gain; (b) that AAJ's equity value calculation is speculative; and (c) that AAJ cannot recover equity value damages for a period greater than ten years.

#### a. *D.C. Law Does Not Bar Recovery Damages for Equity Gain*

Wachovia argues that damages are for equity gain are barred by D.C. Law. *See Basiliko*, 532 A.2d at 1348 (stating that D.C. has "squarely rejected the availability of damages for the lost profit of anticipated resale"); *see also Quick v. Pointer*, 186 F.2d 355, 355 (D.C. Cir. 1950) (holding that damages in contracts for real property are measured by the difference between the contract price and the fair market value of the property); *Wolf v. Cohen*, 379 F.2d 477, 479 (D.C.

15

1967) (reiterating the holding of *Quick*). *Basiliko*, *Quick*, and *Wolf*, however, are not applicable to the case at hand. Unlike in *Basiliko*, *Quick*, and *Wolf*, this is an action for breach of contract to lend money, not an action for breach of contract for the sale of real property. Thus, Wachovia is liable for any damages that were foreseeable at the time the parties entered into the contract.

Here, it was foreseeable that the building would appreciate during the period AAJ planned to own the building. As the sole owner of the building, AAJ would have received all of the benefits of an increase in value. Under the MEPT deal, however, AAJ does not receive all of the benefits of the property's equity gain. Accordingly, under D.C. law, AAJ may recover the difference in the value it would have received under the Wachovia deal and the value it received under the MEPT deal, provided the damages were foreseeable at the time the parties executed the LCA.

### b.   *AAJ's Equity Gain Damages Are Not Barred as Speculative*

Wachovia next argues that AAJ's equity gain damages should be barred as speculative. Damages for lost profits are not appropriate where the award would be based on a speculative estimate of lost profits. *Vector Realty Group, Inc. v. 711 Fourteenth Street, Inc.*, 659 A.2d 230, 234 (D.C. 1994). In a separate Memorandum Opinion, the Court concludes that AAJ's equity value calculations are sufficiently reliable, and not mere speculation or guesswork. (*See* Mem. Den. Wachovia's Mot. to Exclude the Expert Test. of Gregory Leisch, at 9-13.) Accordingly, the Court finds that AAJ's equity gain damages are not barred as speculative. Wachovia's concerns properly go to the weight the fact-finder should afford AAJ's equity gain calculation, not its admissibility.

### c. *AAJ's Damages Are Not Limited to the Ten-Year Term of the Contract*

Wachovia contends that AAJ's damage calculation cannot exceed the term of the contract. In a breach of contract action, "damages . . . are intended to give the [injured party] the benefit of his bargain by . . . put[ting] him in as good a position as he would have been in had the contract been performed." *Vector Realty*, 659 A.2d at 234 n.8 (quoting Restatement (Second) of Contracts § 347 cmt. a (1981)). In certain circumstances, damages are awarded beyond the term of the contract, provided the damages were foreseeable. *See, e.g., Sears, Roebuck & Co., v. Goudie*, 290 A.2d 826, 832-33 (D.C. 1972) (finding that the injured party could recover lost profits for the summer months because it was foreseeable to the breaching party that customers would not visit the injured party's business if the air conditioning system did not work properly).

Here, AAJ may be able to recover damages that exceed the term of the contract. The LCA was limited to a ten-year term. In year ten, it was foreseeable to Wachovia that AAJ would pay the balance of the loan in one of two ways: AAJ would either sell the building, or obtain new financing. Because it was foreseeable that AAJ may obtain new financing, it was foreseeable that the new financing would be for an additional ten years. Moreover, AAJ has demonstrated that it intended to occupy the building for at least twenty years. (*See* Pls.' Ex. 79.) Accordingly, a reasonable fact-finder could conclude that AAJ is entitled to damages beyond the term of the contract because it was foreseeable that AAJ would own the building beyond the term of the loan.

This holding is consistent with the Court's holding in its separate Memorandum Opinion addressing Wachovia's Motion to Exclude the Expert Testimony of Gregory Leisch. In that Memorandum, the Court found that Leisch's twenty year damage period was sufficiently reliable.

(*See* Mem. Den. Wachovia's Mot. to Exclude the Expert Test. of Gregory Leisch, at 10-11.)
Wachovia's criticisms of Leisch's assumptions, such as AAJ's ability to obtain a second ten-year interest-only loan, properly go to the weight of her report, and not its admissibility.

### 3. Occupancy Costs

The Court notes that AAJ does not dispute Wachovia's claim that AAJ has not suffered damages with respect to occupancy costs.

### 4. Tribute Rights

Wachovia argues that AAJ is not entitled to tribute rights damages because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and because tribute rights calculations are impermissibly speculative and unforeseeable. The Court rejects these arguments.

As Wachovia concedes, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. AAJ argues that it could have obtained ▮▮▮▮ for the building's *naming rights*. Thus, there is a genuine material fact in dispute as to whether AAJ could have obtained additional donations for the naming rights of the building.



In addition, the Court has already found that AAJ's tribute rights calculation is not impermissibly speculative. (*See* Mem. Den. Wachovia's Mot. to Exclude the Expert Test. of Gregory Leisch, at 14-15.) Wachovia's criticisms of AAJ's tribute rights calculation properly go to the weight the jury should afford AAJ's calculation, not its admissibility.

Last, the Court finds that AAJ could recover for lost tribute rights because a reasonable fact-finder could conclude that tribute rights were foreseeable. First, it was foreseeable to Wachovia that under its deal with AAJ, AAJ would be the sole owner the building and would enjoy numerous rights. It is for the fact-finder to determine whether one of those rights was the

right to sell the tribute or naming rights to the building. Second, it was foreseeable that AAJ, a non-profit organization, would solicit donations for tribute rights.

Accordingly, the Court concludes that there is a genuine issue of material fact as to whether AAJ is entitled to recover for lost tribute rights donations.

## C. There Is No Genuine Issue of Material Fact as to Whether Wachovia Provided a Sufficient Accounting of the RLA Breakage Costs

The RLA provides that "Wachovia shall provide Borrowers with a statement setting forth its determination of Breakage Costs." (Def.'s Ex. 2.) Wachovia's breakage cost calculation must be made in good faith using a methodology that it finds appropriate. (*Id.*)

Wachovia has provided AAJ with a good faith breakage cost calculation using a methodology that it deemed appropriate. Wachovia corrected the deficiencies in its initial accounting and provided a revised calculation on December 9, 2008. (Notice of Filing [54], Dec. 9, 2009.) In addition, Wachovia has provided AAJ with native spreadsheets, the underlying calculations of the original and updated accounting statements, materials supporting the underlying calculations, and a deposition of the employee responsible for the breakage loss calculation. (*See* Def.'s Exs. 32, 58, 59.)

AAJ has not produced any evidence to suggest that Wachovia's calculations were made in bad faith. Moreover, AAJ has not provided an alternative calculation of breakage costs using the methodology employed by Wachovia. Indeed, AAJ must make some showing that it is entitled to recover some amount to survive Wachovia's motion for summary judgment with respect to AAJ's accounting claim.

Accordingly, the Court concludes that there is no genuine issue of material fact as to

whether Wachovia provided a sufficient accounting of the RLA breakage costs.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part Wachovia's motion for summary judgment. A separate order shall issue this date.

___12/8/2009___  
DATE

___/s/___  
ROYCE C. LAMBERTH  
CHIEF JUDGE